**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

TAMERLANE, LIMITED,
a limited partnership,
704 G East Main Street
Moorestown, New Jersey 08057

and

PARK TERRACE LIMITED,
a limited partnership,
P.O. Box #264
511 Grove Ave.
Mohnton, PA 19540

and

PARK TERRACE EAST LIMITED,
a limited partnership,
P.O. Box #264
511 Grove Ave.
Mohnton, PA 19540

and

MULLICA WEST LIMITED,
a limited partnership,
704 G East Main Street
Moorestown, New Jersey 08057

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

05-677C

FILED
JUN 22 2005
U.S. COURT OF FEDERAL CLAIMS

**COMPLAINT FOR BREACH OF CONTRACT AND JUST COMPENSATION**

For their Complaint against the defendant United States of America, plaintiffs state and allege as follows:

## PRELIMINARY ALLEGATIONS

1. Each of the plaintiffs contracted with the United States of America ("the Government") for a loan to provide rental housing for low- and moderate-income persons ("the housing programs"). The Government entered into these contracts ("the contracts") with plaintiffs by and through its agency, the Farmers Home Administration, United States Department of Agriculture ("FmHA").

2. While the precise terms of these contracts vary, all of them permitted each contracting plaintiff to terminate its participation in the Government's housing programs "at the option" of plaintiff upon prepayment of each housing project's federally made or insured mortgage. Pursuant to the contracts, said optional termination rights could be exercised by plaintiffs "at any time" prior to the termination of the forty (40) or fifty (50) year terms of their contracts.

3. In 1992, Congress enacted legislation (the "1992 legislation") that purports to permanently repudiate the Government's contractual obligation to permit FmHA contract holders to terminate their contracts at any time at their option. As is alleged more fully below, plaintiffs contend in this action that the enactment of the 1992 legislation anticipatorily repudiates the contract between defendant and each of the plaintiffs. As is their right, plaintiffs have elected to treat the Government's anticipatory repudiation as a breach of contract as of the date of Government performance required by each contract, i.e., the date that each plaintiff would achieve its option of terminating its contract but for the Government's repudiation. Plaintiffs also allege that said legislation results in a taking of each plaintiff's property without just compensation.

4. In Franconia Associates, et al. v. United States, 61 Fed. Cl. 718 (2004), this Court ruled that the Government acted unlawfully and in breach of contract in refusing to allow FmHA contract holders to exercise their contractual rights of prepayment. That unlawful conduct and breach of contract by the Government extended to the present plaintiffs, and caused them financial injury. Plaintiffs seek to recover in this action the damages they have suffered and continue to suffer as a result of the breaches by the Government of plaintiffs' contracts and for just compensation for the taking of their properties.

**(Pre-1979 FmHA Contracts)**

5. In connection with the housing programs, the FmHA entered into contracts before December 21, 1979 ("the pre-1979 FmHA contracts") with housing owners under which the owners were contractually entitled to terminate their participation in the Government's housing program by exercising their option to prepay at any time. Such a prepayment would enable such plaintiffs to enter the real estate market and use or dispose of their property by either (i) raising the property's rents to commercial rates or (ii) selling the property for its commercial fair market value.

6. The 1992 legislation described below made permanent certain emergency interim measures repudiating the contractual right of pre-1979 FmHA contract holders to terminate their contracts at any time at their option.

**(Post-1979 FmHA Contracts)**

7. In connection with the housing programs, the FmHA entered into contracts on or after December 21, 1979 ("the post-1979 FmHA contracts") with housing owners under which the owners were contractually entitled to exercise their option to prepay at any time. However, by their terms the post-1979 FmHA contracts are subject to a twenty (20) year restrictive use clause. This clause is binding upon the owners and their successors in interest and

requires that the property be operated as low-rent housing for a period of twenty (20) years from the date of loan origination.

8. Accordingly, if a holder of a post-1979 FmHA contract intends to terminate its contract and raise its property's rents to commercial rates, it must wait until on or after the end of the twenty (20) year period from the origination date of its mortgage loan to do so. Alternatively, if the holder of such a contract intends to terminate its contract and sell its property to a third party who will retain low rents for the remainder of the twenty (20) year period commencing upon loan origination, such a contract holder is contractually entitled to exercise its termination right and to enter the real estate market at any time.

9. The 1992 legislation, described below, extended to post-1979 FmHA contract holders the interim measures that had repudiated the contractual termination right of pre-1979 FmHA contract holders, and made such measures permanent.

