**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

TAMERLANE, LIMITED,
a limited partnership,
704 G East Main Street
Moorestown, New Jersey 08057

and

PARK TERRACE LIMITED,
a limited partnership,
P.O. Box #264
511 Grove Ave.
Mohnton, PA 19540

and

PARK TERRACE EAST LIMITED,
a limited partnership,
P.O. Box #264
511 Grove Ave.
Mohnton, PA 19540

and

MULLICA WEST LIMITED,
a limited partnership,
704 G East Main Street
Moorestown, New Jersey 08057

Plaintiffs,

v.

UNITED STATES OF AMERICA,

Defendant.

No. 05-677C
(Judge Christine O.C. Miller)

**MEMORANDUM OF LAW OF RESPONDING PLAINTIFFS, PARK TERRACE LIMITED AND MULLICA WEST LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR <u>JUDGMENT ON THE PLEADINGS AS TO THESE PARTNERSHIPS</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..... iii

COUNTERSTATEMENT OF QUESTIONS PRESENTED ..... 1

COUNTERSTATEMENT OF THE CASE ..... 1

Background ..... 1

The Acceptance of "Incentives" ..... 3

The Government's Pending Motion ..... 4

ARGUMENT ..... 4

I. THE MOTION SHOULD BE DENIED IN ITS ENTIRETY, SINCE THE CLAIMS OF MULLICA AND PARK TERRACE ARE NOT BARRED BY THE STATUTE OF LIMITATIONS. ..... 6

A. The Motion Should Be Denied, Since On The Face Of The Pleadings There Is No Allegation Of A Meaningful Request For And Tender Of Prepayment And An Unequivocal Rejection By The Government -- All Of Which Is Needed To Trigger The Claims For Limitations Purposes. ..... 7

B. Notwithstanding The Government's Attempt To Cure Its Defective Motion By Attaching Documents Outside The Pleadings, The Motion Should Be Denied Since The Attached Documents Show Only A Pro Forma Request To Prepay Pursuant To The Process For Obtaining "Incentives. ..... 11

(1) Mullica Did Not Experience an Unequivocal Denial of the Putative October 11, 1988 "Prepayment" Request. ..... 11

(2) The Pro Forma Request to Prepay, Made as Part of the "Incentives" Process, Were Not Sufficient to Convert Repudiation into Breach and to Trigger Accrual. ..... 12

II. ALTERNATIVELY, THE MOTION SHOULD BE DENIED INSOFAR AS THE CLAIMANTS ASSERT CLAIMS FOR THE PERIOD AFTER THE PRESENT RESTRICTIONS EXPIRE BUT PRIOR TO THE END OF THE MORTGAGE TERM. ..... 19

CONCLUSION ........................................................................................................................ 21

APPENDIX

DECLARATION OF BART J. AXELROD, ON BEHALF OF PARK TERRACE LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS ........................................................................ 1

DECLARATION OF BART J. AXELROD, ON BEHALF OF MULLICA WEST LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS ........................................................................ 5

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES**

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) .......... *Passim*

Franconia Assocs. v. United States,
536 U.S. 129 (2002) .......... *Passim*

Franconia Assocs. v. United States,
61 Fed. Cl. 718 (2004) .......... *Passim*

Grass Valley Terrace v. United States,
69 Fed.Cl. 341 (2005) .......... *Passim*

Roehm v. Horst,
178 U.S. 1, 44 L. Ed. 953, 20 S. Ct. 780 (1900) .......... 10

**STATUTES**

12 U.S.C. § 17151 (2000) .......... 2

28 U.S.C. § 2501 .......... 7-8

42 U.S.C. § 1472(c) .......... 2

42 U.S.C. § 1485 (2000) .......... 1

Emergency Low Income Housing Preservation Act of 1987 .......... 2

Section 515 of the Housing Act of 1949 .......... 1-2

**OTHER AUTHORITIES**

Federal Practice and Procedure: Civil 3d ("Wright and Miller") § 1368, at 222 .......... 5

Federal Rule 12(c) .......... 5, 11, 15

Rule 12(c) of the Rules of the United States Court of Federal Claims .......... 5, 11

This memorandum of law is respectfully submitted by responding plaintiffs, Park Terrace Limited ("Park Terrace") and Mullica West Limited ("Mullica"), in opposition to defendant's motion for judgment on the pleadings, on the basis of the statute of limitations, with respect to the claims of these two partnerships.[1]

## COUNTERSTATEMENT OF QUESTIONS PRESENTED

1. May the Government be granted judgment on the pleadings under RCFC 12(c) as to two of the plaintiffs, Park Terrace and Mullica, based on the statute of limitations where (a) the Government must rely on documents outside the pleadings in order to establish that defense; and (b) notwithstanding the attempt of the Government to rely on documents outside the pleadings, Park Terrace and Mullica proffer facts sufficient to overcome the defense or to create a material issue for trial with respect to whether their claims accrued, as the Government contends, by reason of pro forma requests to prepay made to obtain "incentives."

2. Alternatively, may the Government be granted judgment on the pleadings under RCFC 12(c) as to two of the plaintiffs, Park Terrace and Mullica, where, as to claims for the period after the present loan restrictions expire but prior to the end of the mortgage term, the claims accrued only upon the filing of this suit.

## COUNTERSTATEMENT OF THE CASE

**Background**

This suit relates to loan transactions provided for under Section 515 of the Housing Act of 1949, later codified at 42 U.S.C. § 1485 (2000). The loan program was administered by the Farmers Home Administration ("FmHA"), a division of the Department of

---

1 This motion affects only two of the plaintiffs. As to the other plaintiffs, Park Terrace East and Tamerlane Limited, no statute of limitations defense has been raised.

Agriculture. The program, created in 1962, allowed the FmHA to make loans to property owners for the production of low income rural housing.

By 1979, many property owners were beginning to prepay their mortgages, as permitted by their agreements. Congress in 1987 enacted the Emergency Low Income Housing Preservation Act of 1987, codified as amended 42 U.S.C. § 1472(c) and 12 U.S.C. § 17151 (2000) ("ELIHPA"), which amended the Section 515 program by retroactively imposing restrictions on the prepayment of mortgages entered into before December 21, 1979 – effectively repudiating the prepayment provisions of those loan agreements.

