# In the United States Court of Federal Claims

No. 05-677C
(Filed May 18, 2007)

| | |
|---|---|
| **TAMERLANE, LIMITED, PARK TERRACE LIMITED, PARK TERRACE EAST LIMITED, and MULLICA WEST LIMITED**<br><br>Plaintiffs,<br><br>v.<br><br>**THE UNITED STATES,**<br><br>Defendant. | Contracts, breach of contracts, Franconia Associates v. United States, 536 U.S. 129 (2002); Housing Act of 1949, Pub. L. No. 81-171, 63 Stat. 413; jurisdiction; statute of limitations; 25 U.S.C. § 2501 (2000); Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1815 (1988) ("ELIHPA") |

H. Robert Fiebach, Philadelphia, PA, for plaintiffs. David M. Doret, Cozen O'Connor, of counsel.

Shalom Brilliant, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Michael S. Dufault and Kenneth D. Kessler, Department of Justice and Alicia Peden, Office of General Counsel, Department of Agriculture, of counsel.

## MEMORANDUM ORDER AND OPINION

This case is one of several hundred unique cases with over 600 plaintiffs and 800 properties involving the Government's cancelling prepayment rights of owners of low-income housing. See Transcript of Proceedings, Tamerlane, Ltd. v. United States, No. 05-677C, at 5 (Fed. Cl. Jan. 25, 2007) ("Tr."). See generally Franconia Assoc. v. United States, 536 U.S. 129 (2002) (in lieu of suffering the breach, certain developers proceeded under new contracts with new prepayment restrictions). Before the court after briefing and oral argument is Defendant's Motion for Judgment on the Pleadings, Dismissing the Claims of

Park Terrace Limited and Mullica West Limited. 1/ Defendant seeks dismissal of plaintiffs' claims pursuant to RCFC 12(c). Defendant argues that plaintiffs failed to file their complaints in the United States Court of Federal Claims within six years of accrual. Id.; see also Order entered Nov. 15, 2006 (lifting long-standing settlement stay for all purposes to address jurisdictional issues). 2/ Plaintiffs ask the court to deny defendant's motion arguing that (1) the motion is improper as it relies on documents outside the pleadings; and (2) plaintiffs "proffer facts sufficient to overcome the defense or to create a material issue for trial with respect to whether their claims accrued, as the Government contends." Pls.' Br. filed Dec. 18, 2006, at 1; see also Pls.' Br. filed Dec. 18, 2006, at 19, 20. Alternatively, plaintiffs argue that, if the court grants defendant's motion for judgment on the pleadings, jurisdiction shall be retained to hear plaintiffs' claims "as to the period after the restrictions expire," because those claims "accrued only with the filing of this suit." Id. at 21.

## BACKGROUND

The subject of this litigation involves entity property owners that entered into loan agreements with the Farmers Home Administration of the United States Department of Agriculture ("FmHA") to provide rental housing for low- and moderate-income persons. These loans were entered into pursuant to section 515 and section 521 of the Housing Act of 1949, Pub. L. No. 81-171, 63 Stat. 413 (codified as amended at 42 U.S.C. §§ 1485, 1490a (2000)) ("Section 515"and "Section 521," respectively), which obligated borrowers to operate the properties according to FmHA regulations in exchange for favorable loan terms. See Compl. filed June 22, 2005, ¶¶ 16, 17, 20. Plaintiffs contend that the Government breached their loan agreements through the enactment and implementation of the Emergency Low Income Housing and Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (codified in relevant part at 42 U.S.C. § 1472(c)).

---

1/ This motion has been raised only with respect to two plaintiffs, Park Terrace Limited and Mullica West Limited. Defendant has not raised a statute of limitations defense as to the other plaintiffs in this case, Park Terrace East and Tamerlane Limited. The term "plaintiffs" herein refers to Park Terrace Limited and Mullica West Limited.

2/ Following oral argument, the case was stayed for a period not to exceed ninety days in order to permit the parties to reinstate the two plaintiffs' claims to the settlement queue. See Order entered Jan. 3, 2006 (granting parties' joint motion for stay of proceedings and referring the cases to Judge Marian Blank Horn for ADR); see also Order entered Nov. 15, 2006 (lifting stay and allowing defendant to file dispositive motion).

In 1979 Congress determined that many Section 515 and Section 521 borrowers who entered into loan agreements with the FmHA were choosing to exercise a pre-pay option. Franconia Assoc., 536 U.S. at 135. This option allowed borrowers to terminate early their involvement in FmHA's low- and moderate-income housing program. Id. Congress determined that prepayment of these loans was disrupting the availability of affordable housing. Id.; see also H.R. Rep. No. 96-154, slip op. at 43 (1979) ("Recently many section 515 Rural rental projects have started to prepay their mortgages and be diverted from housing the low- and moderate-income families who are the intended beneficiaries of the program. There are potentially 30,000 section 515 units that could be lost in this way."). Accordingly, Congress amended the National Housing Act to place significant restrictions on the circumstances under which FmHA could accept prepayment. Housing and Community Development Amendments of 1979, Pub. L. No. 96-153, 93 Stat. 1101, § 503. The Supreme Court summarized these amendments in Franconia Assoc., 536 U.S. at 135, as follows:

