**IN THE UNITED STATES
COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TAMERLANE, LIMITED, PARK TERRACE LIMITED, PARK TERRACE EAST LIMITED, and MULLICA WEST, LIMITED, Plaintiffs, v. UNITED STATES OF AMERICA, Defendant. | No. 05-677C (Judge Christine O.C. Miller) |

**SUPPLEMENTAL MEMORANDUM OF PLAINTIFFS, MULLICA WEST LIMITED AND PARK TERRACE LIMITED, IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS**

Pursuant to the Court's order dated October 23, 2007, plaintiffs, Mullica West Limited ("Mullica") and Park Terrace Limited ("Park Terrace") (collectively, "Responding Plaintiffs") hereby submit this Supplemental Memorandum in Opposition to the Government's Motion for Judgment on the Pleadings, treated by the Court as a motion for summary judgment pursuant to RCFC 56.

**SUPPLEMENTAL PROCEDURAL HISTORY**

On November 16, 2006, defendant moved for judgment on the pleadings as to the claims of Responding Plaintiffs. Defendant did so on two bases: (1) by virtue of the statute of limitations, which defendant had pleaded as an affirmative defense, the Court was without subject matter jurisdiction to entertain the claims; and (2) in any event, the claims in Count II under the takings clause failed to state a cause of action.

Pursuant to the Court's earlier order lifting a stay of proceedings previously requested by the parties to pursue settlement, the parties briefed the jurisdictional portion of the Government's motion. On December 19, 2006, Responding Plaintiffs filed their response. On January 25, 2007, the Court conducted oral argument.

On May 18, 2007, the Court, treating the Government's motion as one under RCFC 56, entered an order (1) granting the motion and dismissing claims for the time period until the expiration of the restrictions undertaken with the equity loan incentives (the "Primary Period"); and (2) denying the motion as to the future period after the expiration of the restriction but until the loans were fully paid off (the "Extended Period"). The Court also directed the parties to brief the takings clause issue.

On June 5, 2007, the Government filed a brief on the takings issue, and also asked the Court to reconsider the portion of the opinion denying its motion as to the Extended Claims. On June 6, 2007, Responding Plaintiffs moved to strike the attempt to reargue the jurisdictional issue as improper. On June 15, 2007, Responding Plaintiffs briefed their response on the takings issue. At the same time, Responding Plaintiffs asked for an opportunity to take discovery pursuant to RCFC 56(f) with respect to the "Primary Period" claims. They also replied to the Government's arguments concerning the Extended Period claims, reiterating why the Court's ruling with respect to the "Extended Period" claims was proper. On June 25, 2007, the Court granted Responding Plaintiffs a short period to take documentary discovery. That discovery was concluded on August 15, 2007.

On October 23, 2007, the Court established a supplemental briefing schedule. This Supplemental Memorandum is submitted to present further arguments arising from the discovery taken as to why summary judgment as to the Primary Period claims is inappropriate.

The alternative position, based upon the takings clause, has been briefed by Responding Plaintiffs.

Against this background, Responding Plaintiffs file this supplemental brief.

**ARGUMENT**

**THE COURT SHOULD DENY THE GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT SEEKING DISMISSAL OF THE PRIMARY PERIOD CLAIMS.**

In Franconia Assocs. v. United States, 536 U.S. 129 (2002), the United States Supreme Court held that a "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Id. at 149. The Supreme Court explained that ELIHPA functioned as an anticipatory repudiation, not an immediate breach triggering the accrual of the claim for statute of limitations purposes. Id. at 143. Instead, the repudiation ripens into a breach only when the plaintiffs attempt to prepay their loans and the prepayments are rejected, or, in the alternative, when the plaintiffs elect to treat the repudiation as a breach by bringing suit. Id. at 143-44, 148.

On remand, the Court of Claims in Franconia Assocs. v. United States, 61 Fed. Cl. 718 (2004), reiterated that the statutory repudiation of the bargain does not translate into a breach (and the accrual of a cause of action) until performance is demanded and refused. 61 Fed. Cl. at 755. The Court analyzed the rationale of the Supreme Court concerning accrual of a claim:

> [Plaintiffs] contended that "given the fact that [the statute] continued to compel the agency to . . . [accept prepayments] in certain circumstances, it was certainly reasonable for petitioners to defer suit until they decided to exercise their termination option, submitted a request to the agency, and obtained a decision. They further asserted that "[u]nder the doctrine of anticipatory repudiation, petitioners' contract claims did not accrue upon the enactment of the legislation by Congress, but rather when the agency, applying the new restrictions set forth in the statute,

> breached its contractual obligation by refusing to accept petitioners' prepayment requests."

