**IN THE UNITED STATES**
**COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TAMERLANE, LIMITED, PARK TERRACE LIMITED, PARK TERRACE EAST LIMITED, and MULLICA WEST, LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 05-677C<br>(Judge Christine O.C. Miller) |

**DECLARATION OF DAVID M. DORET, ESQUIRE**

David M. Doret, Esquire, one of the counsel to Moving Plaintiffs, avers that attached hereto is a true and correct copy of the expert report of Bruce Coin dated November 30, 2007.

I understand that the statements made herein are made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

David M. Doret

DAVID M. DORET, ESQUIRE

Dated: November 30, 2007

PHILADELPHIA\3455478\1 164980.000

# Exhibit A

**PRO-GRESSIVE MORTGAGE CORPORATION**
1760 MARKET STREET • SUITE 900
PHILADELPHIA, PA 19103
TEL: 215-893-9924 • FAX 215-893-9830

# Financing Report
# Tamerlane Apartments
# Park Terrace East Apartments

Submitted by

Bruce J. Coin

November 30, 2007

# TABLE OF CONTENTS


| ITEM | | PAGE |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | BASIC BACKGROUND | 1 |
| III. | ASSUMPTIONS | 2 |
| IV. | 2005 APARTMENT FINANCING DISCUSSED<br>A. MARKET SOURCES<br>B. MARKET PRICING<br>C. IMMEDIATE AND FORWARD COMMITMENTS | 3, 4, 5 |
| V. | APARTMENT LOAN UNDERWRITING | 5 |
| VI. | THE ANALYSIS AND UNDERWRITING: | 6, 7 |
| VII. | THE FINANCING AND TERMS AVAILABLE | 8, 9 |
| VIII. | OPINION | 9 |
| IX. | LIMITATIONS | 9 |

**ADDENDUM**

| | | |
|---|---|---|
| EXHIBIT 1 - | LIST OF DOCUMENTS | TAB |
| EXHIBIT 2 - | NEWS ARTICLES, NEWSLETTER, RATE TABLES ETC. | TAB |
| EXHIBIT 3 - | MAPS, PHOTOGRAPHS OF SUBJECT PROPERTIES | TAB |
| EXHIBIT 4 - | RESUME | TAB |

## I. Introduction:

I have been retained by the law firm of Cozen and O'Conner to provide my professional opinions concerning the mortgage financing that my firm could have provided during the summer of 2005 for the owners of two existing garden style apartment developments (the subject properties). The subject properties are the 44 unit Park Terrace East apartments located in the Borough of Mohnton, Berks County, PA and the 160 unit Tamerlane apartments located in Sicklerville, Winslow Township, Camden County, NJ.

The purpose of the financing would have been to replace the then existing financing to facilitate the conversion or transition of the subject properties from apartment developments that were limited to accepting rent subsidized tenants that met the requirements of section 515 of the National Housing Act (in concert with the Federal Farmers Home Administration) to apartment developments that would no longer accept subsidized tenants and would have been able to lease their apartment units at the then fair market rents.

My opinions herein are based on my general inspection of each property on November 26, 2007, my 39 years experience providing financing for multi-family apartment developments and commercial projects, my independent review of the information listed in Exhibit I of this report, review of information contained in my company's files, the reading of appraisal reports on each property with effective value rates of July 1, 2005 and my specific knowledge of the types of apartment financing, interest rates and terms available in the commercial mortgage market during the summer of 2005.

This report is to be used solely for the specific purpose of this litigation and may not be used for any other purpose without my express written consent.

## II. The Basic Background:

On June 22, 2005 the owners of the subject properties, Park Terrace East Limited and Tamerlane Limited, brought suit against the U.S. Government alleging that the U.S. Government breached its contracts with them by preventing their ability to repay the then existing "Farmers Home Administration" mortgage loans funded through the U. S. Department of Agriculture. Such inability prevented the owners from operating their properties on a basis that was free and clear of the restrictions imposed by those loans and therefore prevented the owners from leasing their apartment units, then and thereafter, at the market rents to "Non-Subsidized" tenants.

## III. Assumptions:

A. That the information, materials and representations provided to me and relied upon by me for the purpose of developing my opinions for this report are true and correct to the best of my knowledge and belief.

B. That, based on my understanding of the existing rent rolls it would have taken between 6 and 12 months for the current owners to convert the apartments from those with subsidized rent tenants to those with market based rents from non-subsidized tenants, complete the improvement upgrades planned and to completely turn over the rent rolls from those that featured subsidized tenants to those that totally featured tenants paying the market rents.

C. That the planned improvements would cost approximately $85,000 for the Park Terrace East apartment complex and approximately $760,000 for the Tamerlane apartment complex as estimated by Mr. Bart Axelrod, a principal of the ownership entities.

D. That all leases secured at the market rents would typically be for one year periods.

E. That the appraised values of each complex as appraised on an "unrestricted basis" in the appraisal reports by the firm of Reaves C. Lukens Company, dated November 30, 2007 and read by me were reasonable and could be relied upon by me for mortgage underwriting and financing purposes as of July 1, 2005

F. That the credit of the proposed borrowing entities, their general partners and their major principal were acceptable at that time.

G. That the condition of the subject properties on July 1, 2005 was good and acceptable for financing purpose although apparently inferior to their conditions as seen by me on November 26, 2007, as substantial improvements to the Tamerlane complex (as reflected in the may 2007 Fermano Schedule) had been completed and lesser improvements (as observed by me) had taken place at the Park Terrace East Complex.

H. That the owners would have been seeking new financing for the subject properties on or before June 22, 2005.

I. Other assumptions as indicated within this report.

**IV. 2005 Apartment Financing:**

A. *Market Sources:* During 2005 existing, substantially leased and occupied (minimum 90%), apartment developments in decent condition could obtain "permanent mortgage" financing from 5 primary sources; insurance companies, commercial banks, the "agencies" (FNMA, FHMLC) credit companies and from "conduit" lenders in the commercial mortgage backed securities - CMBS market.

During that time period my firm was actively securing permanent mortgage financing commitments for apartment developments from varied sources but principally from our insurance company correspondents. Our correspondent insurance companies were offering interest rates and terms that were competitive with what the "agency" and CMBS lenders were offering and that were superior to the rates and terms being offered by commercial banks and credit companies.

B. *Market Pricing:* Then, as today, all long term permanent mortgage lenders were "pricing" and quoting their interest rates based on a rate spread over the appropriate term of the U.S. Treasury rate, current at the time the rate was fixed or "locked". If a balloon term was contemplated, the Treasury Rate that corresponded to the term was used, e.g. a 5, 7 or 10 year Treasury Rate was used to price a 5, 7 or10 year balloon term loan. If a longer term, self liquidating, 15-30 year loan was contemplated, an interpolated Treasury Rate that corresponded with the estimated midpoint of such loan was used. While loan maturity periods vary from lender to lender and on a case by case basis, they can occasionally be for 30 years or even longer. During 2005 a fixed rate 10 year balloon term loan with amortization based on a 25 to 30 year schedule for a loan that was based on 75% to 80% of the appraised value of the property being financed was most typical. Loan amortization schedules also varied based upon a particular lender's underwriting, the age and condition of the property, the loan to value ratio as well as market and other conditions.

During the early summer of 2005 lenders were quoting rate spreads for immediate funding apartment loans in amounts up to 75% to 80% of appraised value in the range of 100 to 125 basis points (i.e., 1.00% to 1.25%) over the applicable U.S. Treasury rate. For a typical 10 year fixed rate balloon term, the interest rate was being "priced" over the then rate of the 10 year U.S. Treasury. For forward commitments lenders were typically adding 2 basis points per month to the immediate funding rate for the period of the forward commitment, e.g., for a 12 month "forward" approximately 24 basis points were being added.

The rate of 10 year U.S. Treasuries on July 1, 2005 was 4.09%. It dropped to 4.01% on July 6, 2005, rose to 4.39% on August 5th then declined steadily during the balance of August to 4.03% on August 31st.

**IV. Apartment Financing (con't.):**

C. *Immediate and Forward Commitments:*

1. *Immediate Funding:* Mortgage loans that are to fund within 60-90 days of the date of the formal financing commitment. Such loans are granted for substantially leased and completed properties. The interest rate can be "locked" as elected by the borrower on a variety of dates from as early as a date that is between the date of execution of a formal application (typically 3 to 4 weeks before loan approval), or not until 3 days prior to the actual loan closing date. The "date of election" process can be determined by the lender and/or by a borrower that elects to negotiate the option to "play the rate market" choosing to lock the rate at a point within that time period when they believe they can achieve their most acceptable rate.

2. *Forward Commitments*: There are also binding commitments wherein a lender formally agrees to fund a mortgage loan at a future date based on the borrower's or the property's ability to achieve something by a future date that is not currently in existence. The achievement can be based on a number of concepts such as securing higher rents, achieving a forecasted appraised value, completing planned improvements, reducing a prepayment premium, impacting capital gains treatment for a sale, a combination of these concepts and others. Securing a forward commitment at an interest rate that is fixed basically at the time of commitment removes the risk of the market interest rate possibly being higher by the time the achievement had been met. It also removes the potential risk of future market conditions deteriorating to the point where decent financing may not be available even though the achievement had been accomplished.