## THE PARTIES

### (Parties Plaintiff)

10. Each of the plaintiffs is a limited partnership which entered into a contract with FmHA for a loan to provide rental housing for low- and moderate-income residents meeting Government eligibility standards.

### Rule 20(a) List

11. Pursuant to Rule 20(a) of the Rules of the Court of Federal Claims, the following comprises an alphabetized, numbered list of all said plaintiffs, together with a summary of their FmHA contracts:

1. Tamerlane, Limited, a limited partnership organized and existing under the laws of New Jersey having an address at 704 G East Main Street, Moorestown, New Jersey 08057, entered into one contract for one post-1979 loan for rental housing at the

Tamerlane Apartments, Sicklerville, New Jersey, consisting of one hundred sixty (160) units. A formal request to prepay was made in December 2000, after the 20 year use restriction expired. Thereafter, in the face of actual or constructive denial of the request to prepay, Tamerlane accepted "incentives" in the form of government approval to get $1 million in conventional financing so as to make a partial distribution of capital back to the partners; at the same time, the Government deducted a purported charge of $400,000 for deferred maintenance, eliminating much of the financial benefit of the "incentive."

2. Park Terrace Limited, a limited partnership organized and existing under the laws of Pennsylvania having an address at P.O. Box #264, 511 Grove Ave., Mohnton, Pennsylvania 19540, entered into one contract for a pre-1979 loan for rental housing at Park Terrace Apartments Phase I, consisting of forty-five (45) units. In or about 1992, the Government, aware that contractually the partnership had the unfettered right to prepay its loan, informed the partnership that notwithstanding its unfettered right to prepay the FmHA would never approve prepayment, and urged the partnership that it should settle for "incentives." The partnership, under duress and otherwise by reason of the wrongdoing of the Government, accepted "incentives" and obligated itself to a 20 year period in which it agreed not to take the project out of the program.

3. Park Terrace East Limited, a limited partnership organized and existing under the laws of Pennsylvania having an address at P.O. Box #264, 511 Grove Ave., Mohnton, Pennsylvania 19540, entered into one contract for a post-1979 loan for rental housing at Park Terrace Apartments Phase II, consisting of forty-five (45) units. The twenty year restriction on prepayment expired in or about 2000.

4. Mullica West Limited, a limited partnership organized and existing under the laws of New Jersey having an address at 704 G East Main Street, Moorestown, New

Jersey 08057, entered into one contract for a pre-1979 loan for rental housing at Mullica West, Mullica Hill, New Jersey, having 168 units. In 1991, the Government, aware that contractually the partnership had the unfettered right to prepay its loan, informed the partnership that notwithstanding its unfettered right to prepay the FmHA would never approve prepayment, and urged the partnership that it should settle for "incentives." The partnership, under duress and otherwise by reason of the wrongdoing of the Government, accepted "incentives" and obligated itself to a 20 year period in which it agreed not to take the project out of the program.

**(Party Defendant)**

12. FmHA is an agency of the defendant. At all times relevant to the allegations in this Complaint, FmHA and its respective officials and employees were acting as agents of the defendant. Pursuant to the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994, Pub. L. No. 103-354, § 233, 108 Stat. 3178 (1994), the Secretary of the Department of Agriculture was authorized to establish a successor agency to FmHA known as Rural Housing and Community Development Services ("RHCDS"). Effective January 30, 1996, RHCDS changed its name to Rural Housing Service ("RHS"). (Agency Name Change, 61 Fed. Reg. 2899 (1996).) RHS is itself part of the area within the Department of Agriculture known as "Rural Development." As used herein, "FmHA" shall refer to Farmers Home Administration or its successor agencies, as appropriate.

13. An actual controversy exists between the parties.

**JURISDICTION**

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U. S. C. § 1491.

## BACKGROUND

15. Prior to the 1960s, Congress sought to provide low-income housing primarily by subsidizing projects developed, owned, and managed by local government public housing authorities. During the 1960s and the 1970s, Congress changed its approach and enacted legislation to encourage private developers to construct, own, and manage large numbers of federally assisted housing units for low- and moderate-income residents.