Two plaintiffs assert claims which are the subject of the Government's motion. The first plaintiff, Park Terrace, a limited partnership organized and existing under the laws of Pennsylvania, entered into a pre-1979 loan (in 1978) for rental housing at Park Terrace Apartments Phase I, consisting of 45 units. As a pre-1979 loan, there was no limitation on pre-payment. The Government, aware that contractually the partnership had the right to prepay its loan, informed the partnership that notwithstanding its right to prepay its loan, the FmHA would never approve prepayment. Against the background of the repudiation by ELIHPA, the Government told the partnership it had no other option and urged the partnership that it should settle for "incentives." The partnership accepted "incentives," and thereby obligated itself to a 20 year period, through 2013, in which it agreed not to take the project out of the program. The Park Terrace loan by the Government will not be fully liquidated until the end of its term in 2043.

The second plaintiff, Mullica, a limited partnership organized and existing under the laws of New Jersey, entered into a pre-1979 loan (in 1978) for rental housing at Mullica West, Mullica Hill, New Jersey, having 168 units. The Government, aware that contractually the partnership had the right to prepay its loan, informed the partnership that notwithstanding its

right to prepay its loan, the FmHA would never approve prepayment. Against the background of the repudiation by ELHPA, the Government told the partnership it had no other option and urged the partnership that it should settle for "incentives." The partnership accepted "incentives," and thereby obligated itself to a 20 year period, through 2011, in which it agreed not to take the project out of the program. The Mullica loan by the Government will not be fully liquidated until the end of its term in 2036.

**The Acceptance of "Incentives"**

As reflected in the attached Axelrod Declarations, ((Appendix ("App.") 1-10)),[2] shortly after ELIHPA was enacted, the Government told the partnerships that pre-payment of their loans would never be permitted. FmHA told the partnerships that incentives would be their only viable option, and promulgated regulations to that effect. The partnerships took the Government at its word, and elected to seek "incentives" as their best and only option. Axelrod Declaration, ¶¶ 3-6.

To obtain incentives, a pro forma request for "prepayment" was required. The pro forma request was made by the partnerships as part of a specific loan approval and documentation process which the partnerships had to follow to get "incentives." As reflected in the Axelrod Declarations, ¶¶ 7-10, at no point in the process did the partnerships intend to declare the Government in breach, or elect to take action accruing claims against the Government. Rather, the partnerships' sole goal was to perfect receipt of incentives, and to follow the prescribed requirements to secure them. The requests for prepayment were pro forma requests pursuant to the Government's incentives process, not genuine elections sufficient to convert the Government's repudiation into actual breach and there was no tender of prepayment.

[2] Mr. Axelrod was the President of Bala Realty Advisors, Inc., a general partner of each responding plaintiff. A declaration is submitted for each responding plaintiff. Collectively, the declarations will be referred to as the "Axelrod Declarations," although reference will be made by partnership, i.e. "Axelrod Mullica Declaration," where the applicable facts differ.

Nor did the partnerships tender prepayment, although as part of the incentives process they submitted evidence of their ability to pay off the loan. Id. ¶ 10.

**The Government's Pending Motion**

The Government has raised the defense of the statute of limitations with respect to the claims of Park Terrace and Mullica, and now seeks to have their claims dismissed through a motion for judgment on the pleadings. The basis for the Government's motion is that Park Terrace and Mullica made prepayment requests as part of the process of taking "incentives." The Government all but admits that the pleadings themselves do not support its defense. This is reason enough to deny the pending motion.

The Government, apparently recognizing that infirmity, attaches to its motion for judgment on the pleadings an eight page appendix ("Gov. App.") purporting to reflect the respective requests of the partnerships, and their denials. However, even with the attachments, the Government's motion is based on tunnel vision. First, the Government fails to attach its March 30, 1989 letter (Axelrod Mullica Declaration, Ex. "A," App. 9-10) in response to Mullica's alleged October 11, 1988 request (Gov. App. 6) -- which if it was a denial at all did not constitute a final, unequivocal denial. Second, the partnerships in fact accepted "incentives," but the process -- which was orchestrated by the Government and which the Government informed the partnerships was their only option -- required a pro forma "prepayment" letter in order to secure the "incentives" which were the goal of the process in the first place. At no time did the partnerships intend to prepay or to elect to declare the Government in breach, nor did they tender funds to prepay. Consequently, the preconditions to the accrual of the claims never occurred.

For the reasons stated below, the Government's motion should be denied.

**ARGUMENT**

Rule 12(c) of the Rules of the United States Court of Federal Claims provides:

> **(c) Motion for Judgment on the Pleadings.**
> After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings. If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by RCFC 56.[3]

Motions for judgment on the pleadings under Federal Rule 12(c) are measured by a "fairly restrictive standard." 5C Wright & Miller, Federal Practice and Procedure: Civil 3d ("Wright and Miller") § 1368, at 222. Wright and Miller comment that:

> hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense. The importance of this policy has made federal judges unwilling to grant a motion under Rule 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law.

Id. at 222-23 (footnotes omitted). Moreover, in considering such a motion:

> the trial court is required to view the facts presented in the pleadings and the inferences to be drawn therefrom in the light most favorable to the nonmoving party . . . .

Id., at 227. A court should not dismiss a complaint under Rule 12(c) "unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him or her to relief under the governing substantive law." Id., § 1368 at 238, 244.[4]

---

3 RCFC 12(c) is substantively identical to Rule 12(c) of the Federal Rules of Civil Procedure.

4 The Government concedes that there exists a division of authority on whether the statute of limitations is of jurisdictional dimension as opposed to relating to the sufficiency of the claim, and all but concedes that the proper course of action is to consider the limitations issue as bearing on the merits of the claim. Defendant's Brief ("Brief") at 4, note 5. In Grass Valley Terrace, 69 Fed. Cl. 341 (2005), Chief Judge Damich considered the issue and concluded the statute of limitations would be treated merely as relating to the sufficiency of the claim. 69 Fed. Cl. at 345-48.

The reluctance to peremptorily dismiss is particularly appropriate in ELIHPA cases. As noted below, the courts have been especially sensitive to peremptory motions depriving ELIHPA litigants of the opportunity to make factual presentations at trial, repeatedly denying such motions where there were issues as to the claimant's knowledge, the reality of the request, or the reality of the Government's rejection.