> In these 1979 amendments, Congress prohibited the FmHA from accepting prepayment of any loan made before or after the date of enactment unless the owner agreed to maintain the low-income use of the rental housing for a 15-year or 20-year period from the date of the loan. 93 Stat. 1134-1135. That requirement could be avoided if the FmHA determined that there was no longer a need for the low-cost housing. Id., at 1135. . . .
>
> The 1979 amendments applied to all program loans, past, present, and future. In 1980, however, Congress further amended the National Housing Act to eliminate retroactive application of the § 515 prepayment limitations imposed by the 1979 legislation. The Housing and Community Development Act of 1980, 94 Stat. 1614, provided that the prepayment restrictions would apply only to loans entered into after December 21, 1979.

In 1987 Congress again became concerned about the decreasing number of low- and moderate-income housing units available because of an increase in the number of prepayments of Section 515 loans. See Franconia Assoc., 536 U.S. at 135 (citing H.R. Rep. No. 100-122, p.53, U.S. Code Cong. & Admin. News 1987, pp. 3317, 3369). In response to these concerns, Congress passed ELIHPA. The Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (codified in relevant part at 42 U.S.C. § 1472(c)(2000)), amended ELIHPA to "impose[] permanent restrictions upon prepayment of § 515 mortgages entered into before December 21, 1979." Franconia Assoc., 536 U.S. at 136; ELIHPA, Pub. L. 100-242, 101 Stat. 1877 (codified as amended at 12 U.S.C. §§ 4101-4124, 4141-4147 (2000)). ELIHPA provides that, before FmHA could accept the prepayment of a Section 515 loan,

> "the [FmHA] shall make reasonable efforts to enter into an agreement with the borrower under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed." 42 U.S.C. § 1472(c)(4)(A) (1994 ed.).

Franconia Assoc., 536 U.S. at 136. ELIPHA also provides for incentives for borrowers that agreed to extend the low-income use of their housing including, *inter alia*: (1) reduction in the interest rate on the loan; (2) increase in the rate of return; and (3) additional loans to the borrower. 42 U.S.C. § 1472(c)(4)(B). With certain limited exceptions, if FmHA and the borrower cannot reach an agreement, the property owner seeking prepayment, "after a reasonable period . . . [FmHA] shall require the borrower . . . to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at a fair market value." 42 U.S.C. § 1472(c)(5)(A)(i) (2000).

**FACTS**

The following facts are not disputed in any material respect. Pursuant to Section 515 and 521, on July 28, 1978, plaintiff Park Terrace Limited ("Park Terrace"), a Pennsylvania limited partnership, borrowed two lump sums from FmHA in the amounts of $850,000 and $125,000. See Partnership Real Estate Mortgage For Pennsylvania, at 1; 3/ see Compl. ¶¶

---

3/ In response to the court's post-argument telephonic request, plaintiffs provided copies of the following documents on April 17, 2007:

1. Park Terrace Limited (1978):
    - A. Promissory Note ($850,000)
    - B. Promissory Note ($125,000)
    - C. Real Estate Mortgage
    - D. Loan Agreement
    - E. Security Agreement
2. Park Terrace Limited (1993):
    - A. Promissory Note
    - B. Real Estate Mortgage
    - C. Loan Agreement
    - D. Security Agreement
3. Mullica West Limited (1977):
    - A. Promissory Note ($1,809,050)
    - B. Promissory Note ($1,300,000)

17, 18. In accordance with Section 515 and Section 521, Park Terrace executed a number of loan documents, including a loan agreement, a promissory note, and a real estate mortgage. See Compl. ¶¶ 17, 18. The two promissory notes obligated Park Terrace to repay the loans in equal monthly installments spread over fifty years with a low fixed interest rate. Under the payment schedule for the loans, the final monthly payment is due on July 28, 2028. In exchange the favorable loan terms, Park Terrace agreed to numerous restrictions on the use of its property "[s]o long as the loan obligations remain unsatisfied." Park Terrace Loan Agreement (1978), at 5. Restrictions included*, inter alia:* (1) agreeing to use the housing exclusively as rental property and "related facilities for eligible occupants," Park Terrace Loan Agreement, at 6; (2) submitting annual budgets and operating plans to the Government for approval; and (3) using any return on investment that exceeds 8% per annum of borrower's initial investment in a manner that will "best benefit the tenants" or, alternatively, refunding the excess to the tenants. Park Terrace Loan Agreement (1978), at 5. Both promissory notes allowed Park Terrace the ability to prepay its loans. See Park Terrace Promissory Note (1978) ($125,000), at 2 ("Prepayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower."); Park Terrace Promissory Note (1978) ($850,000), at 2 (same).