61 Fed. Cl. at 755 (citations omitted). The Court then summarized the Supreme Court's reasoning:

> The Supreme Court unmistakably credited these assertions in holding that plaintiffs' suit was not time barred under 28 U.S.C. § 2501, for if a breach could arise earlier than an actual request for performance, the Court would have been unable to determine whether plaintiffs' suit was timely filed.

Id.

In Grass Valley Terrace v. United States, 69 Fed.Cl. 341 (2005), the Court of Claims further elaborated on Franconia. Referring to the Supreme Court's holding in Franconia, Judge Damich held that a "breach would occur, and the six-year limitations period would commence to run, when a borrower tenders prepayment and the government then dishonors its obligation to accept the tender and release its control over use of the property that secured the loan." Id. at 344 (emphasis original). The Court denied summary judgment, holding that the claims accrued, for purposes of the six-year statute of limitations, on the date that the owners elected to treat passage of legislation restricting prepayment as a breach by filing suit against the government. Id. at 354.

The essence of the position of Responding Plaintiffs in their prior briefing was that the "prepayment" letters were a formalism submitted to secure incentives -- in effect, they were part of a process one may best characterize as a "charade." The Court's Memorandum and Order filed May 18, 2007, however, declined to characterize the prepayment letters as mere pro forma writings which were intended only as a mechanism to secure incentives. While the Court acknowledged "it is arguable that [Responding Plaintiffs] had no other alternative," the Court concluded that the prepayment request letters could be taken literally and constituted a demand

which, when prepayment was not allowed, triggered accrual of the claim. Memorandum and Order at 15-16.

Discovery now reveals that the Government itself recognized the "prepayment" letters were part of an incentives process tantamount to a charade. With both sides viewing the "prepayment" letters in that fashion, the requirements to trigger accrual of the claims of Responding Plaintiffs have not been met.

### A. Responding Plaintiffs Have Urged The Court To Recognize The "Prepayment" Letters Were Part Of A Charade.

Prior to being permitted to go forward with discovery, Responding Plaintiffs argued that the trigger for the statute of limitations did not occur merely because, in order to secure incentives, they merely submitted a formulaic "prepayment" letter to the agency. See responding brief and the supporting Axelrod Declarations, submitted December 19, 2006.

The crux of the position was that the agency told them incentives were the only form of relief available to them. This being so, the putative "prepayment" letters were submitted by the partnerships on a pro forma basis, in order to obtain the incentives. At the same time, the Government's denial of the putative "prepayment" requests was mechanical and foreordained. Consequently, the "prepayment" letters therefore did not constitute the demands required under Franconia -- nor did the denials constitute the required rejections -- to trigger accrual of the claims of Responding Plaintiffs.

### B. The Discovery Shows That Defendant Itself Recognized That The Prepayment Letters Were A Charade.

The Court ruled that it was "immaterial" whether the "prepayment" letters were "intended" as prepayment requests, and took the "prepayment" request letters at face value. If a borrower applied for and received an incentive, and in the process submitted the de rigeur

"prepayment" request letter, there occurred a bona fide attempt to prepay and a bona fide rejection of that request by the Government.

Responding Plaintiffs submit that discovery supports their argument that it is inappropriate to take the "prepayment" letters at face value. The documents produced by the Government in discovery, specifically regulations and/or drafts thereof, reinforce the position of Responding Plaintiffs that a "prepayment" letter did not ipso facto act as a demand. Rather, those regulations reflect that the incentives-granting process in reality was entirely pro forma so that the context of the "prepayment" request, and the context of the consequent rejection, do not satisfy the Franconia standards to cause a claim to accrue.

The Government's incentive program was framed in terms of incentivizing the borrower not to insist on prepayment. In fact, the program to award incentives was framed in terms of getting the borrower to accept an equity loan in lieu of prepayment, i.e., to get the borrower to withdraw the prepayment request through the agency taking an action to "avert prepayment." See the March 8, 1991 agency memorandum (App. 1-4) regarding Mullica West, at 1, characterizing Mullica West's application as an "application for an equity loan to avert prepayment." See also the April 19, 1991 memorandum regarding Mullica West titled "Authorization to Obligate Incentives to Avert Prepayment of RRH Loans" (App. 5).