If interim funds are required by a borrower, to reach their goal(s), such commitments are typically "banked" with an interim lender that advances funds against the forward commitment. The interim lender provides the funds to the borrower to accomplish such things as repaying any existing loans, paying the transactional fees and closing costs, funding the cost of any improvements contemplated, capitalizing any interim "carry", to fund working capital and similar. When the funding conditions of the forward commitment have been met and closing of the forward commitment achieved, the proceeds from the closing of the forward commitment loan are used to repay the interim lender that effectively "banked" the forward commitment.

## IV. Apartment Financing (con't):

At the subject properties the appraised values on an "unrestricted basis" were predicated on the subject properties' securing unsubsidized market rents. As it would have taken a transition period of approximately 6-12 months (after July 1, 2005) for the subject properties to achieve leasing at the market rents and the appraised values indicated they would not have qualified for typical "immediate funding" financing.

While there are different ways to finance a property in transition, for an existing owner or for a purchaser, I believe the easiest, least expensive and prudent method to provide financing for the owners for the subject properties, based on the appraised values that reflected the market rents, would have been to secure a "forward" commitment from one of our insurance company investors.

For the subject properties the forward commitment would feature a fixed interest rate, 10 year balloon term, 25 year amortization schedule and all of the other necessary and typical loan conditions. It would have been funded when the subject properties had been improved and had achieved a minimum of 90% leasing of the units at the projected market rents.

## V. Apartment Loan Underwriting:

A myriad of aspects are reviewed by lenders and loan underwriters when analyzing and underwriting a mortgage loan proposal. The significant items reviewed are:

a. The location, population statistics and area trends
b. The physical characteristics of the land and buildings
c. Subject and Market occupancy rates
d. For existing properties, their operating history for the most recent past years
e. The property's rents and their relation to the market
f. Any improvements planned to be made and their cost
g. The management capabilities of the property manager(s)
h. The borrower's credit
i. The credit of any major principals of the borrower, as appropriate
j. Other aspects on a case by case basis
k. The amount of the loan request and reason for the request.
l. A professional, generally MAI, appraisal of the property.
m. The ratio of the loan requested to the appraised value of the property
n. The debt service coverage ratio required by the potential lender(s)
o. The adequacy of the potential loan proceeds

*Note:* During 2005 the typical maximum loan to value for standard apartment mortgage loans was 75% to 80%. The typical minimum debt service coverage ratio was 1.20 times. These varied by lender and there were exceptions.

**VI. The Analysis and Underwriting:**

On November 26, 2007 I personally visited, reviewed and photographed both subject properties. For value, underwritten net income, market data, population facts, rents and similar purposes I relied on the information contained in the appraisal reports prepared by the Reaves C. Lukens and Company with effective value dates as of July 1, 2005.

My visits disclosed that the properties' locations were good and the descriptions, occupancies, population statistics and similar data contained in the appraisal reports confirmed to me that these were acceptable locations for financing purposes.

My observations of the land and buildings indicated that they were well maintained and in good condition and acceptable for financing purposes noting that improvements had subsequently been made between July 1, 2005 and November 26, 2007. At the Tamerlane Complex all new roofs, all new exterior siding and all new windows and sundry improvements had been made at a cost of approximately $760,000. At the Park Terrace East complex the owners were in the process of installing all new windows.

The properties were well occupied. Tamerlane had some vacant units, Park Terrace East was 100% occupied.

Detailed operating histories were included in the appraisals and were used by the appraisers to support the projected operating expenses that would be incurred on an "unrestricted market rent basis".

The market rent comparables included in the appraisal supported the projected market rents.

Mr. Bart Axelrod confirmed that the improvements planned in July of 2005 for Park Terrace East would cost about $ 85,000 and those planned for the Tamerlane Complex would cost about $760,000.

From my observation, meeting with the property managers on November 26, 2007 and my review of the past operating histories, the properties appear to have been well managed by a capable ownership and staff.

Mr. Bart Axelrod explained that the owner, Tamerlane Limited is a New Jersey Limited Partnership. It its sole general partner is Tamerlane Investors, a Pennsylvania Limited Partnership whose general partner is Bala Realty Advisors, Inc. Mr. Bart Axelrod is the sole stockholder of that corporation. He further explained that the owner, Park Terrace East Limited is a Pennsylvania Limited Partnership that Park Terrace Investors (another Pennsylvania Limited Partnership) is its general partner and that Bala Realty Advisors, Inc is also the general partner of that partnership.

**VI. The Analysis and Underwriting (con't):**

The mortgage financing contemplated was to be "non-recourse" except that Mr. Bart Axelrod, as the effective general partner of each owning entity, would be required to personally guarantee the required environmental indemnification and other "carveout clauses" (fraud, wasting of the asset, voluntary bankruptcy and similar). Accordingly I reviewed a copy of his personal financial statement and resume from July of 2005 and found then to be most acceptable for financing purposes.

No credit reporting information was available to me from 2005 for either borrowing entity or for Mr. Bart Axelrod. Accordingly, I must assume that their then credit would have been acceptable for mortgage lending purposes.

The MAI appraisals were provided by the Reaves C. Lukens and Co. and opined values as of July 1, 2005 of $10,200,000 for the Tamerlane complex and $2,100,000 for the Park Terrace East complex. Applying a 75% ratio to those appraised values would support loan amounts of $7,650,000 for the Tamerlane complex and $1,575,000 for the Park Terrace East complex.

The approximate totals of the funds needed to repay the existing mortgage debt, fund the planned improvements, pay the fees and closing costs during the transition period are estimated below:

| Complex: | Tamerlane | Park Terrace East |
|---|---|---|
| Item: | | |
| Repay existing mortgage debt: | $ 4,464,000 | $ 717,000 |
| Fund proposed improvements: | 760,000 | 85,000 |
| Pay the fees and closing costs: | 135,000 | 55,250 |
| Approximate Total required: | $ 5,359,000 | $ 857,250 |

As the financing amounts supported by the appraisals far exceeded the above amounts, the new financings would have easily facilitated the borrower's transition program nothing that more funds were available from the excess loan proceeds if needed or desired.

The appraisals indicated that the annual net operating income for the Tamerlane complex was $718,550 and $153,205 for the Park Terrace East complex. To satisfy the minimum debt service coverage requirement of 1.20 times, approximately $598,552 of the annual net operating income from the Tamerlane complex could go toward annual debt service and approximately $127,619 from the Park Terrace East complex could go toward annual debt service. As shown in Section VII, below, the annual debt service proposed for each loan was less than those amounts indicating that the loans would have also met the minimum debt service coverage requirement.

## VII. The financing and terms available for the subject properties and opinion:

Based upon my review of the Lukens Company appraisals, my files, published articles from the applicable time period, other information provided to me concerning the subject properties and their existing owners and application of the basic underwriting standards of our correspondent insurance companies that were applicable at the time, the following financing could have been provided:

| | |
|---|---|
| Type financing: | A fixed rate "forward" commitment for a 1st lien mortgage secured by the subject properties |
| Forward period: | 12 months from the date of commitment assumed to be July 1, 2005. An extension option could have been negotiated. |
| Amounts: | based upon 75% of the values of the subject properties based on the MAI Appraisals:<br>For Tamerlane: $ 7,650,000<br>For Park Terrace: $ 1,575,000 |
| Rate developed: | The rate would have been fixed at 1.49% over the rate of the 10 year U.S. Treasury rate at the time the rate was locked. The rate spread was conservatively developed by using the high end of the immediate funding range of 125 basis points and by adding 24 additional basis points (2 per month) for a 12 month "forward". For purposes of this report I assumed that the rate was fixed on July 1, 2005 when the 10 year U.S. Treasury was 4.09%. The total rate indicated was 5.58% (1.49% + 4.09%) which is rounded up to 5.625% |
| Interest rate: | 5.625% |
| Term: | 10 year balloon |
| Amortization: | conservatively based upon a 25 year schedule |
| Annual Debt Service: | For Park Terrace East: $117,477.60 (coverage factor: 1.30x)<br>For Tamerlane: $570,605.64 (coverage factor: 1.26x) |
| Loan to close: | July 1, 2006 or earlier as, if or when 90% leasing was achieved at the projected market rents |
| Liability: | The loan would have been "non-recourse" except that Mr. Bart Axelrod (individual) would have been personally liable for any environmental concerns should they arise and for the typical "carveout" clauses such as committing a fraud, squandering the asset and similar. |

| **VII.** | **The financing and terms (con't):** |
|---|---|
| Monthly escrows: | for real estate taxes and insurance |
| Prepayment: | The loan, once closed, would have been closed to prepayment during the first 24 months of the loan. Thereafter, the loan could be prepaid at any time upon 30 days prior written notice for a "make whole" yield maintenance type premium based upon U.S. treasury rates at the time, with a 1% minimum and with no premium applicable during the last 60 days of the term. |
| Assumability: | The loan could be assigned to a purchaser, reasonably acceptable to the insurance company, at any time upon 30 days notice and for an assumption fee of 1.5% |
| Assignability: | The loan could be assigned to an interim lender and the insurance company would enter into a tri-partite ('buy-sell") agreement with the interim lender if so requested |
| Other: | the balance of the standard clauses for a mortgage of this type |

## VIII. Opinion:

It is my professional opinion, to a reasonable degree of certainty, that I could have provided financing on or about July 1, 2005 for each of the subject properties as shown in section VII of this report above.