16. In furtherance of this changed approach, Congress authorized FmHA to make or insure loans to private entities in order to stimulate the private development of federally assisted housing for low- and moderate-income and elderly residents in rural areas of the United States. Congress began this program in 1962 by adding Section 515 to the Housing Act of 1949 (Pub. L. No. 87-723, § 4(b), 76 Stat. 671 (1962)) and expanded its scope in 1968 by adding Section 521 to that Act (Pub. L. No. 90-448, Tit. X, § 1001, 82 Stat. 551 (1968))(now codified at 42 U.S.C. §§ 1485 and 1490a, respectively). Housing projects subject to Sections 515 and/or 521 of the Housing Act of 1949 are referred to herein as "FmHA projects."

17. Each of the plaintiffs agreed, under Sections 515 and/or 521 of the Housing Act of 1949, as amended, 42 U.S.C. §§ 1485 and 1490a, to construct, rehabilitate, or improve housing projects and to enter into Loan Agreements with FmHA. The Loan Agreements, inter alia, imposed significant obligations on plaintiffs regarding the tenants to whom plaintiffs could rent, the rents they could charge, the profits they could receive, and the maintenance and financial operation of each project ("the low income affordability restrictions").

18. Contemporaneous with the execution of the Loan Agreement, and referenced therein, each plaintiff executed, inter alia, a Promissory Note and Real Estate Mortgage. In executing the Promissory Note, each plaintiff promised to pay to the order of the Government, in scheduled installments, the entire principal due pursuant to the Loan Agreement, together with interest at a specified rate. The Promissory Note provided, inter alia,

"Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."

19. By signing the Loan Agreements and the Promissory Notes referenced therein, plaintiffs promised, inter alia, (i) to construct and maintain housing in accordance with FmHA's specifications; (ii) to use their FmHA projects for the purpose of housing people eligible for occupancy as provided by Section 515 and appropriate FmHA regulations; (iii) to charge rents no higher than those permitted by FmHA; (iv) to make timely payments on their mortgages; and (v) to maintain certain cash reserves. In exchange, the Government agreed to allow plaintiffs to free themselves of FmHA's regulatory strictures in accordance with the contractual provisions of the Promissory Notes subject to FmHA's present regulations and to its future regulations not inconsistent with the express provisions of the Notes.

20. The Loan Agreements obligate the plaintiffs to operate their housing projects in accordance with FmHA regulatory strictures only so long as plaintiffs' indebtedness and other obligations under the Promissory Note, Real Estate Mortgage, and any related agreement remain unsatisfied. Thus, a plaintiffs obligation under the Loan Agreement to operate its housing project in accordance with FmHA regulations expires upon that plaintiffs prepayment in full of its indebtedness and satisfaction of any related obligations.

21. Consistent with the language of the Promissory Note, FmHA regulations codified at, inter alia, parts 1865, 1866, and 1965, implementing Section 502 of the Housing Act of 1949, 42 U.S.C. § 1472, permitted plaintiffs to prepay their mortgages at any time at their option, so long as they and their successors in interest continued to comply with the restrictive-use clause, if any, contained in the Real Estate Mortgage.

22. Accordingly, plaintiffs were entitled under their Loan Agreements with FmHA, FmHA's regulations, and their respective Promissory Notes to terminate their contracts

by prepaying their mortgages at any time at their option to enable them to enter the real estate market and maximize their return on investment.

23. Notwithstanding plaintiffs' contractual right to terminate their participation in the Government's housing programs, the Government permanently repudiated its obligation to recognize plaintiffs' right by enacting the 1992 legislation described more fully below.

## CONGRESSIONAL ACTIONS

### The 1988 Legislation

24. On February 5, 1988, Congress imposed emergency interim measures repudiating the right of pre-1979 FmHA contract holders to exercise their contractual termination right at any time at their option by enacting Title II of the Housing and Community Development Act of 1987. (Pub. L. No. 100-242, 101 Stat. 1877 (1988), cited as the Emergency Low Income Housing Preservation Act of 1987 (codified as amended at 42 U.S.C. § 1472(c) and 12 U.S.C. § 1715l note) ("the 1988 legislation" or "EMPA").) Congress made certain findings in the 1988 legislation, including but not limited to the following:

(i) some 150,000 units of rural low income housing financed under section 515 of the Housing Act of 1949 [i.e. FmHA housing units] are threatened with loss as a result of the prepayment of mortgages by owners;

(ii) the loss of this privately owned and federally assisted housing would occur in a period of sharply rising rents on unassisted housing and extremely low production of additional low rent housing;

(iii) a major review of alternative responses to this threatened loss of affordable housing is now being undertaken by numerous private sector task forces as well as State and local organizations;

(iv) until the Congress can act on recommendations that will emerge from this review, interim measures are needed to avoid the irreplaceable loss of low income housing and irrevocable displacement of current tenants.