## I. THE MOTION SHOULD BE DENIED IN ITS ENTIRETY, SINCE THE CLAIMS OF MULLICA AND PARK TERRACE ARE NOT BARRED BY THE STATUTE OF LIMITATIONS.

The cases governing the statute of limitations arising in the context of ELIHPA and the FmHA housing program can be synthesized into three principles discussed below: (1) the passage of ELIHPA is a mere repudiation not determinative of the timing of the accrual of a breach, but the repudiation ripens into a breach by filing suit, and a claim accrues, when a tender of prepayment is made and rejected, or when plaintiff elects to treat the repudiation as a breach by filing suit; (2) the knowledge of the claimant with respect to the Government's refusal to accept prepayment is not determinative, since accrual depends not on the repudiation of the agreement but the election to treat the repudiation as a breach; and (3) it is the denial of a meaningful request to prepay via a meaningful rejection to accept it that triggers accrual of the statute, not the mere knowledge of futility of prepayment.

Here, the Government's motion for judgment on the pleadings fails in its entirety. First, the motion does not reflect on the face of the pleadings the events legally required to cause the claims to accrue prior to the expiration of the six-year limitations period. This suffices to deny the motion. Second, the Government reaches outside the pleadings to attach documents to support its defense. The motion should be denied because the facts, proffered in the Axelrod Declarations, suffice to avoid the Government's statute of limitations defense.

**A. The Motion Should Be Denied, Since On The Face Of The Pleadings There Is No Allegation Of A Meaningful Request For And Tender Of Prepayment And An Unequivocal Rejection By The Government -- All Of Which Is Needed To Trigger The Claims For Limitations Purposes.**

In Franconia Assocs. v. United States, 536 U.S. 129, 149 (2002), the property owners who received low interest loans from the FmHA, in exchange for providing low-income rental housing in rural areas, brought suit alleging that provisions of ELIHPA, which imposed permanent restrictions on FmHA's ability to allow prepayments by borrowers, breached their loan agreements. The Supreme Court held that enactment of ELIHPA was merely a repudiation of the loan agreements rather than a present breach, and therefore the property owners' claims accrued when prepayment was tendered and rejected.

The lower court in Franconia had held that the plaintiffs' claims were time barred under 28 U.S.C. § 2501, which prescribes that all claims must be filed within six years of the date they "first accrue[d]," viewing the passage of ELIHPA as constituting an immediate breach of the FmHA loan agreements which triggered the running of the six year limitations period. The Supreme Court reversed, holding that a "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Id. The Supreme Court explained that ELIHPA functioned as an anticipatory repudiation, not an immediate breach triggering the accrual of the claim for statute of limitations purposes. Id. at 143. Instead, the repudiation ripens into a breach only when the plaintiffs attempt to prepay their loans and the prepayments are rejected, or, in the alternative, when the plaintiffs elect to treat the repudiation as a breach by bringing suit. Id. at 143-44, 148.

The possibility that the Government could change its mind and perform formed part of the Supreme Court's reasoning. In deciding that a claim had not accrued on the date of

ELIHPA's enactment, the terms of which foreshadowed the possible breach of a loan agreement, the Supreme Court stated:

> Just as Congress may announce the Government's intent to dishonor an obligation to perform in the future through a duly enacted law, so may it retract that renouncement prior to the time for performance, thereby enabling the agency or contracting official to perform as promised.

Id. at 148.

On remand, the Court of Claims in Franconia Assocs. v. United States, 61 Fed. Cl. 718 (2004), reiterated that the statutory repudiation of the bargain does not translate into a breach (and the accrual of a cause of action) until performance is demanded and refused. 61 Fed. Cl. at 755. The Court analyzed the rationale of the Supreme Court concerning accrual of a claim:

> [Plaintiffs] contended that "given the fact that [the statute] continued to compel the agency to . . . [accept prepayments] in certain circumstances, it was certainly reasonable for petitioners to defer suit until they decided to exercise their termination option, submitted a request to the agency, and obtained a decision. They further asserted that "[u]nder the doctrine of anticipatory repudiation, petitioners' contract claims did not accrue upon the enactment of the legislation by Congress, but rather when the agency, applying the new restrictions set forth in the statute, breached its contractual obligation by refusing to accept petitioners' prepayment requests."

61 Fed. Cl. at 755 (citations omitted). The Court then summarized the Supreme Court's reasoning:

> The Supreme Court unmistakably credited these assertions in holding that plaintiffs' suit was not time barred under 28 U.S.C. § 2501, for if a breach could arise earlier than an actual request for performance, the Court would have been unable to determine whether plaintiffs' suit was timely filed.

Id.

In Grass Valley Terrace v. United States, 69 Fed.Cl. 341 (2005) (Damich, C.J.), the Court of Claims further elaborated on Franconia. The property owners filed suit complaining of the inability to prepay their loans. Referring to the Supreme Court's holding in Franconia, the Grass Valley Terrace Court held that a "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Id. at 344 (emphasis original).[5] The Court denied summary judgment, holding that the claims accrued, for purposes of the six-year statute of limitations, on the date that the owners elected to treat passage of legislation restricting prepayment as a breach by filing suit against the government. Id. at 354.

In Allegre Villa v. United States, 60 Fed. Cl. 11, 18 (2004), this Court held that a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." The Court stated:

> In the context of ELIHPA, the Supreme Court has held that a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." Franconia, 536 U.S. at 143. Accordingly, the date of breach for plaintiffs that attempted prepayment is the date on which such attempt was made.

The Court then explained the two step aspect of the accrual of a breach of contract, based upon the distinction between repudiation and the breach itself:

> The passage of ELIHPA and HCDA operated as a repudiation on the part of the Government, which "ripens into a breach prior to

---

5 The Grass Valley Court also characterized the Supreme Court's opinion in Franconia as follows:

> a breach did not occur with the passage of the legislation itself, but rather with the government's refusal in each specific instance to accept prepayment.

69 Fed. Cl. at 353, citing 536 U.S. at 143-44.

> the time for performance only if the promise 'elects to treat it as such.'" Id. The option to choose the date of breach by filing suit arises because repudiation "gives the promise the right of electing...to wait till the time for [the promisor's] performance has arrived, or to act upon [the repudiation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm v. Horst, 178 U.S. 1, 13, 44 L. Ed. 953, 20 S. Ct. 780 (1900).

At 17, 18.