Similarly, on May 31, 1977, Mullica West Limited ("Mullica"), a New Jersey limited partnership, borrowed $1,300,000 from FmHA. Later that same year, on November 30, 1977, Mullica borrowed an additional $1,809,050 from FmHA. The two loans, entered into pursuant to Section 515 and Section 521, obligated Mullica to operate its property according to FmHA regulations. See Compl. ¶ 20. The loans were to be repaid over a period of forty

---

3/ (Cont'd from page 4.)

C. Real Estate Mortgage ($1,809,050)
D. Real Estate Mortgage ($1,300,000)
E. Loan Agreement ($1,809,050)
F. Loan Agreement ($1,300,000)
G. Security Agreement ($1,809,050)
H. Security Agreement ($1,300,000)

4. Mullica West Limited (1991):
A. Loan Agreement
B. Security Agreement
C. Real Estate Mortgage.

Coinciding with the filing of this order and opinion, the court directs plaintiffs to file one copy of these documents.

years in equal monthly installments, with low fixed interest rates. See Mullica Promissory Note, Nov. 30, 1977, at 1; Mullica Promissory Note, May 31, 1977, at 1. Unless pre-paid, the final monthly payments on these loans are due on June 17, 2036. Mullica Real Estate Mortgage for New Jersey, June 18, 1991, at 1 (noting that May 31, 1977 and November 30, 1977 loans were re-amortized on June 18, 1991). Both promissory notes allowed Mullica to prepay its loans "at any time at the option of Borrower." Mullica Promissory Note, Nov. 30, 1977, at 2; Mullica Promissory Note, May 31, 1977, at 2 (same). In exchange for favorable loan terms, Mullica agreed to abide by extensive restrictions on the use and alienation of its property. Mullica Real Estate Mortgage (Nov. 30, 1977) at 4-6; Mullica's RRH Loan to Profit Type Corporation Operating on a Limited Profit Basis, August 25, 1977 ("Mullica Loan Agreement of August 25, 1977"). In addition to agreeing not to lease, assign, sell, transfer, or encumber the property without prior permission from the Government, Mullica also promised "so long as the loan obligations remain unsatisfied," *inter alia*: (1) to reduce rents the following year or use excess funds in a manner that will benefit tenants if the return on investment in any one year exceeds pre-established levels, see Mullica Loan Agreement of August 25, 1977, ¶ 10(b); (2) maintain books and records relating to the housing's financial affairs and provide such documents to the Government to inspect at "all reasonable times" id. ¶ 10(c); and (3) unless the Government gives prior consent, not to use the housing for any purpose "other than as rental housing and related facilities for eligible occupants," id. ¶ 10(e)(1). See also Mullica's RRH Loan to Profit Type Corporation Operating on a Limited Profit Basis, May 31, 1977 ("Mullica Loan Agreement of May 31, 1977") (containing similar restrictions).

Aware of the passage of ELIPHA and the Housing and Community Development Act of 1992, Park Terrace elected to apply for an equity loan, one of the alternative incentives available to borrowers under the new laws. Decl. of Bart J. Axelrod, on Behalf of Park Terrace Ltd., Dec. 18, 2006, ¶¶ 5-6. On November 19, 1991, Mr. Axlerod, President of Bala Realty Advisors, Inc., the General Partner of Park Terrace Investors, wrote to Jack Kauffman, Assistant District Director for FmHA. "This letter will serve as a request to pay off the remaining mortgage balance for the [Park Terrace Apartments]." DX 1 at 1. Park Terrace contends that this letter was a "pro forma request for 'prepayment'" in order to secure an equity loan. Pls.' Br. filed Dec. 18, 2006, at 3. On July 16, 1993, Park Terrace borrowed an additional $925,000. See Park Terrace Real Estate Mortgage for Pennsylvania, July 16, 1993; Park Terrace Promissory Note, July 16, 1993. Once again, the payments were spread out in equal installments over fifty years and carried a low fixed interest rate. Park Terrace Promissory Note, July 16, 1993. Unlike the mortgage and loan agreements entered into in 1978, however, the mortgage that Park Terrace entered into in 1993 contained the following clause:

> The borrower and any successors in interest agree to use the housing for the purpose of housing low- and moderate-income people eligible for occupancy as provided in Section 515 of Title V of the Housing Act of 1949 and FmHA regulations then extant during this 20 year period beginning the date of this mortgage. A tenant may seek enforcement of this provision as well as the Government. No person occupying or wishing to occupy the housing shall be required to vacate or be denied occupancy prior to the close of such 20 year period because of early repayment.

Park Terrace Real Estate Mortgage for Pennsylvania, July 16, 1993, at 3; see also Park Terrace Loan Agreement, April 1, 1993, ¶ 7(h) (similar). Therefore, by accepting the equity loan, Park Terrace obligated itself to continue providing low- and moderate-income housing through 2013. Unless prepaid, the loans entered into in 1978 will not be liquidated fully until 2028, while the equity loan entered into in 1993 will not be fully liquidated until 2043. See, e.g., Park Terrace Real Estate Mortgage for Pennsylvania, July 16, 1993, at 1.