Other Government documents also reflect that the incentive process was an avoidance measure. A January 11, 1989 Government memorandum (App. 6-11), at 6, and a January 25, 1990 Government memorandum (App. 12-18), at 13, each state:

> Processing Incentives to Avoid Prepayment: After the borrower indicates the intention to accept an equity loan in lieu of prepayment, a loan application must be submitted. This application need not contain all information generally required for a loan, but only the information listed in exhibit A to this AN.

With the Government positioning its incentive program as one "in lieu of" or "to avert" prepayment, it is hard to square the "prepayment" letters in this case with Franconia's requirement of a meaningful tender of performance and dishonor, which is necessary to cause the Government's repudiation to ripen into an actual breach triggering accrual of the claim. It is equally hard to square the Government's response to the "prepayment" letter with the required rejection of such a request. There was no more reality to the Government's rejection than with events in a play, where the plot is not the product of the actions of the actor but derives from a script. After all, if the demand is not genuine, the rejection can be no more genuine.

That the request and rejection were only scripted is shown by the fact that the incentives process was pro forma in the first place. As stated in the Government's February 25, 1991 release (App. 19-22), at 20-21:

> III. In accordance with paragraph IV of Exhibit E, every borrower who requests to prepay, and can document the ability to prepay, will be offered an incentive to not do so. The size of the incentive will be based on whether this housing is needed by current tenants and other low- and moderate-income people in the market area, and on the loss to the borrower by remaining in the FmHA program. The size of the incentive may not be based on whether the borrower actually wishes to prepay or wishes to receive an incentive to not prepay, or on whether the borrower is a servicing problem.

Emphasis supplied.

As the Government's commentary recognized, the award of incentives did not depend on whether a borrower actually wished to prepay or actually desired an award of incentives. The fact that a borrower could get incentives irrespective of the desire to prepay is convincing evidence that a request to prepay made during the incentive process cannot be taken literally.

### C. With Both Sides Treating The "Prepayment" Letters As Part Of A Charade, The Letters Cannot Constitute A Bona Fide Demand Sufficient To Trigger The Claims.

In order to trigger accrual of the claim, Franconia requires a good faith demand, representing a bona fide effort to prepay. As reflected in the Axelrod Declarations, the partnerships were submitting paperwork, not a demand to prepay. The Government recognized that this was the case, since the regulatory context rendered the "prepayment" letters mere paperwork. Responding Plaintiffs respectfully rely on the time-honored legal maxim, "if it walks like a charade and quacks like a charade, it's a charade."

Such recognition of reality is only fitting and right. On the scale which measures the degree of elective action for claim accrual purposes, Responding Plaintiffs should be regarded as having done the equivalent of taking no action at all. All agree that doing nothing does not trigger accrual. There is no principled reason why an attempt to get relief through incentives should be treated any differently.

This is especially so given that the Government in Franconia all but took the position that a claimant was required to accept incentives as a "suitable substitute transaction" in order to reasonably mitigate loss. Franconia, 61 Fed. Cl. at 741-742. The Government now can hardly be heard to say that acceptance of its incentives represented a meaningful election. It would be particularly unjust for the Government, having previously argued that accepting incentives was all but mandatory, now to be allowed to reverse field. The Government should not have its cake and eat it too, especially since the mechanism it uses to bring about this untoward result was recognized to be a charade in the first place.

## CONCLUSION

In the end, the point is not to determine whether a piece of paper containing a form of words expressing a desire to "prepay" can be found in the Government's files. This gives short shrift to what in fact was taking place, elevating form over substance, making the

standards under Franconia devoid of meaning, and enabling the Government to profit from its wrong. Mere reliance on the literal meaning of scripted words thus proves too much.

For the reasons stated above, the Government's motion for summary judgment as to the "Primary Period" should be denied, and the Court should overrule the Government's limitations defense as a matter of law. In the alternative, the Court should rule that the limitations issue presents a genuine disputed issue of fact required to be decided at trial. In the further alternative, the Court should uphold its prior ruling as to the claims of Responding Plaintiffs for the Extended Period, while denying the Government's motion for summary judgment as to the takings claims.

Respectfully submitted,

COZEN O'CONNOR

**s/ H. Robert Fiebach**
H. ROBERT FIEBACH, ESQUIRE
DAVID M. DORET, ESQUIRE
1900 Market Street
Philadelphia, PA 19103
Tel: (215) 665-4166
Fax: (215) 665-2013

Attorneys for Plaintiffs, Tamerlane Limited, Park Terrace Limited, Park Terrace East Limited and Mullica West Limited

**Filed Electronically**

Dated: November 15, 2007

PHILADELPHIA\3418470\1 164980.000