## IX. Limitations:

The foregoing is my complete report.

After the date hereof should subsequent information be disclosed or should any of the representations and/or assumptions utilized and relied upon in any of my analysis be found to be unreliable, I reserve the right to amend, supplement or revise my conclusions and opinions as appropriate.

Respectfully submitted,

Bruce J. Cohn
November 30, 2007

**EXHIBIT 1**

**LIST OF DOCUMENTS REVIEWED**

1. Appraisal, Park Terrace East Apartments as of 07/01/05

2. Appraisal, Tamerlane Apartments as of 07/01/05

3. Pro-Gressive Mortgage Corp's history of 5 year, 10 year and 30 year U.S. Treasury rates between 01/01/05 and 09/29/05

4. NJPA Journal Real Estate Article of 06/10/05

5. NJPA Journal Real Estate Article of 09/23/05

6. Capital markets (CMBS) rate spread histories Jan 2001 to June 2007 prepared by CBRE/Melody Capital Markets

7. Published News Letter of Pro-Gressive Mortgage Corp. dated January 7, 2005

8. Redacted pages of insurance company commitments dated 05/03/05 and 06/07/05

9. Financial Statement of Mr. Bart Axelrod

10. Tamerlane cost material/Three Dimensions Architectural Group, Inc. 05/14/07 a.k.a. "The Fermano Report"

11. Rent Roll dated 08/2005 – Park Terrace East

12. Brochure Floor Plans of Tamerlane Apartments

13. Computer Calculated Debt Service Schedules

**EXHIBIT 2**

PRO-GRESSIVE MORTGAGE CORPORATION
999 OLD EAGLE SCHOOL ROAD - SUITE 101
WAYNE, PENNSYLVANIA 19087-1784
TEL: 610-687-9718 - FAX: 610-687-2161
E-MAIL: PROGRESSIVEMORTG@CS.COM

January 7, 2005

BRUCE J. COIN
DIRECTOR

**RE: NEWSLETTER**

Dear Friend,

2004 witnessed a strong residential sales and mortgage market nationwide. Commercial mortgage lenders had a good year but much of it was generated by refinancing existing loans. Interest rates reached historic "lows". The federal government continued to experience an increasing deficit caused by a number of factors including the tax reduction stimulus, the costs of funding its general budget, the Middle East troop deployment and homeland security and the Congress' unwillingness during a major election year to blunt the deficit by reducing and controlling spending in other areas.

Oil and gas prices skyrocketed then backed off modestly. As they permeate virtually every aspect of American life their full impact on increasing inflation cannot be discounted or explained away and OPEC is currently contemplating reducing world production. Steel prices and other building material prices rose dramatically as world wide demand for those products impacted costs in this country. Year end retail sales while "good" were not as strong as anticipated. The stock market had a good fourth quarter.

As summarized below, the 10-year benchmark treasury rate was again very reactionary to market and international news, "Fed" policy actions and statements and to pre and post presidential election conditions:

| Quarter: | 1st | 2nd | 3rd | 4th |
|---|---|---|---|---|
| High | 4.36% (Jan 2) | 4.86% (June 14) | 4.60% (July 27) | 4.40% (Dec 2) |
| Low | 3.68% (Mar 16) | 3.87% (Apr 1) | 3.98% (Sept 22) | 3.94% (Oct 22) |

Concerns about historically low treasury rates impacting foreign investment in American securities, an improving job market and inflation caused the Federal Reserve to increase short term interest rates five times by an aggregate of 1.25% while indicating that further increases are likely. Correspondingly, the Prime Rate increased from 4.00% to 5.25% (higher than treasuries) evidencing an overlooked 31% INCREASE. The economy is expanding. Inflation is a concern. In the past the "Fed" has permitted rapid inflation by delaying acting vigorously or has overreacted leading to economic downturn and recession. Their actions during 2005 will critically impact how our economy will perform throughout the balance of the Bush Administration's term.

As no one sector can be pinpointed as being a major engine to bring about strong economic growth the financial markets appear to be looking for direction. Currently they appear to only be receiving it from the "Fed" with its acknowledged "bias" toward more rate increases during 2005.

For the past 5 years long term commercial mortgage lenders have varied their mortgage rate spreads over treasuries to reflect competition from contemporaries as well as from alternative investments. 2004 was no different with spreads generally being lowered from early January levels through the end of the summer.

Generally the lowest "spreads" over treasuries, for typical 75% LTV, "non-recourse", 10-year balloon term, 25-year amortization loans, are offered by the insurance companies. Conduit/CMBS sources generally quote slightly higher spreads but readily offer 30-year amortizations as a competitive "offset." Apartments and real "AAA" credits continue to be preferred enabling such loans to secure the lowest rates and spreads as currently estimated below:

| Type of Security | Approximate Rate Spread Over Treasuries |
|---|---|
| A Rated or Better Credits: | .95% - 1.25% |
| Apartments: | 1.10% - 1.25% |
| Office; Flex & Industrial: | 1.45% - 1.65% |
| Anchored Retail | 1.25% - 1.50% |

As we enter the New Year the commercial mortgage industry offers many beneficial aspects but there are also some concerns confronting borrowers and lenders that plan on being active in the commercial mortgage market.

Insurance companies, banks, conduit/CMBS lenders, credit companies, mezzanine lenders and others will all be in the market. In a climate of rising interest rates the insurance companies and banks will enjoy a competitive advantage over conduit/CMBS lenders due to their ability to commit and offer to lock rate "prior to" receipt of third party reports. Unlike conduit/CMBS lenders these sources are also able to accommodate a borrower's future needs. However, conduit/CMBS underwriting will be more aggressive. Other negative CMBS considerations include their large reserve requirements; their prohibitive defeasance prepayment method and their inability to provide future funds.

New free standing retail, substantially pre-leased to be built properties and refinances will continue to dominate the local financing scene. The following types of financing will be available in 2005:

- Typical, standard, immediate funding mortgages.
- "Future" permanent take-outs, typically for only 12 months with exception to 18.
- Construction loans with convertible 3 to 5-year "mini-perms".
- Combination construction/permanent loan variations with an interest rate that is fixed for the life of the loan that is locked at or prior to construction closing.
- Institutional "joint venture" type financing for high-quality, value created/added transactions.
- Mezzanine equity financing without a lien on the real estate.
- Selective "tax frees" and customized financings.

The commercial real estate markets in our region should improve but remain somewhat in "equilibrium." Moderate demand in the apartment market will support selective new construction as evidenced by the strong Center City Philadelphia market. Most, but not all, office markets will improve but remain oversupplied as local vacancy levels of close to 15% will continue to discourage new office construction. The same appears to apply to major retail and industrial property markets. Individual investor purchases in the $3,000,000 - $20,000,000 price range will continue to be limited by the large cash down requirements and seller tax consequences.

Regionally, commercial loan demand should remain "soft" at least through the first half, particularly if rates increase as anticipated. Lender competition for good loans will exist but lenders will exhibit caution, in the office, hotel and industrial loan sectors, due to present vacancy levels. Financing for "to-be-built" properties, including the exceptional "spec" will be available. Significant pre-leasing and/or strong borrower equity and guarantees will be preferred or mandatory prerequisites to secure such financing.

Depending upon loan demand, as well as short-term Libor and long-term treasury rate movement, "rate spreads" should remain at current levels but could widen. In the past when treasury rates increased dramatically so did rate "spreads". Supply and demand will impact this. It is important for borrowers to recognize that the real interest rate offered, not the spread or other "rate formula," and when, not how, the rate can be "locked" is most important. This is very significant when interest rate increases appear imminent. An apparent 10-15 basis point rate spread "advantage" can quickly evaporate if treasury rates increase while one is waiting for receipt of the 3rd party reports before they can lock rate.

**Consistent with the above, Thrivent Financial, and Canada Life/Great West Life our correspondent life companies are looking to commit between $750 million and $1 billion and $250 million to $300 million respectively of permanent mortgages during 2005. <u>During the first half of 2005</u>, if you or a client are looking to acquire, build, expand or refinance, we believe that abundant mortgage funds at real long-term permanent rates in the 5.25% to 6.35% range should be available depending upon the loan request particulars and timing.**

As always, we hope the foregoing will aid your plans for 2005. If at anytime you feel that we can assist you, a friend or client, with financing, consultation, expert analysis or testimony, we would welcome a call or visit us at www.pro-gressivemortgage.com. Best wishes for a Happy and Prosperous New Year.