The 1988 legislation, Section 202(a) (emphasis supplied).

**(The 1988 Legislation's Interim Measures For Pre-1979 FmHA Contracts)**

25. Congress estimated that a large portion of the 367,000 units owned by both pre- 1979 and post-1979 loan holders and originating between 1963 and 1985 were vulnerable to being prepaid during the few years following 1988. However, post-1979 FmHA loan-holders, which, unlike pre-1979 loan holders, already were contractually required to maintain their projects as low- and moderate-income housing for twenty (20) years, were the subject of continuing reviews of alternative responses to the perceived imminent loss of affordable housing. Thus, until such time as Congress could act on recommendations and devise a permanent solution for all FmHA loans, the 1988 legislation temporarily confined itself to dealing only with the pre-1979 FmHA loans, i.e., those FmHA loans originating from 1963 to 1979.

26. The 1988 legislation constituted an interim measure designed to temporarily place the pre-1979 FmHA contract holders "on the same playing field" as the post-1979 FmHA contract holders already subject to a restrictive-use clause. For example, a pre-1979 FmHA contract holder could avoid an immediate forced sale of its project by agreeing to extend

its low-income use for a period of not less than twenty (20) years from the date of loan origination. The 1988 Legislation, Section 241.

27. Although denominated as an "interim measure," the 1988 legislation specifically amended existing law -- Section 502(c) of the Housing Act of 1949 -- and did not contain a sunset provision. Congress did not revisit this issue and devise a permanent response for all FmHA loans, including those post-1979 loans with contractual termination rights, until 1992.

28. Consistent with the provisions of existing post-1979 FmHA contracts containing restrictive-use clauses, the interim measures of the 1988 legislation temporarily recognized the contractual right of post- 1979 FmHA loan holders to terminate their contracts by prepaying their loans at any time at their option provided that the projects were maintained as low- and moderate-income housing for a period of fifteen (15) or twenty (20) years from the date of loan origination.

29. Contrary to the provisions of pre-1979 FmHA contracts, the interim measures of the 1988 legislation repudiated the contractual right of said contract holders to terminate their contracts at any time at their option. The 1988 Legislation, Section 241.

**The 1992 Legislation**

30. On October 28, 1992, Congress amended Section 502(c) of the Housing Act of 1949 by enacting the Housing and Community Development Act of 1992 (Pub. L. No. 102-550, § 2 & Tit. VII, § 712, 106 Stat. 3681, 3841 (1992) (codified in relevant part at 42 U.S.C. § 1472(c)) ("the 1992 legislation or Title VII").) This amendment eliminated the interim measure status of the 1988 legislation's emergency provisions repudiating the contractual right of pre-1979 FmHA loan holders to terminate their contracts at any time at their option.

31. In addition to making permanent the temporary repudiation of the contractual termination rights of pre-1979 FmHA loan holders, the 1992 legislation extended said repudiation to those post-1979 FmHA loan holders with the same contractual rights. (42 U.S.C. § 1472(c)(4)(A), as amended.) Thus, the 1992 legislation, signed into law by the President on November 2, 1992, together with implementing regulations, repudiates the contractual termination right of any FmHA loan holder who chooses to terminate its contract.

32. Pursuant to the 1992 legislation, holders of both pre-1979 and post-1979 FmHA contracts are permitted to terminate their contracts by prepaying their loans only in accordance with specified, non-contractual restrictions, including but not limited to the requirement that, before accepting any offer to prepay, the Secretary must make reasonable efforts to enter into an agreement to extend the low-income use of FmHA projects for not less than a period of twenty (20) years beginning on the date the agreement is executed. The 1992 Legislation, Section 712, 42 U.S.C. § 1472(c)(4)(A).

33. The 1992 legislation authorizes FmHA, subject to various conditions and at its discretion, to offer limited, specified "incentives" to holders of FmHA contracts which, along with the threat of the forced property sales discussed below, are designed to induce said contract holders to extend the low-income use of their projects. In general, the "incentives" allowed owners whose projects satisfied various guidelines to apply for: (i) increases in the rate of return on investment; (ii) reductions of the interest rate on the mortgage loan; (iii) additional rental assistance; and (iv) an equity loan. 42 U.S.C. § 1472(c)(4)(B).