The Government bases its motion for judgment on the pleadings on the statute of limitations, claiming the claims accrued in 1992 (as to Park Terrace) and 1991 (as to Mullica) by reason of the "prepayment" requests which were part of the process to seek "incentives" from FmHA. Brief at 6. The Government relies heavily on the Complaint's allegations in ¶¶ 11.2 and 11.4. In ¶ 11.2, the Complaint alleges as to Park Terrace:

> In or about 1992, the Government, aware that contractually the partnership had the unfettered right to prepay its loan, informed the partnership that notwithstanding its unfettered right to prepay the FmHA would never approve prepayment, and urged the partnership that it should settle for "incentives." The partnership, under duress and otherwise by reason of the wrongdoing of the Government, accepted "incentives" and obligated itself to a 20 year period in which it agreed not to take the project out of the program.

Brief at 6, citing Complaint ¶ 11.2. The Government further claims that the Complaint in ¶ 11.4 makes the identical allegation with respect to Mullica, except that the same events are alleged to have occurred in 1991.

The Government, however, concedes that the Complaint "does not expressly state that Park Terrace and Mullica each submitted a prepayment application prior to being offered incentives to remain in the program . . . ." Brief at 6. Nor does the Government attempt to show that the pleadings reflect the tender of prepayment itself, nor does the motion even address a tender requirement. These deficiencies alone suffice to deny the Government's motion for

judgment on the pleadings, since the Government admittedly cannot point to a trigger of claim accrual contained within the pleadings.[6]

**B. Notwithstanding The Government's Attempt To Cure Its Defective Motion By Attaching Documents Outside The Pleadings, The Motion Should Be Denied Since The Attached Documents Show Only A Pro Forma Request To Prepay Pursuant To The Process For Obtaining "Incentives.**

Recognizing the insufficiency of the pleadings to support its motion, the Government then attaches to its motion for judgment on the pleadings eight pages of correspondence relating to the taking of "incentives" on which it bases a claim that the claims were triggered. See Brief at 6-7; Gov. App. This does not cure the deficiency in the Government's Rule 12(c) motion. As to Mullica, the Government omits critical correspondence which shows that the Government never rejected the prepayment offer on which the Government rests its position. As to both partnerships, the putative "prepayment" requests, on which the Government relies, were pro forma in nature, made in the context of the process of obtaining "incentives" orchestrated by the Government, and in no way should be regarded as a genuine election to convert repudiation into breach, which is required to trigger accrual.

Each issue is discussed below.

**(1) Mullica Did Not Experience an Unequivocal Denial of the Putative October 11, 1988 "Prepayment" Request.**

With respect to Mullica, the Government omits from its addendum the Government's March 30, 1989 letter in response to Mullica's October 11, 1988 letter. (Gov.

6 The remainder of the Government's motion is based on an attempt to use what may be termed conclusory or advocatorial allegations in the Complaint against the plaintiffs. Brief at 5-7. In measuring the adequacy of a Rule 12(c) motion, conclusory allegations and statements regarding law are not counted in the Rule 12(c) review of the pleadings. As Wright and Miller state, in ruling on a motion for judgment on the pleadings, conclusions of law or matters not admissible in evidence at trial are not considered. See § 1368, at 243-244. In any event, to the extent that the Complaint is deemed to be inconsistent with the law as reviewed in this memorandum of law, plaintiffs are prepared to amend the Complaint and (if need be) leave is requested and should appropriately be granted to replead any such allegations.

App. 6). A copy of the March 30, 1989 letter is attached to the Axelrod Mullica Declaration as Ex. "A." (App. 9-10). The March 30, 1989 letter reveals that the October 11, 1988 Mullica letter could not act as a request to trigger accrual of Mullica's claims since the Government's response, reflected in the March 30, 1989 letter, was not a final denial of the request -- if it could even be construed as a denial at all. The March 30, 1989 letter stated in pertinent part:

> After careful consideration, Farmers Home Administration (FmHA) is unable to accept your offer to prepay the loan on Mullica West Apartments at this time.

App. 9-10 (emphasis added). See Franconia, supra (no breach exists where the Government holds open changing to mind); see also Grass Valley Terrace, supra (no breach exists where the Government holds open possibility of prepayment and requests submission of additional items).[7]

**(2) The Pro Forma Request to Prepay, Made as Part of the "Incentives" Process, Were Not Sufficient to Convert Repudiation into Breach and to Trigger Accrual.**

The corollary of the separation of repudiation and breach necessarily is that mere knowledge of the futility of prepayment is not determinative. In fact, knowledge of the Government's repudiation of the agreement is irrelevant for purposes of the accrual of the claim. Otherwise, the entire limitations analysis of the Franconia Court -- and every court after it -- would become meaningless. If the property owner chooses to take no action, the statute does not begin to run since mere repudiation has not been converted to breach.

In Allegre Villa, three groups of plaintiffs brought suit alleging breach of contract. The first group of plaintiffs requested permission from the FmHA to prepay their mortgages without restrictions by filing formal prepayment applications. 60 Fed. Ct. at 15. The second group of plaintiffs consisted of owners who were aware of the FmHA's denial of prepayment

---

7 In addition, as reflected in the Axelrod Mullica Declaration, the putative "prepayment" request was part of an effort to secure "incentives." This argument is addressed in the next section.

applications and, believing the tendering of an application to be futile, did not submit prepayment applications. Id. The third group of plaintiffs consisted of post-1979 owners that had not yet reached their 20-year anniversary that would trigger their contractual right to prepayment. These plaintiffs believed, based on statements from the FmHA and the denial of other owners' applications, that their prepayment right would not be honored.

The Government's motion for summary judgment on statute of limitation grounds was denied as to all three groups of plaintiffs. 60 Fed. Cl. at 17. Of particular note was the denial as to the second group, those claimants who were aware of the policy of denying prepaying applications and who believed tendering an application to prepay to be futile. As to these litigants, the Court determined that the contracts were breached on the date the lawsuit was filed because those plaintiffs had chosen to treat the Government's repudiation as a breach only when they filed suit. Id. at 18.

The trigger event -- that is the prepayment request and the denial, or the election to treat the repudiation as a breach -- must be meaningful, genuine and not pro forma. The Courts have carefully scrutinized prepayment requests to determine if they had the requisite intentionality to constitute the necessary election, considering the state of mind of the property owner making the request, the content of the demand the Government claims to constitute the request, and the content of the Government's response constituting the purported rejection.