Similarly, Mullica, aware of new laws preventing prepayment of its 1977 FmHA loans, also elected to pursue the equity loan option. Decl. of Bart J. Axelrod, on Behalf of Mullica West Ltd., Dec. 18, 2006, ¶¶ 5-6, 12. On October 11, 1988, Larry A. Wanerman wrote on behalf of Mullica West Apartments to Ernest Grunow of FmHA. "This letter will serve as a request to pay off the remaining mortgage balance for [Mullica West Apartments]." DX 1 at 6. Mullica also argues that this letter was a "pro forma request for 'prepayment.'" Pls.' Br. filed Dec. 18, 2006, at 3. As part of the new mortgage, Mullica agreed:

> The borrower and any successors in interest agree to use the housing for the purpose of housing very low-, low- and moderate-income people eligible for occupancy as provided in FmHA regulations then extant during this 20 year period beginning on the date of this mortgage instrument. A tenant may seek enforcement of this provision as well as the Government. No person occupying or wishing to occupy the housing shall be required to vacate or be denied occupancy prior to the close of such 20 year period because of early prepayment.

Mullica Real Estate Mortgage for New Jersey, June 18, 1991, at 4. Accordingly, by accepting the equity loan as part of an incentive package, Mullica obligated itself to continue providing low- and moderate-income housing through 2011. The loans entered into in 1977 and 1991 will not be liquidated fully until 2036. See Mullica Real Estate Mortgage of New Jersey, June 18, 1991, at 1.

## DISCUSSION

1. Standard of Review

The Court of Federal Claims is empowered by the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." Plaintiffs allege breach of contract by the United States and a taking of property without compensation, a violation of the Fifth Amendment. These claims fall squarely within the Tucker Act jurisdiction.

1) Motion for Judgment on the Pleadings

Defendant has moved pursuant to RCFC 12(c) for judgment on the pleadings. RCFC 12(c) provides: "After the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." Matters outside the pleadings are presented by defendant. Thus, because "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56, and all parties shall be given reasonable opportunity to present all material made pertinent." RCFC 12(c); see also John R. Sand & Gravel Co. v. United States, 457 F.3d 1345, 1349 n.7 (Fed. Cir. 2006); Colvin Cattle Co. v. United States, 468 F.3d 803, 806 (Fed. Cir. 2006); Brubaker Amusement Co. v. United States, 304 F.3d 1349, 1355-56 (Fed. Cir. 2002).

Under Rule 56(c) "[s]ummary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Brubaker Amusement Co., 304 F.3d at 1356 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). No genuine issue of material fact exists when a rational trier of fact could only arrive at one reasonable conclusion. See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Hall v. Aqua Queen Mfg., Inc., 93 F.3d 1548, 1553 n.3 (Fed. Cir. 1996). In such cases the need for a trial is not present, and the motion for summary judgment must be granted. Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Eli Lilly & Co. v. Barr Labs., Inc., 251 F.3d 955, 971 (Fed. Cir. 2001); Gen. Elec. Co. v. Nintendo Co., 179 F.3d 1350, 1353 (Fed. Cir. 1999).

If the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, the motion for summary judgment should be denied. "The moving party in a summary judgment motion has the burden to show 'that there is an absence of evidence to support the non-moving party's case[.]'" Crown Operations Int'l v. Solutia Inc., 289 F.3d 1367, 1377 (Fed. Cir. 2002) (quoting Celotex Corp., 477 U.S. at 322-23 (1986)). The benefit of all reasonable presumptions and inferences runs to the party opposing summary judgment. Matsushita Elec. Indus., 475 U.S. at 587-88; Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1257 (Fed. Cir. 2001); H.F. Allen Orchards v. United States, 749 F.2d 1571, 1574 (Fed. Cir. 1984) (noting that non-moving party shall "receive the benefit of all applicable presumptions, inferences, and intendments").

2) Statute of limitations as a jurisdictional requirement

Defendant seeks dismissal of plaintiffs' claims for lack of subject matter jurisdiction, or, alternatively, for failure to state a claim upon which relief can be granted. Defendant argues that the statute of limitations bars plaintiffs' claims under the Tucker Act, which provides that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501 (2000).

The six-year statute of limitations "set forth in § 2501 [of Title 28] is a jurisdictional requirement." Bianchi v. United States, 475 F.3d 1268, 1274 (Fed. Cir. 2007); John R. Sand & Gravel, 457 F.3d at 1354-55 ("The six-year statute of limitations set forth in section 2501 is a jurisdictional requirement for a suit in the Court of Federal Claims."); Martinez v. United States, 333 F.3d 1295, 1316 (Fed. Cir. 2003) (en banc) ("It is well established that statutes of limitations for causes of action against the United States, being conditions on the waiver of sovereign immunity, are jurisdictional in nature."). Because the requirement of section 2501 is jurisdictional it may not be waived. John R. Sand & Gravel, 457 F.3d at 1354 (citing Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1576-77 (Fed. Cir. 1988))