Sincerely,

Pro-Gressive Mortgage

U.S. TREASURY
# DAILY INTEREST RATES
2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 01-01-05 | | NEW YEARS DAY | |
| 01-03-05 | 3.63% | 4.21% | 4.81% |
| 01-04-05 | 3.71% | 4.28% | 4.87% |
| 01-05-05 | 3.69% | 4.28% | 4.86% |
| 01-06-05 | 3.69% | 4.26% | 4.82% |
| 01-07-05 | 3.71% | 4.26% | 4.82% |
| 01-10-05 | 3.74% | 4.28% | 4.82% |
| 01-11-05 | 3.69% | 4.25% | 4.80% |
| 01-12-05 | 3.69% | 4.21% | 4.74% |
| 01-13-05 | 3.67% | 4.19% | 4.70% |
| 01-14-05 | 3.70% | 4.21% | 4.72% |
| 01-17-05 | | Martin Luther King Holiday - CLOSED | |
| 01-18-05 | 3.73% | 4.22% | 4.73% |
| 01-19-05 | 3.71% | 4.17% | 4.64% |
| 01-20-05 | 3.70% | 4.19% | 4.68% |
| 01-21-05 | 3.65% | 4.16% | 4.67% |
| 01-24-05 | 3.64% | 4.11% | 4.59% |
| 01-25-05 | 3.70% | 4.17% | 4.64% |
| 01-26-05 | 3.74% | 4.21% | 4.68% |
| 01-27-05 | 3.69% | 4.15% | 4.61% |
| 01-28-05 | 3.70% | 4.14% | 4.60% |
| 01-31-05 | 3.69% | 4.12% | 4.57% |
| 02-01-05 | 3.70% | 4.14% | 4.59% |
| 02-02-05 | 3.75% | 4.18% | 4.60% |
| 02-03-05 | 3.69% | 4.09% | 4.48% |
| 02-04-05 | 3.68% | 4.07% | 4.46% |
| 02-07-05 | 3.68% | 4.05% | 4.40% |
| 02-08-05 | 3.65% | 4.04% | 4.42% |
| 02-09-05 | 3.60% | 4.02% | 4.42% |
| 02-10-05 | 3.63% | 4.07% | 4.49% |
| 02-11-05 | 3.70% | 4.08% | 4.46% |
| 02-14-05 | 3.69% | 4.09% | 4.48% |
| 02-15-05 | 3.67% | 4.09% | 4.49% |

# DAILY INTEREST RATES

2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 02-16-05 | 3.78% | 4.18% | 4.56% |
| 02-17-05 | 3.80% | 4.23% | 4.64% |
| 02-18-05 | 3.85% | 4.26% | 4.65% |
| 02-21-05 | | CLOSED PRESIDENT'S DAY | |
| 02-22-05 | 3.81% | 4.22% | 4.61% |
| 02-23-05 | 3.84% | 4.23% | 4.62% |
| 02-24-05 | 3.89% | 4.26% | 4.63% |
| 02-25-05 | 3.91% | 4.27% | 4.62% |
| 02-28-05 | 3.98% | 4.36% | 4.71% |
| 03-01-05 | 4.01% | 4.39% | 4.74% |
| 03-02-05 | 3.98% | 4.37% | 4.73% |
| 03-03-05 | 3.97% | 4.35% | 4.71% |
| 03-04-05 | 3.96% | 4.30% | 4.62% |
| 03-07-05 | 4.00% | 4.34% | 4.65% |
| 03-08-05 | 4.09% | 4.45% | 4.77% |
| 03-09-05 | 4.12% | 4.48% | 4.79% |
| 03-10-05 | 4.17% | 4.50% | 4.79% |
| 03-11-05 | 4.22% | 4.55% | 4.82% |
| 03-14-05 | 4.16% | 4.48% | 4.75% |
| 03-15-05 | 4.17% | 4.51% | 4.80% |
| 03-16-05 | 4.11% | 4.46% | 4.75% |
| 03-17-05 | 4.16% | 4.50% | 4.80% |
| 03-18-05 | 4.18% | 4.52% | 4.81% |
| 03-21-05 | 4.13% | 4.47% | 4.78% |
| 03-22-05 | 4.35% | 4.66% | 4.91% |
| 03-23-05 | 4.26% | 4.57% | 4.82% |
| 03-24-05 | 4.29% | 4.59% | 4.84% |
| 03-25-05 | 4.32% | 4.63% | 4.87% |
| 03-28-05 | 4.28% | 4.59% | 4.85% |
| 03-29-05 | 4.28% | 4.59% | 4.84% |
| 03-30-05 | 4.20% | 4.51% | 4.77% |
| 03-31-05 | 4.11% | 4.44% | 4.70% |

# DAILY INTEREST RATES

2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 04-01-05 | 4.12% | 4.45% | 4.72% |
| 04-04-05 | 4.11% | 4.45% | 4.74% |
| 04-05-05 | 4.08% | 4.42% | 4.72% |
| 04-06-05 | 4.08% | 4.44% | 4.75% |
| 04-07-05 | 4.15% | 4.50% | 4.79% |
| 04-08-05 | 4.14% | 4.46% | 4.74% |
| 04-11-05 | 4.03% | 4.35% | 4.67% |
| 04-12-05 | 4.00% | 4.34% | 4.65% |
| 04-13-05 | 4.00% | 4.35% | 4.67% |
| 04-14-05 | 3.93% | 4.30% | 4.65% |
| 04-15-05 | 3.85% | 4.22% | 4.58% |
| 04-18-05 | 3.91% | 4.27% | 4.60% |
| 04-19-05 | 3.90% | 4.25% | 4.57% |
| 04-20-05 | 3.91% | 4.25% | 4.58% |
| 04-21-05 | 3.91% | 4.25% | 4.59% |
| 04-22-05 | 3.93% | 4.25% | 4.56% |
| 04-25-05 | 3.92% | 4.23% | 4.53% |
| 04-26-05 | 3.89% | 4.21% | 4.53% |
| 04-27-05 | 3.86% | 4.18% | 4.50% |
| 04-28-05 | 3.89% | 4.21% | 4.52% |
| 05-02-05 | 3.86% | 4.18% | 4.50% |
| 05-03-05 | 3.86% | 4.17% | 4.49% |
| 05-04-05 | 3.83% | 4.18% | 4.61% |
| 05-05-05 | 3.84% | 4.17% | 4.59% |
| 05-06-05 | 3.97% | 4.28% | 4.62% |
| 05-09-05 | 3.94% | 4.25% | 4.60% |
| 05-10-05 | 3.89% | 4.19% | 4.53% |
| 05-11-05 | 3.91% | 4.21% | 4.54% |
| 05-12-05 | 3.83% | 4.13% | 4.49% |
| 05-13-05 | 3.80% | 4.11% | 4.47% |
| 05-16-05 | 3.83% | 4.13% | 4.49% |
| 05-17-05 | 3.75% | 4.06% | 4.43% |
| 05-18-05 | 3.79% | 4.08% | 4.41% |

# DAILY INTEREST RATES

2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 05-19-05 | 3.84% | 4.12% | 4.44% |
| 05-20-05 | 3.84% | 4.10% | 4.42% |
| 05-23-05 | 3.76% | 4.02% | 4.34% |
| 05-24-05 | 3.75% | 4.01% | 4.34% |
| 05-25-05 | 3.81% | 4.08% | 4.42% |
| 05-26-05 | 3.81% | 4.07% | 4.42% |
| 05-27-05 | 3.77% | 4.03% | 4.38% |
| 05-30-05 | | MEMORIAL DAY - CLOSED | |
| 05-31-05 | 3.70% | 3.95% | 4.28% |
| 06-01-05 | 3.65% | 3.90% | 4.24% |
| 06-02-05 | 3.58% | 3.82% | 4.15% |
| 06-03-05 | 3.72% | 3.96% | 4.26% |
| 06-06-05 | 3.71% | 3.92% | 4.21% |
| 06-07-05 | 3.69% | 3.91% | 4.19% |
| 06-08-05 | 3.75% | 3.97% | 4.25% |
| 06-09-05 | 3.78% | 3.99% | 4.26% |
| 06-10-05 | 3.83% | 4.06% | 4.35% |
| 06-13-05 | 3.85% | 4.08% | 4.37% |
| 06-14-05 | 3.89% | 4.13% | 4.44% |
| 06-15-05 | 3.89% | 4.12% | 4.41% |
| 06-16-05 | 3.86% | 4.08% | 4.37% |
| 06-17-05 | 3.88% | 4.11% | 4.39% |
| 06-20-05 | 3.89% | 4.11% | 4.38% |
| 06-21-05 | 3.77% | 3.98% | 4.27% |
| 06-22-05 | 3.74% | 3.97% | 4.26% |
| 06-23-05 | 3.72% | 3.95% | 4.24% |
| 06-24-05 | 3.69% | 3.91% | 4.21% |
| 06-27-05 | 3.72% | 3.93% | 4.22% |
| 06-28-05 | 3.71% | 3.93% | 4.20% |
| 06-29-05 | 3.72% | 3.96% | 4.25% |
| 06-30-05 | 3.73% | 3.94% | 4.21% |
| 07-01-05 | 3.88% | 4.09% | 4.35% |