34. The appraisal guidelines used by FmHA to determine "incentives" are inconsistent with standard appraisal guidelines and result in value determinations below fair market value.

35. For those FmHA project owners unwilling or unable to extend their participation in the Government's housing programs by acquiescing to the "incentives" outlined above, the 1992 legislation provides for forced sales of said owners' properties to nonprofit organizations or public agencies approved by FmHA which are required to maintain the projects as low income housing, subject to FmHA's approval of financial assistance to the prospective purchasers. Under the lengthy, cumbersome, and costly procedures required, such owners are required to offer their properties for sale to such purchasers for an extended period without receiving "incentives" or any other compensation. 42 U.S.C. § 1472(c)(5)(A)-(F).

36. Such forced sale proceedings can be avoided only if (i) the FmHA project owner agrees to continue to operate its project as low-income housing for a period determined by the Secretary, but not less than twenty (20) years from the date of loan origination, and to subject itself to the forced sale proceeding at the end of that period; or (ii) if the Secretary determines that housing opportunities for minorities will not be materially affected as a result of the prepayment and that either (a) tenants will not be displaced or (b) there is an adequate supply of affordable rental housing within the market area of the housing that is assured of being made available to all current tenants. 42 U.S.C. § 1472(c)(5)(G).

**Material Terms**

37. Plaintiffs' contractual right to terminate their contracts at any time at their option was a material term of their contracts. In the absence of this contractual termination right, plaintiffs would not have entered into their contracts with FmHA. But for the 1992 legislation permanently repudiating plaintiffs' contractual termination right, plaintiffs would achieve their option of terminating their contracts on those dates that would maximize their investment return on their properties, or on such other dates as they deem appropriate given their individual circumstances.

38. Plaintiffs have complied fully and in good faith in all material respects with the terms and conditions of their contracts, and have otherwise fully performed their undertakings in connection therewith.

**THE IMPACT OF THE 1992 LEGISLATION UPON PLAINTIFFS**

39. The statutory scheme under the 1992 legislation and FmHA's implementing regulations repudiate the contractual right of FmHA project owners to terminate their contracts at any time at their option in part by (i) compelling them to extend the low-income use of their projects; and (ii) subjecting them to forced sales of their properties. The Government's repudiation does not constitute a failure to carry out any immediate duty of present performance unless and until the date of Government performance required by each contract arrives, i.e., the date that any FmHA contract holder would have achieved its option of terminating its contract but for the Government's repudiation. Thus, the Government's scheme constitutes an anticipatory repudiation of the contract termination rights of the plaintiffs.

40. The 1992 legislation complained of herein also results in a taking of the property of the plaintiffs for public use without just compensation. By requiring plaintiffs to house low-income tenants and to accept new low-income tenants, the Government has (i) conscripted plaintiffs' properties for public use; (ii) physically invaded or authorized others to physically invade plaintiffs' properties; and (iii) deprived plaintiffs of their distinct investment-backed expectations with regard to their properties, all without providing any just compensation.

**DAMAGES**

41. As a consequence of the Government's conduct, certain of the plaintiffs have submitted applications for prepayment and/or an offer of "incentives" from the Government. The Government has in every instance refused to accept prepayment from plaintiffs pursuant to the provisions of their contracts. Those plaintiffs have been compelled to

change their position to their detriment in reliance upon the Government's repudiation, including accepting "incentives" in lieu of a sale at fair market value. In light of the Government's repudiation, other plaintiffs have foregone submitting any prepayment application because of the futility of doing so.

42. As a consequence of the Government's conduct, certain of the plaintiffs have met with, or otherwise made inquiries of, FmHA officials regarding prepayment of their loans. Said Government officials have repeatedly represented to plaintiffs that prepayment will not be accepted, and/or that it is not worthwhile even to file a prepayment application. Further, Government officials who are in positions of authority, trust, and confidence with respect to plaintiffs have represented to plaintiffs that they do not have and never had a contractual right to prepayment, that their contracts were subject to all future regulatory changes, including prepayment prohibitions, and have made various other misrepresentations and misstatements of fact.

43. In addition, during the period of emergency interim measures described above, Government officials led certain plaintiffs to believe that permanent legal and/or regulatory changes currently under review would be made which would remove or significantly liberalize the temporary prepayment restrictions.