Grass Valley considered the Government's statute of limitations defense as to two claimants and denied summary judgment in each case. As to the first claimant, Wishing Well I, on January 15, 1990, the property owner had sent a letter to the FmHA stating, "I hereby request permission to prepay the Wishing Well I Loan." The FmHA responded by stating "we have determined that [the property owner] [is] not eligible to prepay the Wishing Well I loan" because the property was still subject to a restrictive use provision.

The Court looked to the Supreme Court's ruling in Franconia, stating that:

> In order to determine whether the FmHA breached the agreement, the court must ascertain the nature of [the property owner's] prepayment request.

69 Fed. Cl. at 350. The Court rejected the Government's argument that what the property owner "may have thought or felt about the request to prepay the loan" was irrelevant. Id. at 350.

Instead, the Court conducted precisely such an inquiry into the claimant's state of mind. Since the property was contractually subject to use restrictions that would not expire until 2000, the court held there was at least a genuine issue of material fact as to whether the property owner's letter had requested prepayment without restriction. If that had been the case, the Government's failure to grant approval would not have started the statute running since the existing restriction would have justified the Government's denial of the request, the Government would not have dishonored an obligation due at the time, and the Government therefore would not have committed a breach of its contract. Id. at 351.

In the case of the second Grass Valley claimant, the claimant submitted a prepayment request in July, 1992; on August 20, 1992, the Government informed the claimant that "it must submit additional items" before its request would be granted. The court held that the Government's letter "does not even purport to be a denial of Plaintiff's prepayment request and, thus, cannot be a breach." 69 Fed. Cl. at 354.

Consequently, in determining whether a reasonable jury could conclude that the plaintiff sought to declare a breach, the Court, under the Franconia standard that the limitations period begins when the "borrower tenders prepayment and the government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan," 536 U.S. at 149, properly examines the state of mind of the property owner and the circumstances surrounding the prepayment request.

The circumstances surrounding acceptance of "incentives" by the responding plaintiffs do not constitute the required actions by the partnerships to convert the Government's repudiation into accrual of a claim. Plaintiffs can prove facts to overcome the defense, and proffer those facts in the Axelrod Declarations. Indeed, these Declarations put flesh on the bones of the language from Complaint ¶ 11 -- relied on by the Government -- and, at the very least, provide the inferences that are favorable to the nonmoving party which, under Rule 12(c) standards, the Court properly accepts.

Franconia and its progeny afford a property owner an option in how to treat the repudiation -- the Government's known policy that prepayment will not be allowed -- by controlling election of breach and the timing of claim accrual. That option may be exercised by making a demand for payment, or by making an election of breach through the exercise of the termination option and bringing suit. Franconia, supra; Grass Valley, supra; Allegre Villa, supra. Doing nothing does not commence the running of the statute. Id. In addition, the reality of the prepayment request and the reality of the Government's denial are appropriately scrutinized. See Grass Valley Terrace, supra, 69 Fed. Cl. at 350.

As reflected in the Axelrod Declarations, the putative prepayment requests relied on by the Government were not sufficient to trigger accrual of the claims, since they were pro forma and orchestrated by the Government itself as part of a prescribed process to secure "incentives" -- the only option available to a property owner after ELIHPA. The Axelrod Declarations aver:

1. After ELIHPA was enacted, the Government came to the property owners to present the "incentive" program. Relying on its own repudiation, the Government painted the property owners into a corner, telling the property owners that the only option for relief was to

obtain "incentives." The Government promoted incentives by telling the property owners they had no other option as the result of ELIHPA. Axelrod Declarations, ¶¶ 3-5.

2. The Government had established a process by which the property owner could seek "incentives." To get an equity loan, the partnerships were told they had to follow a specific loan approval and documentation process. This process included submitting a letter to FmHA making a pro forma request for prepayment of the loan, which all parties understood would result in the ultimate consideration, approval and probable award of "incentives."[8]

3. There was never any intention on the part of the partnership to declare the Government in breach, or to convert the Government's repudiation into breach. The partnerships were not attempting to do anything other than seek "incentives." In view of what the Government told the partnerships -- that "incentives" were the only option -- before the partnerships began the process, the objective of the process from the start was to obtain incentives.

4. Because the partnerships were not expecting the Government to allow prepayment, the partnerships never made tender of the funds to prepay, although they did, as part of the "incentives" process, obtain evidence to tell the Government that the partnerships were able to pay off the loans.

In short, the "prepayment" letters on which the Government relies were merely an exercise in following the steps prescribed by the Government to secure "incentives" -- the only alternative allowed by the Government in response to its repudiation. That such letters were written, and "incentives" were taken, was a response to the Government informing the partnerships they had no other option in the face of the Government's repudiation, and should not be regarded as sufficient to trigger accrual of the statute of limitations.

---

[8] Indeed, the Government argues in its brief that under 1992 FmHA regulations, incentive offers could only be made in response to a prepayment request. Brief at 7.

On the scale which measures the degree of electiveness for accrual purposes, the claimants electing incentives should be regarded as having done the equivalent of taking no action at all. A property owner could do nothing and not trigger the statute. There is no principled reason why an attempt to get relief through incentives should come at the expense of electing accrual; for accrual purposes, the acceptance of "incentives" should be regarded as being no different than doing nothing at all. It certainly is not deciding to "draw the line in the sand."

The mechanistic request for prepayment as part of the "incentives" process thus did not represent the genuine election to declare breach sufficient to convert the Government's repudiation into breach. A breach should be regarded as triggered only when the claimant makes a purposeful and intentional request to prepay which is rejected. The pro forma "prepayment" request prescribed by the Government was not the product of the claimants' initiative to declare the Government in breach. It is as if the Government provided a script and tracing paper to the claimants, and then tried to have the result recognized as the original prose of the signatory. To consider the pro forma letters a meaningful election to prepay representing the property owner's election to convert repudiation into breach is to stand reality on its head.

In Franconia, the Government took the position that a claimant was required to accept incentives as a "suitable substitute transaction" in order to reasonably mitigate loss. Franconia, 61 Fed. Cl. at 741-742. If this were so, the Government now can hardly be heard to say that the acceptance of its incentives represented a meaningful election. It would be particularly unjust that the Government, which previously argued accepting incentives was all but mandatory, now be heard to take the inconsistent position that accepting incentives represented a meaningful election. The Government should not be allowed to have its cake and eat it too.