As defendant recognizes, see Def.'s Br. filed Nov. 16, 2006, at 4 n.5, some decisions of the United States Court of Appeals for the Federal Circuit and the Court of Federal Claims have held that claims failing to satisfy section 2501 should be dismissed for failure to state a claim rather than for lack of subject matter jurisdiction. See, e.g., Venture Coal Sales Co. v. United States, 370 F.3d 1102, 1105 n.2 (Fed. Cir. 2004) ("The most precise ground for the trial court's decision here . . . would seem to be that [plaintiff] failed to make its claim within the required limitations period—that is not a question of subject matter jurisdiction of the court."); Ariadne Fin. Servs. Pty. Ltd. v. United States, 133 F.3d 874, 878 (Fed. Cir. 1998) ("As a threshold matter, this statutory language confirms that the question of a time bar on [plaintiff's] claim does not affect the subject matter jurisdiction of the Court of Federal

Claims. The Court of Federal Claims has subject matter jurisdiction to adjudicate cases arising under the Tucker Act regardless of the timeliness of [plaintiff's] actions. [Plaintiff's] untimeliness can, however, bar its eligibility to invoke that jurisdiction."). Panels of the Federal Circuit continue to disagree on this issue, as evidenced by Judge Newman's dissent in the recent case of John R. Sand & Gravel, 457 F.3d 1361. In dissenting from the majority's holding that the statute of limitations contained in section 2501 is jurisdictional, Judge Newman stated:

> [T]he Court of Federal Claims, without dispute, had jurisdiction of the parties and the subject matter. . . . The text of the statute confirms that the limitations period is applied to claims of which the Court of Federal Claims already "has jurisdiction" . . . .
>
> Contrary to the position of the panel majority, the limitations period is not itself a matter of jurisdiction.

Id. at 1361-62 (citations omitted); see also Martinez, 333 F.3d at 1320 (Judges Plager, Mayer, Newman, Gajarsa, Linn, and Dyk, dissenting). Despite a nascent in shift in the more recent appellate decisions, the court follows the predominant view that a motion to dismiss a complaint as time-barred by the statute of limitations properly is considered as a motion to dismiss for lack of subject matter jurisdiction, given the en banc decision in Martinez and the majority opinion in John R. Sand & Gravel.

2. Statute of limitations in FmHA loan cases

The issue presented in this case originally was addressed in Franconia Associates v. United States, 43 Fed. Cl. 702 (1999), aff'd, 240 F.3d 1358 (Fed. Cir. 2001), rev'd, 536 U.S. 129 (2002). The trial court had dismissed plaintiffs' claims for lack of subject matter jurisdiction based on the statute of limitations. Id. at 709. The Federal Circuit affirmed the lower court's decision, ruling that the statute of limitations began to run on February 5, 1988, when ELIHPA was enacted. Franconia Assoc. v. United States, 240 F.3d 1358,1362-63 (2001), rev'd, 536 U.S. 129 (2002). On January 4, 2002, the United States Supreme Court granted certiorari. In its June 10, 2002 opinion, the Supreme Court reversed the Federal Circuit, holding:

> ELIHPA's enactment, we conclude, qualified as a repudiation of the parties' bargain, not a present breach of the loan agreements. Accordingly, breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its

> obligation to accept the tender and release its control over use of the property that secured the loan.

536 U.S. at 133.

Following the Supreme Court's decision, this court had an opportunity to address the issue again in Allegre Villa v. United States, 60 Fed. Cl. 11 (2004). This court stated:

> The passage of ELIHPA and HCDA operated as a repudiation on the part of the Government, which "ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" Id. The option to choose the date of breach by filing suit arises because repudiation "give[s] the promisee the right of electing . . . to wait till the time for [the promisor's] performance has arrived, or to act upon [the repudiation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." Roehm v. Horst, 178 U.S. 1, 13, 20 S. Ct. 780, 44 L. Ed. 953 (1900). Contracts with plaintiffs for which the right to prepayment has not yet vested were breached on the date this lawsuit was filed, because those plaintiffs have chosen to treat the Government's repudiation as a breach.

Id. at 17.

The central question before the court on defendant's motion is whether FmHA's denial of Mullica's and Park Terrace's offers of prepayment constitute a breach of contract, such that the statute of limitations began to run in 1988 and 1991, respectively. Both plaintiffs argue against this proposition. First, Mullica contends that it never received a final denial of its prepayment request. According to Mullica, the October 11, 1988 letter to FmHA could not trigger the statute of limitations because the Government's response on March 30, 1989, was not a final denial. Second, Mullica and Park Terrace insist that "the 'prepayment' letters on which the Government relies were merely an exercise in following the steps prescribed by the Government to secure 'incentives.'" Pls.' Br. filed Dec. 18, 2006, at 16. Plaintiffs alternatively argue that the statute of limitations does not bar their claims "as to the period after the restrictions expire," because those claims "accrued only with the filing of this suit." Pls.' Br. filed Dec. 18, 2006, at 21.

1) Final denial of Mullica's prepayment request

Mullica contends that because it never received a "final, unequivocal denial" of prepayment, payment was never tendered. Pls.' Br. filed Dec. 18, 2006, at 4. Consequently,

the statute of limitations commenced to run when it filed suit in the Court of Federal Claims on June 22, 2005, and not before.