## DAILY INTEREST RATES

2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 07-04-05 | | JULY 4th HOLIDAY | |
| 07-05-05 | 3.86% | 4.07% | 4.33% |
| 07-06-05 | 3.79% | 4.01% | 4.26% |
| 07-07-05 | 3.84% | 4.05% | 4.30% |
| 07-08-05 | 3.92% | 4.12% | 4.37% |
| 07-11-05 | 3.91% | 4.11% | 4.35% |
| 07-12-05 | 3.95% | 4.15% | 4.39% |
| 07-13-05 | 3.96% | 4.17% | 4.41% |
| 07-14-05 | 3.98% | 4.18% | 4.41% |
| 07-15-05 | 3.98% | 4.18% | 4.41% |
| 07-18-05 | 4.01% | 4.22% | 4.46% |
| 07-19-05 | 3.98% | 4.19% | 4.43% |
| 07-20-05 | 4.02% | 4.22% | 4.45% |
| 07-21-05 | 4.05% | 4.25% | 4.47% |
| 07-22-05 | 4.03% | 4.22% | 4.43% |
| 07-25-05 | 4.05% | 4.23% | 4.45% |
| 07-26-05 | 4.07% | 4.24% | 4.46% |
| 07-27-05 | 4.08% | 4.23% | 4.44% |
| 07-28-05 | 4.07% | 4.22% | 4.42% |
| 07-29-05 | 4.13% | 4.29% | 4.49% |
| 08-01-05 | 4.15% | 4.32% | 4.52% |
| 08-02-05 | 4.16% | 4.33% | 4.54% |
| 08-03-05 | 4.11% | 4.29% | 4.50% |
| 08-04-05 | 4.20% | 4.36% | 4.56% |
| 08-05-05 | 4.24% | 4.39% | 4.57% |
| 08-08-05 | 4.23% | 4.38% | 4.56% |
| 08-09-05 | 4.20% | 4.36% | 4.54% |
| 08-10-05 | 4.21% | 4.37% | 4.55% |
| 08-11-05 | 4.15% | 4.29% | 4.50% |
| 08-12-05 | 4.12% | 4.24% | 4.44% |
| 08-15-05 | 4.11% | 4.24% | 4.43% |
| 08-16-05 | 4.10% | 4.23% | 4.43% |

U.S. TREASURY
# DAILY INTEREST RATES

2005

| DATE 2005 | 5 YEAR NOTE | 10 YEAR NOTE | 30 YEAR BOND |
|---|---|---|---|
| 08-17-05 | 4.10% | 4.23% | 4.44% |
| 08-18-05 | 4.09% | 4.23% | 4.44% |
| 08-19-05 | 4.09% | 4.23% | 4.44% |
| 08-22-05 | 4.07% | 4.21% | 4.42% |
| 08-23-05 | 4.02% | 4.15% | 4.37% |
| 08-24-05 | 4.03% | 4.16% | 4.38% |
| 08-25-05 | 4.06% | 4.17% | 4.36% |
| 08-26-05 | 4.05% | 4.15% | 4.34% |
| 08-29-05 | 4.03% | 4.14% | 4.34% |
| 08-30-05 | 3.92% | 4.06% | 4.30% |
| 08-31-05 | 3.85% | 4.03% | 4.28% |
| 09-01-05 | 3.83% | 4.03% | 4.31% |
| 09-02-05 | 3.84% | 4.03% | 4.29% |
| 09-05-05 | | LABOR DAY | |
| 09-06-05 | 3.90% | 4.11% | 4.38% |
| 09-07-05 | 3.90% | 4.12% | 4.40% |
| 09-08-05 | 3.91% | 4.11% | 4.39% |
| 09-09-05 | 3.96% | 4.15% | 4.43% |
| 09-12-05 | 3.92% | 4.13% | 4.41% |
| 09-13-05 | 3.83% | 4.03% | 4.29% |
| 09-14-05 | 3.82% | 4.03% | 4.30% |
| 09-15-05 | 3.99% | 4.23% | 4.53% |
| 09-16-05 | 4.04% | 4.25% | 4.55% |
| 09-19-05 | 4.03% | 4.25% | 4.55% |
| 09-20-05 | 3.99% | 4.18% | 4.45% |
| 09-21-05 | 3.98% | 4.17% | 4.46% |
| 09-22-05 | 4.03% | 4.22% | 4.49% |
| 09-23-05 | 4.11% | 4.28% | 4.54% |
| 09-26-05 | 4.11% | 4.29% | 4.55% |
| 09-27-05 | 4.14% | 4.30% | 4.54% |
| 09-28-05 | 4.12% | 4.28% | 4.52% |
| 09-29-05 | 4.15% | 4.28% | 4.53% |

## Capital Markets eNews - Fixed Spread Range

(www.cbre.com/capitalmarkets)

| | PROPERTY TYPE | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Hotel | | Office | | Multi-Family | | Distribution/Warehouse | | Anchored Retail | | Strip Center | |
| DATE | Low Leverage | High Leverage | Lov Leverage | High Leverage | Low Leverage | High Leverage | Low Leverage | High Leverage | Low Leverage | High Leverage | Low Leverage | High Leverage |
| Beginning 2001 | 230 | 350 | 195 | 250 | 160 | 220 | 195 | 220 | 195 | 225 | 225 | 275 |
| Year End 2001 | 280 | 455 | 220 | 305 | 200 | 295 | 220 | 275 | 220 | 275 | 240 | 305 |
| Beginning 2002 | 280 | 455 | 220 | 305 | 200 | 295 | 220 | 275 | 220 | 275 | 240 | 305 |
| Year End 2002 | 225 | 350 | 150 | 225 | 130 | 170 | 150 | 215 | 150 | 215 | 165 | 240 |
| Beginning 2003 | 225 | 350 | 150 | 225 | 130 | 170 | 150 | 215 | 150 | 215 | 165 | 240 |
| October 31, 2003 | 225 | 315 | 150 | 225 | 120 | 190 | 140 | 210 | 140 | 220 | 175 | 240 |
| March 18, 2004 | 145 | 265 | 120 | 170 | 95 | 125 | 125 | 170 | 110 | 140 | 135 | 145 |
| Year End 2004 | 150 | 250 | 100 | 140 | 80 | 115 | 110 | 140 | 90 | 120 | 110 | 130 |
| Beginning 2005 | 130 | 210 | 90 | 140 | 80 | 115 | 110 | 130 | 80 | 120 | 100 | 130 |
| Year End 2005 | 130 | 210 | 80 | 120 | 70 | 110 | 85 | 130 | 75 | 110 | 85 | 130 |
| Beginning 2006 | 120 | 190 | 85 | 120 | 80 | 110 | 95 | 130 | 85 | 110 | 95 | 130 |
| Year End 2006 | 110 | 160 | 85 | 120 | 80 | 110 | 95 | 130 | 85 | 110 | 95 | 130 |
| Beginning 2007 | 100 | 125 | 85 | 110 | 80 | 100 | 95 | 130 | 85 | 100 | 90 | 120 |
| June 2007 | 115 | 130 | 105 | 115 | 100 | 115 | 105 | 120 | 105 | 115 | 110 | 125 |

### Hotel Spread




Year Begin/End 2001-2007

Hotel Low Leverage — Hotel High Leverage

### Office Spread




Year Begin/End 2001-2007

Office Lov Leverage — Office High Leverage

### Multi-Family Spread




Year Begin/End 2001-2007

Multi-Family Low Leverage — Multi-Family High Leverage

### Distribution/Warehouse Spread




Year Begin/End 2001-2007

Distribution/Warehouse Low Leverage
Distribution/Warehouse High Leverage

### Anchored Retail Spread




Year Begin/End 2001-2007

Anchored Retail Low Leverage — Anchored Retail High Leverage

### Strip Center Spread




Year Begin/End 2001-2007

Strip Center Low Leverage — Strip Center High Leverage

Source: Data extracted from CBRE|Melody Capital Markets eNews beginning in 2001-Current

Note: Data from 2001-2006 classified spreads as Low Leverage Class A vs. High Leverage Class B/C. As of October 2006 spreads represent Class A Low vs. High Leverage

CBRE CB RICHARD ELLIS | MELODY Capital Markets

[redacted]

VIA EMAIL

June 7, 2005

[redacted] Partners Limited
c/o Progressive Mortgage Corporation
The Woods, Suite 101
999 Old Eagle School Rd.
Wayne, Pennsylvania 19087
Attention: Bruce J. Coin

Ladies and Gentlemen,

We are pleased to advise you that [redacted] Insurance Company [redacted] ("Lender") has approved your request for a loan ("Loan") to be made to Borrower, as identified below, secured by a first priority mortgage lien on the real property described below, based on your representations to our correspondent, Progressive Mortgage Corporation ("Correspondent"). This commitment letter ("Commitment Letter"), when accepted by Borrower, shall constitute a bilateral contract between Lender and Borrower whereby Lender agrees to make the Loan to Borrower and Borrower agrees to accept the Loan from Lender, on the terms and conditions hereinafter set forth.