44. The "incentives" potentially provided by the 1992 legislation and implementing regulations fall overwhelmingly short of compensating plaintiffs for the damages they have suffered and will continue to suffer as a result of the Government's repudiation of its contracts with plaintiffs, and would not provide just compensation to plaintiffs for the taking of their property for public use.

45. FmHA has acted arbitrarily and capriciously and not in accordance with law by failing to promulgate regulations and appraisal guidelines that justly compensate plaintiffs for the damages they have suffered and for the taking of their property for public use.

46. As a result of the Government's repudiation of their contractual termination right, plaintiffs have been (i) deprived of their right to use or dispose of their property as they see fit; (ii) compelled to allow the Government to use or authorize others to purchase and use their property to fulfill the Government's undertaking to provide low cost rental housing to a segment of the public meeting Government eligibility standards; and (iii) required to continue to comply with the costly restrictions and obligations imposed upon them by their Loan Agreements.

47. But for the Government's conduct, plaintiffs would have terminated their contracts by prepaying their mortgage loans and (i) converting their properties into commercial housing in which they could obtain rents at market rates in excess of the rents chargeable to low- and moderate-income tenants under the Government's programs, and/or (ii) selling their properties to third parties. The Government has deprived and will deprive plaintiffs of earnings on the sales of their properties, or the value of the increased rents (and the relief from other burdens under the loans) they would receive, because its repudiation of plaintiffs' contractual termination right has prevented any prepayment, and consequently any sale, or increase in rentals (and the relief from other burdens under the loans), from taking place.

48. Plaintiffs have suffered other, additional damages, including without limitation (i) diminutions in the fair market value of their properties as a direct and proximate result of the Government's repudiation of plaintiffs' contractual termination right and the extended restrictions on the profitable use of their properties; (ii) the costs associated with continuing to operate under and comply with rules and regulations associated with the

Government's housing programs; and (iii) the lost opportunity costs associated with investment and business opportunities plaintiffs have been foreclosed from pursuing by virtue of their inability to exercise their contractual right to terminate their contracts at any time at their option.

**COUNT ONE**

**(Breach of Contract)**

49. Plaintiffs incorporate paragraphs 1 through 48 by reference as if fully set forth herein.

50. Defendant's 1992 legislation anticipatorily repudiated the contract between the defendant and each of the plaintiffs. The Government's anticipatory repudiation has deprived and will deprive each plaintiff of its contractual right to terminate its contract at any time at its option before the expiration date of its forty (40) or fifty (50) year contract term. The Government's anticipatory repudiation constitutes a breach of each plaintiff's contract as of the date of Government performance required by each contract, i.e., the date that each plaintiff would terminate its contract but for the Government's repudiation.

51. As a direct and proximate result of defendant's conduct, plaintiffs have been damaged in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and to enter the real estate market with their properties at any time at their option.

**COUNT TWO**

**(Just Compensation)**

52. Plaintiffs incorporate paragraphs 1 through 51 by reference as if fully set forth herein.

53. As of the date of Government performance required by each contract entered into between defendant and the plaintiffs, defendant's conduct constitutes a taking of plaintiffs' properties for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution.

54. Plaintiffs are entitled to just compensation for the taking of their properties in an amount which will be proven at trial. Plaintiffs are continuing to suffer injury and resulting damages each day that they are denied the ability to exercise their contractual termination right and to enter the real estate market with their properties at any time at their option.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for judgment as follows:

### As To Count One

1. That the Court award plaintiffs monetary relief for the damages suffered to date and for the damages plaintiffs continue to suffer as a result of defendant's breaches of plaintiffs' contracts, in an amount to be determined at trial.

### As To Count Two

2. That the Court award plaintiffs just compensation during the period during which plaintiffs' properties have been taken for public use by defendant, in an amount to be determined at trial.

### As To All Counts

3. That the Court award plaintiffs their attorneys' fees and expenses as allowed pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq., the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 USC. § 4654(c), and other applicable law.

4. That the Court award plaintiffs their costs and interest as allowed by law.

5. That the Court grant such other and further relief as the law and the evidence may justify and as the Court may deem and proper.

Respectfully submitted,

COZEN O'CONNOR

H. ROBERT FIEBACH, ESQUIRE
DAVID M. DORET, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-4166
Fax: (215) 665-2013
Attorneys for Plaintiffs,
Tamerlane, Limited, Park Terrace Limited, Park Terrace East Limited and Mullica West Limited

Dated: June 21, 2005

PHILA1\2265422\1 164980.000