The Franconia Court also specifically rejected the idea that a reasonable claimant was required to go down the primrose path of incentives. 61 Fed. Cl. at 745. Franconia held that the refusal of an owner to be led down that primrose path was entirely reasonable, and recognized that the property owners which went down that road did not relinquish their claims. Rather, accepting incentives only acted (to the extent of their economic value) as an offset to damages. Id. If the acceptance of incentives did not relinquish the claims of the property owners, the incentive process should not be regarded as triggering accrual; since incentives do not extinguish the underlying right to sue, they should not act as an election to convert the Government's repudiation into a demand for performance.

The point is driven home when one considers that absent the Government's initiation of the incentives transaction, through telling the property owner that it had no other choice for relief from its own repudiation, the property owner could have maintained the status quo and done nothing, or elected to sue. Either way, there would be no limitation issues. To allow the Government to invoke a limitations defense where otherwise there would be none has a distinct element of inequity and unfairness -- effectively allowing the Government to use an offer of relief from its repudiating statute "to profit from its own wrong."[9]

That the acceptance of incentives was not an election to treat the repudiation as a breach of contract receives considerable support from Franconia itself. Franconia termed many of the "incentives" as "feckless, fruitless or just plan risky." 61 Fed. Cl. at 742. Franconia also

---

9 The unfairness is accentuated by the fact that the Government's position, invoked to preclude claims based on the statute of limitations, is inconsistent with its prior position and seeks to "whipsaw" the affected claimants. The Government ignores the position it took in Franconia, bordering on an assertion that accepting incentives was obligatory to mitigate damages. In no way should the acceptance of incentives be deemed anything other than an offset to damages, to the extent of any economic benefit.

identified a gamut of reasons why property owners might have accepted incentives which had little to do with a voluntary election:

> For example, some plaintiffs accepted incentives because, under the statute and regulations, they believed that rejection would lead to a "forced sale" of their property to a nonprofit entity. Others accepted loans from the FmHA because, due to the restrictions imposed under the program, that was the only available way to finance needed maintenance and improvements. Still others accepted incentives only after being informed by FmHA officials that they could not prepay under any circumstance and thus had no other alternative.

61 Fed. Cl. at 746, note 47. The Franconia Court also called the incentives "unfounded and dysfunctional options." Id. at 757. It further noted that even where incentives were accepted, they had a "toll charge" -- they were not meaningful options, were underfunded, did not work as intended and represented what amounted to a constructive failure to accept prepayment without offsetting benefit to the owners. Id. at 726-727.

Under these circumstances, the acceptance of incentives could hardly be deemed a voluntary election by the property owner to declare a breach and to trigger accrual of claims. For these reasons, the Government cannot show the absence of material disputed facts with respect to the accrual of the claims. The defense based on the statute of limitations cannot be sustained, and the Government's motion for judgment on the pleadings should be denied.

## II. ALTERNATIVELY, THE MOTION SHOULD BE DENIED INSOFAR AS THE CLAIMANTS ASSERT CLAIMS FOR THE PERIOD AFTER THE PRESENT RESTRICTIONS EXPIRE BUT PRIOR TO THE END OF THE MORTGAGE TERM.

Assuming arguendo the Court should conclude that the statute accrued prior to suit -- which claimants respectfully submit it should not -- the fact is that both partnerships have claims for damages with respect to the period after the restrictions (undertaken pursuant to the "incentives") expire, but prior to the end of the mortgage term. The period of restrictions ends in 2013 as to Park Terrace, but its loan will not be fully liquidated until 2043. As to Mullica, the

period of restrictions ends in 2011, but its loan will not be fully liquidated until 2036. Therefore, the filing of suit is an election to treat the repudiation as a breach for the respective partnership claims as to the post-restrictions periods.

The premise of the Government's accrual position is that, to obtain incentives, the partnerships necessarily would have made a demand for prepayment denied by the Government. But assuming arguendo there was a demand, and the claim accrued, the preclusion should only extend to the restrictions period, not the entire loan term, because the putative "denial" and the operation of the restrictions, by their terms, extends only for the length of the period in which the restrictions were imposed. See Gov. App. 3, 7. Thus, the bar to pursue claims should last only for the duration of the restrictions period. In other words, should the plaintiff partnerships be deemed barred for the period as to which the restrictions pursuant to incentives were taken, there still exists a period prior to the expiration of the term of the loan -- but after the restrictions expire -- as to which this suit may nevertheless proceed.[10]

Allegre Villa supports the ability to make this claim. In the context of the third group of plaintiffs, i.e., those with contracts for which the right to prepayment has not yet vested, the Court allowed future claims to go forward. The Court stated at 6-7:

> Contracts with plaintiffs for which the right to prepayment has not yet vested were breached on the date this lawsuit was filed, because those plaintiffs have chosen to treat the Government's repudiation as a breach.

---

10 It has become apparent that the Government will not allow prepayment before the end of the loan term, even when the express restrictions expire. In Franconia, the Court noted that at the end of the restrictions period "the owners must reapply for prepayment, with no assurance they will be allowed out of the program." 61 Fed. Cl. at 726. In other words, even when the restrictions expire, the Government will not let the property owner pay off the loan so long as there are years left in its term.

Consequently, the claims of Mullica and Park Terrace for damages as to the period after the restrictions expire accrued only with the filing of this suit. At the very least, these period claims may be litigated in this suit.

## CONCLUSION

For the reasons stated above, the motion of defendant for judgment on the pleadings should be denied in its entirety. Alternatively, the motion should be denied as to the period of time after the respective restrictions expire but prior to the expiration of the terms of the loans. To the extent the Court may deem it necessary to conform the Complaint to the principles of law expressed herein, leave to replead should be granted.