The statute of limitations in the Tucker Act requires that "[e]very claim of which the United States Court of Federal Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues." 28 U.S.C. § 2501; see Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1481 (Fed. Cir. 1994). It is a jurisdictional requirement in the Court of Federal Claims. Fed. Nat'l Mortgage Ass'n v. United States, 469 F.3d 968, 973 (Fed. Cir. 2006). "A claim accrues when all events have occurred that fix the alleged liability of the Government and entitle the plaintiff to institute an action[,]" Tex. Land Grants, 37 F.3d at 1481; see John R. Sand & Gravel, 457 F.3d at 1355; Hopland Band, 855 F.2d at 1577 (stating that cause of action accrues "only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence"). A cause of action accrues when a plaintiff is "armed with the facts about the harm done to him." United States v. Kubrick, 444 U.S. 111, 123 (1979). In the cases that have been spawned by Congress's passage of ELIHPA, the Supreme Court has held that "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Franconia Assoc., 536 U.S. at 130.

By letter dated October 11, 1988, addressed to Mr. Grunow of FmHA, Mr. Wanerman, on behalf of Mullica West Apartments, requested to prepay the outstanding balance on Mullica's mortgage, stating: "[T]his letter will serve as a request to pay off the remaining mortgage balance for the above referenced property. Please contact me at your earliest convenience to review what procedure should be followed regarding this payoff of the mortgage." DX 1 at 6. On March 30, 1989, Howard Henderson, District Director of FmHA, responded to Mr. Wanerman's letter:

> After careful consideration, Farmers Home Administration (FmHA) is unable to accept your offer to prepay the loan on Mullica West Apartments at this time. . . .
>
> . . . .
>
> In accordance with FmHA 1900-B Adverse Decisions and Administrative Appeals, please be advised that all appellants are entitled to an opportunity for a separate informal meeting with the decision maker before the appeal process is begun.

> Within seven (7) days of the date of this letter, you may notify the District Office to reserve the right to appeal, and to allow for the opportunity to review any incentives not to prepay. If this notice is not given, appeal must be made within 30 days. Should you appeal and the appeal be denied or should you request an incentive offer, you must show evidence of the nature of the prepayment if actual prepayment cannot be demonstrated no incentives will be offered. The hearing officer would be a member of the National Appeals Staff.

PX A. Mullica emphasizes the phrase "at this time" in the first paragraph of the March 30, 1989 letter to support its argument that it never received a final denial of its prepayment request. Id. According to Mullica, the inclusion of this phrase indicates that FmHA did not reach a final determination. "The March 30, 1989 letter," Mullica argues, "reveals that the October 11, 1988 Mullica letter could not act as a request to trigger accrual of Mullica's claims since the Government's response . . . was not a final denial of the request – if it could even be construed as a denial at all." Pls.' Br. filed Dec. 18, 2006, at 12.

The court disagrees with plaintiffs' assessment of the March 30, 1989 letter. The language of the letter, taken as a whole, confirms that Mullica had the right to challenge the determination through an appeals process. It sets forth, in detail, the process for challenging FmHA's initial determination. Mullica was afforded the opportunity to avail itself of the appeals process. 4/ To support its position, Mullica characterizes the Supreme Court's finding in Franconia Associates, 536 U.S. at 146-47, as a determination that "no breach exists where the Government holds open changing [its] mind." Pls.' Br. filed Dec. 18, 2006, at 12. It concludes that, because the March 30, 1989 letter was not a final decision, FmHA still had the opportunity to change its position. Mullica's characterization of Franconia Associates, however, amounts to a reformation of the Supreme Court's ruling. The pertinent language is, as follows:

> [J]ust as Congress may announce the Government's intent to dishonor an obligation to perform in the future through a duly enacted law, so may it retract that renouncement prior to the time for performance, thereby enabling the agency or contracting official to perform as promised. Indeed, Congress changed its mind in just this manner before it enacted ELIHPA.

---

4/ The pleadings before the court are silent as to whether Mullica pursued an appeal with FmHA, although pursuit of an agency appeal would be inconsistent with Mullica's position on this issue.

536 U.S. at 131.

A careful reading of the quoted language makes apparent that the Supreme Court was discussing the ability of Congress, not the agency, to "change[] its mind" before being called upon to perform under contract. Id. By submitting the October 11, 1988 letter to FmHA, Mullica sought performance. The agency did not deliver as promised. By denying Mullica's prepayment request, the Government caused Mullica's claim to accrue on March 30, 1989. As of that date, the Government dishonored its obligation to accept prepayment and release control over the apartment complex.