## A. Loan Terms.

1. **Lender's Loan Number:** [redacted]

2. **Borrowing Entity.** [redacted] Partners Limited, a Pennsylvania limited partnership, shall be the borrower of the Loan ("Borrower"), the general partners of which are and shall remain [redacted]

3. **Non-Recourse.** Except as provided herein, Borrower shall not be personally liable on the Loan and Lender shall look solely to the Property and other such security required hereby for repayment of principal and interest. Borrower and Indemnitor, as defined below, shall also be personally liable for any and all losses, costs, or damages incurred by Lender pursuant to Section B.1(e). Also, in the circumstances referred to in B.1(f) below, such parties may be fully liable under the Loan.

4. **Indemnitor.** [redacted] each individually, and Borrower (collectively, the "Indemnitor") shall indemnify Lender as provided herein.

5. **Purpose of Loan.** The purpose of the Loan is to refinance existing debt secured by a first priority mortgage lien on the Property.

6. **Loan Amount.** The Loan shall be in the principal amount of $1,425,000 ("Loan Amount").

7. **Interest Rate.** The rate of interest shall be 5.35%, payable monthly, in arrears ("Interest Rate").

8. **Default Interest Rate.** In the event Borrower defaults on any of its obligations under the Loan Documents, whatever the nature, the entire unpaid balance of principal of the Loan and all other amounts due and owing thereunder (exclusive of interest) shall bear interest at the Interest Rate

[redacted] Partners Limited
Loan Number [redacted]
June 7, 2005
Page 2

plus three percent (3%), per annum. Notwithstanding the foregoing, if Borrower fails to pay any and all amounts due under the terms of the Note on the maturity thereof, said unpaid amounts shall bear interest, per annum, at the greater of (a) the Interest Rate plus three percent (3%); or (b) 450 basis points over the yield on the on-the-run ten (10) year U.S. Treasury Note (as reported in The Wall Street Journal, or, if The Wall Street Journal is no longer published, some other similar daily financial publication of national circulation) on the date of maturity.

9. **Loan Term.** The term of the Loan ("Loan Term") shall be twenty-five (25) years from the first day of the month following the date the transaction contemplated by this Commitment Letter closes ("Closing").

10. **Amortization.** The Loan shall be amortized over a period of twenty-five (25) years.

11. **Property.** The Loan shall be secured by a first priority mortgage lien on the real property and all improvements thereon and interests therein located at [redacted] Pennsylvania [redacted] ("Property"). At or prior to Closing, Borrower shall provide Lender with a legal description of the Property which shall be satisfactory to Lender and Lender's legal counsel. Borrower hereby represents and warrants: (a) it owns the Property in fee simple absolute; (b) the Property is an appropriately zoned and accessible site of approximately 3.0 acres; (c) the Property is fully serviced by all necessary and appropriate utilities, including municipal sewer and water service; (d) the Property is comprised of four 2-story, garden-style apartment buildings ("Buildings") constructed in 1968, containing a total of 58 apartment units, 37 of which are 2 bedroom/1 bath apartments with 825 square feet and 21 of which are 1 bedroom/1 bath apartments with 575 square feet; (e) the Buildings are constructed of block with brick veneer, roofs are pitched with asphalt shingles, and flooring is carpeting over hardwood in living and bedroom areas and ceramic tile in remaining areas; (f) each apartment unit is equipped with a gas stove, refrigerator and through-wall air-conditioning unit; and (g) the Property includes 71 on-site paved parking spaces.

12. **Repayment.** At Closing, Borrower shall make an interest only payment to Lender, which shall be based on the per diem interest on the Loan Amount from the date Lender wires funds for Closing through the last day of the month in which Closing occurs. Beginning on the first day of the second month following Closing, Borrower shall pay Lender monthly installments of principal and interest in the amount of $8,623.56 ("Monthly Payment"), plus monthly deposits for the payment of real property taxes and insurance when due, and special assessments and ground rents, if applicable. Lender will apply each Monthly Payment: (a) first to late charges and other fees, costs and charges, if any, reimbursable to Lender as provided herein or in the Loan Documents, in such order as Lender determines in its discretion; (b) then to accrued interest; and (c) last to unpaid principal. Interest shall be calculated in arrears based upon a 360-day year consisting of twelve 30-day months. Lender may commingle tax and insurance deposits with Lender's other funds and the same shall not bear interest.

13. **Late Payment Charge.** Borrower shall pay a late payment charge for all payments not paid when due in accordance with the terms of the Note, as defined below, in the amount of 4% of the amount of the late payment. Borrower agrees and acknowledges that the late payment charge is reasonable, is calculated to reimburse Lender for its administrative costs incurred as a result of such late payment, and is not intended as a penalty.

[redacted]

[redacted] Life

VIA EMAIL

May 3, 2005

[redacted]
[redacted] Gardens Associates
c/o Progressive Mortgage Corporation
999 Old Eagle School Rd. Suite 101
Wayne, Pennsylvania 19087
Attention: Bruce Coin

Ladies and Gentlemen,

We are pleased to advise you that [redacted] Insurance Company [redacted] ("Lender") has approved your request for a loan ("Loan") to be made to Borrower, as identified below, secured by a first priority mortgage lien on the real property described below, based on your representations to our correspondent, Progressive Mortgage Corporation ("Correspondent").

**A. Loan Terms.**

1. **Lender's Loan Number:** [redacted]

2. **Borrowing Entity.** [redacted] Corporation, a Pennsylvania corporation, Trustee under Declaration of Trust dated March 18, 1982 for the sole benefit of [redacted] a Pennsylvania limited partnership, and [redacted] Associates shall be the borrower of the Loan (collectively, the "Borrower").

3. **Indemnitor.** [redacted] ("Indemnitor") shall continue to indemnify Lender as provided in the Existing Loan Documents, as defined below.

4. **Purpose of Loan.** The purpose of the Loan is to refinance existing debt secured by a first priority mortgage lien on the Property in favor of Lender under existing loan number [redacted] ("Existing Loan"). Borrower hereby acknowledges and agrees that the current outstanding principal balance of the Existing Loan after receipt and application of the April 1, 2005 payment, is $5,685,336.65.

5. **Loan Amount.** The Loan shall be in the principal amount of $6,500,000 ("Loan Amount").

6. **Interest Rate.** The rate of interest shall be 5.59%, payable monthly, in arrears ("Interest Rate"), in accordance with and on the conditions set forth in that certain rate lock letter agreement ("Rate Lock") between Lender and Borrower dated March 29, 2005.

7. **Default Interest Rate.** In the event Borrower defaults on any of its obligations under the Loan Documents, whatever the nature, the entire unpaid balance of principal of the Loan and all other amounts due and owing thereunder (exclusive of interest) shall bear interest at the Interest Rate plus three percent (3%), per annum. Notwithstanding the foregoing, if Borrower fails to pay any and all amounts due under the terms of the Note on the maturity thereof, said unpaid amounts shall bear interest, per annum, at the greater of (a) the Interest Rate plus three percent (3%); or (b)

[redacted]
[redacted]Associates
Loan Number [redacted]
May 3, 2005
Page 2

430 basis points over the yield on the on-the-run five (5) year U.S. Treasury Note (as reported in The Wall Street Journal, or, if The Wall Street Journal is no longer published, some other similar daily financial publication of national circulation) on the date of maturity.

8. **Loan Term.** The term of the Loan ("Loan Term") shall be five (5) years from the first day of the month following the date the transaction contemplated by this Commitment Letter closes ("Closing").

9. **Amortization.** The Loan shall be amortized over a period of thirty (30) years.

10. **Property.** The Loan shall be secured by a first priority mortgage lien on the real property and all improvements thereon and interests therein located at [redacted], Pennsylvania [redacted] ("Property"). *

11. **Repayment.** At Closing, Borrower shall make an interest only payment to Lender, which shall be based on the per diem interest on the Loan Amount from the date Lender wires funds for Closing through the last day of the month in which Closing occurs. Beginning on the first day of the second month following Closing, Borrower shall pay Lender monthly installments of principal and interest in the amount of $37,274.16 ("Monthly Payment"), plus monthly deposits for the payment of real property taxes and insurance when due, and special assessments and ground rents, if applicable. Interest shall be calculated in arrears based upon a 360-day year consisting of twelve 30-day months.