Respectfully submitted,

COZEN O'CONNOR

**s/ H. Robert Fiebach**
H. ROBERT FIEBACH, ESQUIRE
DAVID M. DORET, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-4166
Fax: (215) 665-2013

Attorneys for Plaintiffs and the Responding Parties on the Motion, Park Terrace Limited and Mullica West Limited

**Filed Electronically**

Dated: December 18, 2006

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | |
|---|---|
| TAMERLANE, LIMITED,<br>a limited partnership,<br>704 G East Main Street<br>Moorestown, New Jersey 08057<br><br>and<br><br>PARK TERRACE LIMITED,<br>a limited partnership,<br>P.O. Box #264<br>511 Grove Ave.<br>Mohnton, PA 19540<br><br>and<br><br>PARK TERRACE EAST LIMITED,<br>a limited partnership,<br>P.O. Box #264<br>511 Grove Ave.<br>Mohnton, PA 19540<br><br>and<br><br>MULLICA WEST LIMITED,<br>a limited partnership,<br>704 G East Main Street<br>Moorestown, New Jersey 08057<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 05-677C<br>(Judge Christine O.C. Miller) |

**DECLARATION OF BART J. AXELROD, ON BEHALF OF PARK TERRACE LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Bart J. Axelrod deposes and states as follows:

1. I am President of Bala Realty Advisors, Inc. ("Bala"), a general partner of Park Terrace Limited ("Park Terrace"), one of the plaintiffs in these proceedings. Bala has at all times relevant to the events in question been a general partner of Park Terrace. I am authorized to make this Declaration on behalf of Park Terrace in opposition to the motion of the defendant for judgment on the pleadings.

2. In 1978, Park Terrace made a loan approved by the Farmer's Home Administration (the "FmHA" or the "Government") under the Section 515 housing program in connection with a 48 unit apartment building in Mohnton, Pennsylvania. The loan had no restrictions on prepayment.

3. In or about 1991, as a result of Bala's involvement in obtaining "incentives" for Mullica West Limited, the other responding plaintiff on the defendant's motion, the partnership was aware that due to the passage of the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), the Government would not allow the partnership to prepay its loan to the FmHA and leave the Section 515 program.

4. The Government said that under its new regulations, the only alternative available to the partnership was to elect "incentives." To get "incentives," the partnership was required to follow the prescribed steps in the regulations.

5. The Government further informed the partnership that there were three alternative "incentives" available to the partnership, specifically an increased rate of return on the investment in the project, an increased management fee, or as a last resort, an "equity loan" in which the Government would make an additional loan to the partnership allowing the partners to withdraw some of their equity in the project.

6. In the face of the Government informing the partnership that it had no other alternative, Park Terrace elected to pursue an equity loan.

7. To get the equity loan, the partnership was told it had to follow a specific loan approval and documentation process. This process included submitting a letter to FmHA making a pro forma request for prepayment of the loan, which all parties understood would result in the ultimate consideration, approval and probable award of "incentives."

8. In order to obtain the only relief available, the partnership prepared and sent what it understood to be a pro forma letter requesting prepayment. All of the requests made by the partnership, including the requests attached by the Government to its motion, were merely an exercise in following the steps prescribed by the Government to secure "incentives."

9. There was never any intention by the partnership to declare the Government in breach, or to convert the Government's repudiation into breach. The partnership was not attempting to do anything other than seek "incentives," the intended result of the process, in view of what the Government told the partnership -- that "incentives" were the only option -- before the partnership began the process.

10. Because the partnership was not expecting the Government to allow prepayment, the partnership never made tender of the funds to prepay although it did, as part of the fulfillment of the requirements of the "incentive" process, obtain evidence to show the Government that it was able to pay off the loan.

11. Ultimately, Park Terrace received a package of "incentives" from the FmHA in 1992.

12. As a result of the Government's improper conduct at issue in this case, the partnership has sustained damages. In addition, the partnership will sustain further damages once the restrictions in the equity loan expire in 2013, because the Government will not allow the partnership to leave the program until the end of the loan term in 2043, when all debt has been fully liquidated.

13. The facts set forth herein are based upon my personal knowledge and are true and correct. As President of Bala, the actions taken by Bala and its staff were done with my knowledge and subject to my supervision and control.

14. I understand that the statements made herein are made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

BART J. AXELROD

Dated: December 18, 2006

IN THE UNITED STATES
COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TAMERLANE, LIMITED,<br>a limited partnership,<br>704 G East Main Street<br>Moorestown, New Jersey 08057<br><br>and<br><br>PARK TERRACE LIMITED,<br>a limited partnership,<br>P.O. Box #264<br>511 Grove Ave.<br>Mohnton, PA 19540<br><br>and<br><br>PARK TERRACE EAST LIMITED,<br>a limited partnership,<br>P.O. Box #264<br>511 Grove Ave.<br>Mohnton, PA 19540<br><br>and<br><br>MULLICA WEST LIMITED,<br>a limited partnership,<br>704 G East Main Street<br>Moorestown, New Jersey 08057<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | : | No. 05-677C<br>(Judge Christine O.C. Miller) |

**DECLARATION OF BART J. AXELROD, ON BEHALF OF MULLICA WEST LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Bart J. Axelrod deposes and states as follows:

1. I am President of Bala Realty Advisors, Inc. ("Bala"), a general partner of Mullica West Limited ("Mullica"), one of the plaintiffs in these proceedings. Bala has at all times relevant to the events in question been a general partner of Mullica. I am authorized to make this Declaration on behalf of Mullica in opposition to the motion of the defendant for judgment on the pleadings.

2. In 1977, Mullica made a loan approved by the Farmer's Home Administration (the "FmHA" or the "Government") under the Section 515 housing program in connection with a 168 unit apartment building in Mullica Hills, New Jersey. The loan had no restrictions on prepayment.

3. In or about the late 1980's, after the passage of the Emergency Low Income Housing Preservation Act of 1987 ("ELIHPA"), the Regional Office of the Farmer's Home Administration ("FmHA"), located in Norma, New Jersey approached the partnership and told it that due to the passage of ELIHPA the Government would not allow the partnership to prepay its loan to the FmHA and leave the Section 515 housing program.

4. The Government said that under its new regulations, the only alternative available to the partnership was to elect "incentives." To get "incentives," the partnership was required to follow the prescribed steps in the regulations.

5. The Government further informed the partnership that there were three alternative "incentives" available to the partnership, specifically an increased rate of return on the investment in the project, an increased management fee, or as a last resort, an "equity loan" in which the Government would make an additional loan to the partnership allowing the partners to withdraw some of their equity in the project.

6. In the face of the Government informing the partnership that it had no other alternative, Mullica elected to pursue an equity loan.