Moreover, while the March 30, 1989 letter did not declare that it was a final decision, the text of the letter supports the conclusion that the "process of administrative decision[]making has reached a stage where judicial review will not disrupt the orderly process of adjudication and . . . [the] rights or obligations have been determined or legal consequences [have] flow[ed] from the agency action." Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic, 400 U.S. 62, 71 (1970); see also Teller Envtl. Sys., Inc. v. United States, 802 F.2d 1385, 1387 (Fed. Cir. 1986) ("It is well recognized that the requirement of finality is founded upon a policy that stands against piecemeal litigation and delays caused by appeals of nonfinal decisions."). The court has not been made aware of any effort on the part of Mullica to appeal the March 30, 1989 decision. Instead, Mullica accepted an equity loan, one of the "incentives" offered by FmHA, instead of pursuing an appeal of FmHA's prepayment decision.

2) Applicability of the statute of limitations to the incentive period

Plaintiffs' primary argument is that the prepayment requests were "pro forma" and "were merely an exercise in following the steps prescribed by the Government to secure 'incentives.'" Pls.' Br. filed Dec. 18, 2006, at 13, 16.

> The mechanistic request for prepayment as part of the "incentives" process thus did not represent the genuine election to declare breach sufficient to convert the Government's repudiation into breach. A breach should be regarded as triggered only when the claimant makes a purposeful and intentional request to prepay which is rejected. The pro forma "prepayment" request prescribed by the Government was not the product of the claimants' initiative to declare the Government in breach. It is as if the Government provided a script and tracing paper to the claimants, and then tried to have the result recognized as the original prose of the signatory. To consider the pro forma letters a meaningful election to prepay representing the property owner's election to convert repudiation into breach is to stand reality on its head.

Id. at 17.

During oral argument plaintiffs placed a great deal of emphasis on the term "tender." Counsel for plaintiffs quoted the definitions in Black's Law Dictionary and Williston on Contracts. See Tr. at 28-29. Black's Law Dictionary defines the term "tender" as " valid and sufficient offer of performance; specif[ically], an unconditional offer of money or performance to satisfy a debt or obligation. . . . The tender may save the tendering party from a penalty for nonpayment or nonperformance or may, if the other party unjustifiably refuses the tender, place the other party in default." Black's Law Dictionary 1507 (8th ed. 2004). Similarly, Williston on Contracts defines tender as "an unconditional offer of payment consisting of the actual production of a sum not less than the amount due on a particular obligation; tender must be without conditions to which the creditor can have a valid objection or which will be prejudicial to his or her rights." Richard A. Lord, Williston on Contracts, § 72:27 (4th ed. 2006) (footnotes omitted). In summary, plaintiffs argue that, in order to tender payment, they had to demonstrate the ability to prepay. It is their position that they merely began the application process in order to qualify for incentives, such as the equity loan, and never intended the letters submitted to FmHA to be prepayment requests.

Defendant rejoins, first, that plaintiffs' contention that the prepayment requests were not genuine or were in any way "pro forma" is contrary to plaintiffs' allegations in their complaint. "[Plaintiffs'] allegations that they accepted incentives 'under duress,' Complaint ¶¶ 11.2, 11.4, make no sense except upon the premise that they would have prepaid their loans rather than accept incentives had they been permitted to do so." Def.'s Br. filed Jan. 3, 2007, at 2-3. A breach therefore occurred when plaintiffs attempted to prepay their loans. At that point the claims accrued because plaintiffs sought performance from FmHA and their request was denied. Secondly, defendant insists that plaintiffs did tender prepayment of their loan obligations. "[Defendant is] not relying simply on the fact that prior to 1992 both of these [p]laintiffs submitted prepayment applications. It's that [plaintiffs] submitted prepayment applications, were offered incentives in lieu of prepayment, and accepted them." Tr. at 44.

Plaintiffs' arguments are unpersuasive. The letters of Messrs. Axelrod and Wanerman cannot be characterized as "pro forma" requests for prepayment. The record establishes that plaintiffs were seeking to prepay their loans and submitted requests as required by FmHA regulations. See 7 C.F.R. § 1965.90(b)(1) (1992), and Exhibit E to Subpart B. This does not suffice to support a finding that the letters somehow were intended only as a mechanism to secure incentives.

Furthermore, while plaintiffs contend that they entered into the agreements under duress, they cannot meet the requirements of this legal theory. "To render a contract

unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts." N. Star Steel Co. v. United States, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citing Rumsfeld v. Freedom NY, Inc. 329 F.3d 1320, 1329 (Fed. Cir. 2003)). Although plaintiffs insist that they accepted the Government's terms involuntarily, and it is arguable that they had no other alternative, plaintiffs cannot satisfy the elements of duress because they have put forward no evidence that the circumstances were the result of coercive acts by the Government. Although plaintiffs could have chosen not to pursue the incentives offered by the Government, by applying for the equity loan, plaintiffs triggered the statute of limitations as to the twenty-year restrictive period. This is consistent with the text of both prepayment requests, which simply and unequivocally request permission to prepay plaintiffs' loans. By submitting these letters to FmHA, plaintiffs tendered prepayment of their outstanding loan obligations. That plaintiffs now claim that the letters were not intended as prepayment requests is immaterial. The letters demonstrate plaintiffs' unconditional offer to prepay their loans with FmHA. Therefore, the court finds that the prepayment request letters satisfy the requirements of tender.