12. **Prepayment.** Upon 30 days prior written notice, Borrower may make full, but not partial, prepayment of the Loan. In such event, Borrower shall pay Lender the outstanding principal balance, all interest accrued thereon, all other fees, costs, and charges due Lender, and, if said prepayment occurs within twenty-four (24) months of Closing, the Premium, as defined in that certain Promissory Note made by Borrower in favor of Lender dated August 16, 1995, as amended from time to time. (NEGOTIATE NO PREMIUM LAST 12 MOS FOR SPREAD)

**B. Conditions Precedent to Closing.**

Lender's obligations under this Commitment Letter shall be subject to the satisfaction of all of the following conditions precedent to Closing.

1. **Modification Document.** Prior to Closing, Borrower shall continue all payment and performance obligations under the documents evidencing, securing and otherwise relating to the Existing Loan ("Existing Loan Documents"). The Loan shall be evidenced and secured by a modification agreement to the Existing Loan Documents as well as any other documents recommended and prepared by Lender's local counsel incorporating the terms and conditions set forth herein, and a legal opinion from each of Borrower's and Indemnitor's counsel, in form and content acceptable to Lender and Lender's counsel, each of which Borrower, Indemnitor, counsel for each, as appropriate, shall execute at or prior to Closing (collectively, the "Modification Documents").

2. **Entity Documents.** If Borrower or Indemnitor, or any entity comprising the same, is a corporation, limited liability company, partnership, trust, or any entity other than an individual or

[redacted]

* 35 YEAR OLD, 2 STORY, CENTRAL CORRIDOR GARDEN STYLE APARTMENT BUILDINGS - 144 UNITS 1BR, 2BR + 3BR

individuals, Borrower shall provide such documentation as required by Lender or its local counsel evidencing the qualification of signatories to execute the Loan Documents and said entity's formation, good standing, and capacity to engage in any transaction or business in connection with which the Loan is made.

3. **Title Insurance.** If Lender's local counsel so advises, the existing Loan Policy of Title Insurance issued by First American Title Insurance Company ("Title Company"), under Policy Number [redacted] ("Title Policy"), shall be down-dated by separate endorsement, which endorsement shall also insure the continuing validity, enforceability and first lien priority of the Open-End Mortgage, Security Agreement, Financing Statement and Assignment of Rents made by Borrower in favor of Lender dated August 16, 1995, as modified ("Title Endorsement"). Borrower hereby agrees to promptly cooperate in the delivery of same, at Borrower's sole cost and expense. The Title Endorsement shall be subject to the approval of Lender and Lender's legal counsel, including as to form, content, and permitted exceptions.

4. **Survey.** At least 15 days prior to Closing, and certified to a date no more than 45 days prior to Closing, Borrower shall provide Lender with triplicate originals of a current "as built" licensed engineer's or surveyor's survey of the Property and improvements thereon, satisfactory in form and content to Lender and the title insurer, and prepared and certified to Lender and the title insurer in accordance with ALTA/ACSM Land Title survey most current standards (see Schedule "A" attached). Lender will waive the requirement of a formal survey if, and only if, the Title Company will delete the survey matters pre-printed exceptions by endorsement or Canada Life and its local counsel are otherwise satisfied, in their sole discretion, that the Title Endorsement, acceptable in form and content to Lender and its local counsel, can be issued without a survey.

5. **Restrictions, Regulations, Zoning.** At least 15 days prior to Closing, Borrower shall provide evidence, satisfactory to Lender's legal counsel, that the Property (a) constitutes a legally subdivided parcel independent of any other parcel; (b) constitutes an independent tax parcel; (c) is in conformity with existing codes and ordinances, and Federal and state laws; (d) is properly zoned for its present use; and (e) in terms of the location and use of the Property, does not violate any covenants or restrictions affecting the Property.

6. **Handicap Access Laws.** Borrower and Indemnitor shall defend, indemnify and hold Lender harmless from and against any and all loss, damage, liability and expense (including attorney fees), which Lender may sustain as a result of or in connection with any violation or alleged violation of any handicap access laws, which Laws shall include the Fair Housing Amendments Act of 1988, the Americans with Disabilities Act of 1990, all rules and regulations from time to time in effect under either such law and all other laws, rules and regulations that may from time to time concern access to the Property.

7 **Financial Statements, Credit Reports, and UCC Searches.** At least 15 days prior to Closing, Borrower shall ensure that Lender is provided with a financial questionnaire (Schedule "B" attached), a credit report (including, without limitation, judgment, state and Federal tax liens, and bankruptcy searches), and UCC searches on Borrower and Indemnitor. Borrower and Indemnitor shall certify to Lender that their financial statements and financial questionnaires are true, complete, and correct. This information, in its entirety, shall be satisfactory in form and content to Lender.

Basic Amortization Schedule 1

| | |
|---|---|
| Amount of Loan: | $7,650,000.00 |
| Initial Periods (#): | 300 |
| Annual Rate (%): | 5.6250 |
| Periodic Payment: | $47,550.47 |
| Origination Date: | 11/29/2007 |
| 1st Payment Date: | 01/01/2008 |
| Payment Period: | Monthly |
| Compounding Period: | Monthly |
| Points (%): | 0.00 |
| Amortizing Method: | Normal |
| Rate Basis: | Ordinary |
| Loan Acceleration Method: | No Acceleration |
| Weekend Adjustment Method: | No Adjustment |
| Last Period Adjusting Method: | Increase Payment |
| Apply US Rule: | No |
| Last Day of Month Adjustment: | Adjust |

Prepared On: 11/29/2007 Basic Amortization Schedule 1 Page: 2

| #/YR | Date | Payment | Principal | Interest | Balance |
|---|---|---|---|---|---|
| Init/1 | 11/29/2007 | $2,385.41 | $0.00 | $2,385.41 | $7,650,000.00 |
| | *Annual Totals:* | *$2,385.41* | *$0.00* | *$2,385.41* | |
| | *Running Totals:* | *$2,385.41* | *$0.00* | *$2,385.41* | |
| 1/01 | 01/01/2008 | $47,550.47 | $11,691.09 | $35,859.38 | $7,638,308.91 |
| 2/01 | 02/01/2008 | $47,550.47 | $11,745.90 | $35,804.57 | $7,626,563.01 |
| 3/01 | 03/01/2008 | $47,550.47 | $11,800.96 | $35,749.51 | $7,614,762.05 |
| 4/01 | 04/01/2008 | $47,550.47 | $11,856.27 | $35,694.20 | $7,602,905.78 |
| 5/01 | 05/01/2008 | $47,550.47 | $11,911.85 | $35,638.62 | $7,590,993.93 |
| 6/01 | 06/01/2008 | $47,550.47 | $11,967.69 | $35,582.78 | $7,579,026.24 |
| 7/01 | 07/01/2008 | $47,550.47 | $12,023.78 | $35,526.69 | $7,567,002.46 |
| 8/01 | 08/01/2008 | $47,550.47 | $12,080.15 | $35,470.32 | $7,554,922.31 |
| 9/01 | 09/01/2008 | $47,550.47 | $12,136.77 | $35,413.70 | $7,542,785.54 |
| 10/01 | 10/01/2008 | $47,550.47 | $12,193.66 | $35,356.81 | $7,530,591.88 |
| 11/01 | 11/01/2008 | $47,550.47 | $12,250.82 | $35,299.65 | $7,518,341.06 |
| 12/01 | 12/01/2008 | $47,550.47 | $12,308.25 | $35,242.22 | $7,506,032.81 |
| | *Annual Totals:* | *$570,605.64* | *$143,967.19* | *$426,638.45* | |
| | *Running Totals:* | *$572,991.05* | *$143,967.19* | *$429,023.86* | |
| 13/02 | 01/01/2009 | $47,550.47 | $12,365.94 | $35,184.53 | $7,493,666.87 |
| 14/02 | 02/01/2009 | $47,550.47 | $12,423.91 | $35,126.56 | $7,481,242.96 |
| 15/02 | 03/01/2009 | $47,550.47 | $12,482.14 | $35,068.33 | $7,468,760.82 |
| 16/02 | 04/01/2009 | $47,550.47 | $12,540.65 | $35,009.82 | $7,456,220.17 |
| 17/02 | 05/01/2009 | $47,550.47 | $12,599.44 | $34,951.03 | $7,443,620.73 |
| 18/02 | 06/01/2009 | $47,550.47 | $12,658.50 | $34,891.97 | $7,430,962.23 |
| 19/02 | 07/01/2009 | $47,550.47 | $12,717.83 | $34,832.64 | $7,418,244.40 |
| 20/02 | 08/01/2009 | $47,550.47 | $12,777.45 | $34,773.02 | $7,405,466.95 |
| 21/02 | 09/01/2009 | $47,550.47 | $12,837.34 | $34,713.13 | $7,392,629.61 |
| 22/02 | 10/01/2009 | $47,550.47 | $12,897.52 | $34,652.95 | $7,379,732.09 |
| 23/02 | 11/01/2009 | $47,550.47 | $12,957.98 | $34,592.49 | $7,366,774.11 |
| 24/02 | 12/01/2009 | $47,550.47 | $13,018.72 | $34,531.75 | $7,353,755.39 |
| | *Annual Totals:* | *$570,605.64* | *$152,277.42* | *$418,328.22* | |
| | *Running Totals:* | *$1,143,596.69* | *$296,244.61* | *$847,352.08* | |
| 25/03 | 01/01/2010 | $47,550.47 | $13,079.74 | $34,470.73 | $7,340,675.65 |
| 26/03 | 02/01/2010 | $47,550.47 | $13,141.05 | $34,409.42 | $7,327,534.60 |
| 27/03 | 03/01/2010 | $47,550.47 | $13,202.65 | $34,347.82 | $7,314,331.95 |
| 28/03 | 04/01/2010 | $47,550.47 | $13,264.54 | $34,285.93 | $7,301,067.41 |
| 29/03 | 05/01/2010 | $47,550.47 | $13,326.72 | $34,223.75 | $7,287,740.69 |
| 30/03 | 06/01/2010 | $47,550.47 | $13,389.19 | $34,161.28 | $7,274,351.50 |
| 31/03 | 07/01/2010 | $47,550.47 | $13,451.95 | $34,098.52 | $7,260,899.55 |
| 32/03 | 08/01/2010 | $47,550.47 | $13,515.00 | $34,035.47 | $7,247,384.55 |
| 33/03 | 09/01/2010 | $47,550.47 | $13,578.35 | $33,972.12 | $7,233,806.20 |
| 34/03 | 10/01/2010 | $47,550.47 | $13,642.00 | $33,908.47 | $7,220,164.20 |
| 35/03 | 11/01/2010 | $47,550.47 | $13,705.95 | $33,844.52 | $7,206,458.25 |
| 36/03 | 12/01/2010 | $47,550.47 | $13,770.20 | $33,780.27 | $7,192,688.05 |
| | *Annual Totals:* | *$570,605.64* | *$161,067.34* | *$409,538.30* | |
| | *Running Totals:* | *$1,714,202.33* | *$457,311.95* | *$1,256,890.38* | |