7. To get the equity loan, the partnership was told it had to follow a specific loan approval and documentation process. This process included submitting a letter to FmHA making a pro forma request for prepayment of the loan, which all parties understood would result in the ultimate consideration, approval and probable award of "incentives."

8. In order to obtain the only relief available, the partnership prepared and sent what it understood to be a pro forma letter requesting prepayment. All of the requests which the partnership made, including the requests attached by the Government to its motion, were merely an exercise in following the steps prescribed by the Government to secure "incentives."

9. There was never any intention by the partnership to declare the Government in breach, or to convert the Government's repudiation into breach. The partnership was not attempting to do anything other than seek "incentives," the intended result of the process, in view of what the Government told the partnership -- that "incentives" were the only option -- before the partnership began the process.

10. The October 11, 1988 letter, attached by the Government to its motion in the Government's Appendix (at 6), was responded to by the FmHA on March 30, 1989. A copy of the March 30, 1999 letter (not attached to the Government's motion) is attached hereto as Exhibit "A." In that letter, the FmHA informed Mullica that it was unable to approve the prepayment request "at this time."

11. Because the partnership was not expecting the Government to allow prepayment, the partnership never made tender of the funds to prepay although it did, as part of the fulfillment of the requirements of the "incentive" process, obtain evidence to show the Government that it was able to pay off the loan.

12. Ultimately, Mullica received a package of "incentives" from the FmHA in 1991.

13. As a result of the Government's improper conduct at issue in this case, the partnership has sustained damages. In addition, the partnership will sustain further damages once the restrictions in the equity loan expire in 2011, because the Government will not allow the partnership to leave the program until the end of the loan term in 2036, when all debt has been fully liquidated.

14. The facts set forth herein are based upon my personal knowledge and are true and correct. As President of Bala, the actions taken by Bala its staff were done with my knowledge and subject to my supervision and control.

15. I understand that the statements made herein are made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

BART J. AXELROD

Dated: December 18, 2006

PHILADELPHIA\2868518\1 164980.000

United States Department of Agriculture

Farmers Home Administration

PO Box 366
Norma, NJ 08347
(609) 696-1330
FAX (609) 696-1775

APR 3 1989

March 30, 1989

Bala Realty Advisors Inc.
One Bala Avenue
Bala Cynwyd, Pa. 19004

Attn: Mr. L. A. Wanerman

Re: Mullica West Apartments
Harrison Township
Offer to pre-pay.

Dear Mr. Wanerman:

After careful consideration, Farmers Home Administration (FmHA) is unable to accept your offer to prepay the loan on Mullica West Apartments at this time. The specific reasons for our decision are:

1. Based on the requirements of FmHA instruction 1965-B., final payment on loans made prior to December 21, 1979, but which are less than 20 years old on the proposed date of prepayment, may only be accepted if:

A. The borrower enters into an agreement that obligates the utilization of the assisted housing and related facilities for the purposes specified in Section 514 or 515 for a 20-year period calculated from the date on which the last loan on the project was made and agrees that upon termination of the 20-year period to offer to sell the assisted housing and related facilities to a qualified non-profit organization or public agency in accordance with Paragraph VI of FmHA Instruction 1965-B Exhibit E.

B. It is determined by FmHA that housing opportunities for minorities will not be materially affected as a result of the prepayment, and the borrower enters into an agreement that obligates the borrower and any successors in interest to ensure that current tenants will not be displaced due to: (a) a change in the use of the housing, or (b) an increase in rental or other charges, as a result of the prepayment.

C. There is an adequate supply of safe, decent, and affordable rental housing within the market area of the housing and related facilities, and sufficient actions have been taken to ensure that the rental housing will be made available to each tenant upon displacement.

Based on presented material and our knowledge of the area in which Mullica West is located, there is not an adequate supply of comparable housing available.

EXHIBIT A

FmHA Farmers Home Administration is an Equal Opportunity Lender.
Complaints of discrimination should be sent to:
Secretary of Agriculture, Washington, D.C. 20250

The property to be prepaid is operated under FmHA's Plan II Interest Credit Program, which provides for reduced rental rates. The prepayment of this loan would result in a rent increase of approximately two hundred dollars ($200.00) per month, almost a 100% increase. A review of the current tenant certifications indicates that 50% of the tenants are senior citizens and that 93% of the households are low or very low income.

Based on the above, it is definite that the vast majority of tenants would be displaced if prepayment was authorized.

There are also very few other subsidized rental units in the area and tenant turnover is extremely minimal.

In accordance with FmHA 1900-B Adverse Decisions and Administrative Appeals, please be advised that all appellants are entitled to an opportunity for a separate informal meeting with the decision maker before the appeal process is begun.

Within seven (7) days of the date of this letter, you may notify the District Office to reserve the right to appeal, and to allow for the opportunity to review any incentives not to prepay. If this notice is not given, appeal must be made within 30 days. Should you appeal and the appeal be denied or should you request an incentive offer, you must show evidence of the nature of the prepayment if actual prepayment cannot be demonstrated no incentives will be offered. The hearing officer would be a member of the National Appeals Staff.

Any request for a hearing should be sent to the hearing officer through this office.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, handicap, or age (provided that the applicant has the capacity to enter into a binding contract). because all or part of the applicant's income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with the law concerning this creditor is the Federal Trade Commission, Equal Credit Opportunity, Washington, D.C. 20580.

Sincerely,

Howard Henderson

HOWARD HENDERSON
District Director

cc: Senator Frank Lautenberg
Senator Raymond J. Zane
Honorable James Florio
Honorable George Reuter
Senator William Bradley
Attn: G. Robertson

**CERTIFICATE OF SERVICE**

I, David M. Doret, hereby certify that a true and correct copy of the foregoing Memorandum of Law of Responding Plaintiffs, Park Terrace Limited and Mullica West Limited, in Opposition to Defendant's Motion for Judgment on the Pleadings as to These Partnerships was served upon counsel for Defendant, United States of America, by sending the same to the following named person on the 18th day of December, 2006, by United States Mail, First Class, postage prepaid:

SHALOM BRILLIANT, ESQUIRE
Senior Trial Counsel
Commercial Litigation Branch Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
Room 8012
Washington, D.C. 20530

Attorney for Defendant

**s/ David M. Doret**
David M. Doret

PHILADELPHIA\2899713\1 164980.000