Based on this finding, "the six-year limitations period would commence to run, when . . . the Government then dishonors its obligation to accept the tender and release its control over use of the property securing the loan." Franconia Assoc., 536 U.S. at 133. FmHA's refusal to accept plaintiffs' prepayment request and its refusal to release Government control over the Mullica's property for at least twenty years are demonstrated by the March 14, 1991 letter from Howard Henderson, District Director, FmHA to Mr. Wanerman. The letter states, "Based on the material submitted, it is the determination of [FmHA] that you have demonstrated the ability to repay your loan in full. As a result of this ability, FmHA is offering a package of one-time incentives so that you may remain in the FmHA multiple family housing loan program . . . ." DX 1 at 7. Similarly, Park Terrace's request was denied for at least a twenty-year period via letter on June 23, 1992, with the "one-time offer of an equity loan in the amount of $769,400 as an incentive to keep Park Terrace in low income housing." DX 1 at 7. In these circumstances the statute of limitations began to run on Mullica's claims as to the twenty-year restrictions period on or before June 18, 1991, when Mullica entered into an equity loan with FmHA. The statute of limitations began to run for Park Terrace as to the twenty-year restriction period on or before July 16, 1993, when Park Terrace entered into its equity loan with FmHA.

3) Plaintiffs' alternative argument as for the period after the twenty-year restrictions expire

Alternatively, plaintiffs argue that they have claims for damages as to the period following the lapse of the twenty-year restrictive use provisions, but prior to the end of the mortgage term. Plaintiffs characterize the filing of this suit as "an election to treat the repudiation as a breach for the respective partnership claims as to the post-restrictions periods." Pls.' Br. filed Dec. 18, 2006, at 20. Their argument is based on the contention that "the preclusion [of plaintiffs' claims] should only extend to the restrictions period, not the entire loan term, because the putative 'denial' and the operations of the restrictions, by their terms, extends only for the length of the period in which the restrictions were imposed." Pls.' Br. filed Dec. 18, 2006, at 20 (emphasis omitted). Plaintiffs rely on Allegre Villa v. United States, 60 Fed. Cl. 11 (2004), for the proposition that the Court of Federal Claims has allowed plaintiffs with contracts for which the right for prepayment has not yet vested to go forward. See id. at 17 ("Contracts with plaintiffs for which the right to prepayment has not yet vested were breached on the date this lawsuit was filed, because those plaintiffs have chosen to treat the Government's repudiation as a breach.").

Defendant counters that the complaint alleges a single repudiation of a single prepayment right. Moreover, defendant distinguishes Allegre Villa by arguing:

> [B]orrowers in Allegre Villa v. United States, 60 Fed. Cl. 11 (2004), whose prepayment rights were treated as not having "vested." Those borrowers' claims were treated a[s] not having vested because their Section 515 loans contained restrictive use provisions that prevented borrowers from exiting the Section 515 program during the first 20 years of the loan term. . . . The restrictions to which plaintiffs refer are restrictions "undertaken pursuant to the 'incentives'." These restrictions did not come into existence until after the alleged repudiation of the prepayment right contained in plaintiffs' Section 515 loans and after Park Terrace and Mullica submitted prepayment requests but were not permitted to prepay. At the time these requests were submitted, the prepayment rights in question were vested.

Def.'s Br. filed Jan. 3, 2007, at 5-6. Defendant urges a finding that the statute of limitations has run as to the entire period.

This is not a quotidian instance of FmHA's refusing plaintiffs' tender and of plaintiffs sitting on their rights to sue. The Government offered plaintiffs an alternative arrangement that both plaintiffs chose to accept. Defendant's position that, by entering into the equity loan, the statute of limitations accrued as to all of plaintiffs' claims comes close to

whipsawing. The alternative offered by the Government did not remedy the initial breach. Therefore, the court finds that, by accepting the Government's offer, plaintiffs' rights to pursue claims as to the period following the twenty-year restrictive use provision have not yet vested. Despite defendant's view to the contrary, Allegre Villa is pertinent insofar as it stands for the proposition that plaintiffs can treat the enactment of ELIHPA and the Housing and Community Development Act of 1992 as an anticipatory breach for prepayment rights that have not yet vested. See 60 Fed. Cl. at 17.

## CONCLUSION

Because the transactional documents cited in footnote 3, supra, indicate that plaintiffs Park Terrace Limited and Mullica West Limited entered into equity loans that included restrictive use provisions, the parties are directed to submit briefs on defendant's alternative ground for dismissal based on a failure to state a claim upon which relief can be granted. See Def.'s Br. filed Nov. 16, 2006, at 1 n.1. Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Plaintiff shall file with the Clerk of the Court one copy of the transactional documents provided to the court on April 17, 2007. See supra n.3.

2. Defendant shall file its supplemental brief by May 29, 2007.

3. Plaintiffs shall file their supplemental response by June 8, 2007.

4. Defendant's shall file its supplemental reply by June 18, 2007.

s/ Christine O. C. Miller

________________________________________

**Christine Odell Cook Miller**
Judge