Prepared For: Prepared By: Bruce Coin

This calculation was prepared by the FREE program Loan*Calculator! Plus.
It is not licensed for business use. You may download a copy at http://www.pine-grove.com.

**Basic Amortization Schedule 1**

| | |
|---|---|
| Amount of Loan: | $1,575,000.00 |
| Initial Periods (#): | 300 |
| Annual Rate (%): | 5.6250 |
| Periodic Payment: | $9,789.80 |
| Origination Date: | 07/01/2006 |
| 1st Payment Date: | 08/01/2006 |
| Payment Period: | Monthly |
| Compounding Period: | Monthly |
| Points (%): | 0.00 |
| Amortizing Method: | Normal |
| Rate Basis: | Ordinary |
| Loan Acceleration Method: | No Acceleration |
| Weekend Adjustment Method: | No Adjustment |
| Last Period Adjusting Method: | Increase Payment |
| Apply US Rule: | No |
| Last Day of Month Adjustment: | Adjust |

| #/YR | Date | Payment | Principal | Interest | Balance |
|---|---|---|---|---|---|
| Init/1 | 07/01/2006 | $0.00 | $0.00 | $0.00 | $1,575,000.00 |
| 1/01 | 08/01/2006 | $9,789.80 | $2,406.99 | $7,382.81 | $1,572,593.01 |
| 2/01 | 09/01/2006 | $9,789.80 | $2,418.27 | $7,371.53 | $1,570,174.74 |
| 3/01 | 10/01/2006 | $9,789.80 | $2,429.61 | $7,360.19 | $1,567,745.13 |
| 4/01 | 11/01/2006 | $9,789.80 | $2,440.99 | $7,348.81 | $1,565,304.14 |
| 5/01 | 12/01/2006 | $9,789.80 | $2,452.44 | $7,337.36 | $1,562,851.70 |
| | *Annual Totals:* | *$48,949.00* | *$12,148.30* | *$36,800.70* | |
| | *Running Totals:* | *$48,949.00* | *$12,148.30* | *$36,800.70* | |
| 6/01 | 01/01/2007 | $9,789.80 | $2,463.93 | $7,325.87 | $1,560,387.77 |
| 7/01 | 02/01/2007 | $9,789.80 | $2,475.48 | $7,314.32 | $1,557,912.29 |
| 8/01 | 03/01/2007 | $9,789.80 | $2,487.09 | $7,302.71 | $1,555,425.20 |
| 9/01 | 04/01/2007 | $9,789.80 | $2,498.74 | $7,291.06 | $1,552,926.46 |
| 10/01 | 05/01/2007 | $9,789.80 | $2,510.46 | $7,279.34 | $1,550,416.00 |
| 11/01 | 06/01/2007 | $9,789.80 | $2,522.22 | $7,267.58 | $1,547,893.78 |
| 12/01 | 07/01/2007 | $9,789.80 | $2,534.05 | $7,255.75 | $1,545,359.73 |
| 13/02 | 08/01/2007 | $9,789.80 | $2,545.93 | $7,243.87 | $1,542,813.80 |
| 14/02 | 09/01/2007 | $9,789.80 | $2,557.86 | $7,231.94 | $1,540,255.94 |
| 15/02 | 10/01/2007 | $9,789.80 | $2,569.85 | $7,219.95 | $1,537,686.09 |
| 16/02 | 11/01/2007 | $9,789.80 | $2,581.90 | $7,207.90 | $1,535,104.19 |
| 17/02 | 12/01/2007 | $9,789.80 | $2,594.00 | $7,195.80 | $1,532,510.19 |
| | *Annual Totals:* | *$117,477.60* | *$30,341.51* | *$87,136.09* | |
| | *Running Totals:* | *$166,426.60* | *$42,489.81* | *$123,936.79* | |
| 18/02 | 01/01/2008 | $9,789.80 | $2,606.16 | $7,183.64 | $1,529,904.03 |
| 19/02 | 02/01/2008 | $9,789.80 | $2,618.37 | $7,171.43 | $1,527,285.66 |
| 20/02 | 03/01/2008 | $9,789.80 | $2,630.65 | $7,159.15 | $1,524,655.01 |
| 21/02 | 04/01/2008 | $9,789.80 | $2,642.98 | $7,146.82 | $1,522,012.03 |
| 22/02 | 05/01/2008 | $9,789.80 | $2,655.37 | $7,134.43 | $1,519,356.66 |
| 23/02 | 06/01/2008 | $9,789.80 | $2,667.82 | $7,121.98 | $1,516,688.84 |
| 24/02 | 07/01/2008 | $9,789.80 | $2,680.32 | $7,109.48 | $1,514,008.52 |
| 25/03 | 08/01/2008 | $9,789.80 | $2,692.88 | $7,096.92 | $1,511,315.64 |
| 26/03 | 09/01/2008 | $9,789.80 | $2,705.51 | $7,084.29 | $1,508,610.13 |
| 27/03 | 10/01/2008 | $9,789.80 | $2,718.19 | $7,071.61 | $1,505,891.94 |
| 28/03 | 11/01/2008 | $9,789.80 | $2,730.93 | $7,058.87 | $1,503,161.01 |
| 29/03 | 12/01/2008 | $9,789.80 | $2,743.73 | $7,046.07 | $1,500,417.28 |
| | *Annual Totals:* | *$117,477.60* | *$32,092.91* | *$85,384.69* | |
| | *Running Totals:* | *$283,904.20* | *$74,582.72* | *$209,321.48* | |
| 30/03 | 01/01/2009 | $9,789.80 | $2,756.59 | $7,033.21 | $1,497,660.69 |
| 31/03 | 02/01/2009 | $9,789.80 | $2,769.52 | $7,020.28 | $1,494,891.17 |
| 32/03 | 03/01/2009 | $9,789.80 | $2,782.50 | $7,007.30 | $1,492,108.67 |
| 33/03 | 04/01/2009 | $9,789.80 | $2,795.54 | $6,994.26 | $1,489,313.13 |
| 34/03 | 05/01/2009 | $9,789.80 | $2,808.64 | $6,981.16 | $1,486,504.49 |
| 35/03 | 06/01/2009 | $9,789.80 | $2,821.81 | $6,967.99 | $1,483,682.68 |
| 36/03 | 07/01/2009 | $9,789.80 | $2,835.04 | $6,954.76 | $1,480,847.64 |
| 37/04 | 08/01/2009 | $9,789.80 | $2,848.33 | $6,941.47 | $1,477,999.31 |
| 38/04 | 09/01/2009 | $9,789.80 | $2,861.68 | $6,928.12 | $1,475,137.63 |

Prepared For: Prepared By: Bruce Coin

This calculation was prepared by the FREE program Loan*Calculator! Plus.
It is not licensed for business use. You may download a copy at http://www.pine-grove.com.