# Exhibit D

UNITED STATES DEPARTMENT OF AGRICULTURE
FARMERS HOME ADMINISTRATION

SECURITY AGREEMENT

I. THIS SECURITY AGREEMENT, dated May 14, 1981, is made between the United States of America, acting through the Farmers Home Administration ("Secured Party") and Park Terrace East Limited, a Pennsylvania Limited Partnership ("Debtor"), organized and existing under the laws of the State of Pennsylvania, maintaining an office in Montgomery County, Pennsylvania, whose post office address is 3874 Bradford Road Huntingdon Valley, Pennsylvania 19006.

II. Debtor is justly indebted to Secured Party as evidenced by one or more certain promissory note(s) or other instrument(s), all of which are herein called "note" (if more than one note is executed, the word "note" as used herein shall be construed as referring to each note singly or all notes collectively as the context may require) said note being executed by Debtor, being payable to the order of Secured Party in installments as specified therein, and authorizing acceleration of the entire indebtedness at the option of Secured Party upon any default by Debtor, and being further described as follows:

| Date of Instrument | Principal Amount | Annual Rate of Interest | Due Date of Final Installment |
|---|---|---|---|
| May 14, 1981 | $1,287,140.00 | 9% | May 13, 2031 |

The note evidences a loan to Debtor, and Secured Party, at any time, may assign the note and insure the payment thereof to any extent authorized by the Consolidated Farm and Rural Development Act, Title V of the Housing Act of 1949, or any other present or future act administered by the Secured Party.

It is the purpose and intent of this instrument that, among other things, at all times when the note is held by Secured Party, or in the event Secured Party should assign this instrument without insurance of the note, this instrument shall secure payment of the note; but when the note is held by an insured holder, this instrument shall not secure payment of the note or attach to the debt evidenced thereby, but as to the note and such debt shall constitute an indemnity security agreement to secure Secured Party against loss under its insurance contract by reason of any default by Debtor.

NOW THEREFORE, in consideration of said loan(s) and (a) at all times when the note is held by Secured Party, or in the event Secured Party should assign this instrument without insurance of the payment of the note, to secure the prompt payment of all existing and future indebtedness and liabilities of Debtor to Secured Party and of all renewals and extensions thereof and any additional loans or future advances to Debtor heretofore or hereafter made or insured by Secured Party under the then existing provisions of Subtitle A of the Consolidated Farm and Rural Development Act, Title V of the Housing Act of 1949, or any other present or future act administered by the Secured Party - all with interest, (b) at all times when the note is held by an insured holder, to secure performance of debtor's agreement herein to indemnify and save harmless Secured Party against loss under its insurance contract by reason of any default by Debtor, (c) in any event and at all times to secure the prompt payment of all advances and expenditures made by Secured Party, with interest, as hereinafter described, and the performance of every covenant and agreement of Debtor contained herein or in any supplementary agreement:

DEBTOR HEREBY GRANTS to Secured Party a security interest in and an assignment of its interest in the following collateral, including the proceeds thereof:

A. All contract rights, accounts receivable, general intangibles, and gross receipts now or hereafter in existence, including the proceeds thereof, derived from or pertaining to any and all activities of the Debtor in operating a rural rental housing project situate on the premises hereinafter described.

B. All ranges, refrigerators, washing machines, dryers, heating, air conditioning and other equipment pertaining to said rural rental housing project now owned or hereafter acquired, including all replacements of or substitutions therefor, and including, without limitation, the following:

| Quantity | Kind | Manufacturer | Type or Model No. | Year of Mfg. |
|---|---|---|---|---|
| 44 | Refrigerators | Kenmore | 69221 | 1980 |
| 44 | Ranges | Kenmore | 620 | " |
| 4 | Washing Machines | Kenmore | 24081 | " |
| 4 | Dryers | Commercial | 46081 | " |

Disposition of said collateral is not authorized hereby.

Any fixtures described above are affixed or are to be affixed to the following described real estate:

| Record Owner | Approximate No. of Acres | County & State | Location |
|---|---|---|---|
| Park Terrace East Limited | 4.109 | Berks, PA | 100 Maplewood ave Mohnton, PA 19540 |

III. DEBTOR WARRANTS, COVENANTS, AND AGREES THAT:

A. Debtor is the absolute and exclusive owner of the above-described collateral, and such collateral is free from all liens, encumbrances, security and other interest except (1) any existing liens, encumbrances, security or other interests in favor of Secured Party which shall remain in full force and effect, (2) any applicable statutory liens, and (3) other liens, encumbrances, security or other interests, as follows:

and Debtor will defend the collateral against the claims and demands of all other persons. Any reference to the above liens, encumbrances, security and other interests is for warranty purposes only and does not indicate their priority.

B. Statements contained in this Security Agreement and in Debtor's loan application and related loan instruments are true and correct.

C. Debtor will (1) use the loan funds for the purpose for which they were or are advanced, (2) comply with such operation and management plans as may be agreed upon from time to time by Debtor and Secured Party, (3) care for and maintain the collateral in a reasonable manner, (4) insure the collateral in such amounts and manner as may be required by Secured Party, and if Debtor fails to do so, Secured Party, at its option, may procure such insurance, (5) permit Secured Party to inspect the collateral at any reasonable time, (6) not abandon the collateral or encumber, conceal, remove, sell or otherwise dispose of it or of any interest therein, or permit others to do so, without the prior written consent of Secured Party, (7) not permit the collateral to be levied upon, injured or destroyed or its value to be impaired, and (8) maintain its legal existence.

D. Debtor will pay promptly when due all (1) indebtedness evidenced by the note and any indebtedness to Secured Party secured hereby, (2) rents, taxes, insurance premiums, levies, assessments, liens, and other encumbrances, and costs of lien searches and maintenance and other charges now or hereafter attaching to, levied on, or otherwise pertaining to the collateral or this security interest, (3) filing, or recording fees for instruments necessary to perfect, continue, service or terminate this security interest, and (4) fees and other charges now or hereafter required by regulations of the Farmers Home Administration.

E. If the note is insured by Secured Party, Debtor will indemnify and save harmless Secured Party against any loss by reason of any default by Debtor.

F. Whether or not the note is insured by Secured Party, Secured Party may at any time pay any other amounts required herein to be paid by Debtor and not paid by it when due, including any costs and expenses for the preservation or protection of the collateral or this security interest, as advances for the account of Debtor. All such advances shall bear interest at the rate borne by the note which has the highest interest rate.

G. All advances by Secured Party as described in this instrument, with interest, shall be immediately due and payable by Debtor to Secured Party without demand at the place designated in the latest note and shall be secured hereby. No such advance by Secured Party shall relieve Debtor from breach of its covenant to pay. Any payment made by Debtor may be applied on the note or any indebtedness to Secured Party secured hereby, in any order Secured Party determines.

H. In order to secure or better secure the aforesaid obligation or indebtedness, Debtor will execute and deliver to Secured Party at any time, upon demand, such additional security instruments on such real and personal property as Secured Party may require. With respect to the identification of accounts, contract rights, and general intangibles, Debtor will furnish Secured Party such information as it may require to identify in a manner satisfactory to Secured Party, all account debtors and contract or other obligors and the amount of the respective accounts receivable and contract or other obligations. Debtor will also furnish Secured Party such additional information as it may require from time to time to further identify all other items of collateral.

I. This instrument also secures the obligations and covenants of Debtor set forth in Debtor's Loan Resolution of March 15, 1981, which has previously been executed as a security agreement and which is hereby incorporated herein by reference and shall continue in effect as a security agreement.

J. Debtor will not discriminate, or permit discrimination, in the use or occupancy of the facilities financed in whole or in part with the proceeds of the note because of race, color, creed, sex or national origin.

K. Debtor hereby assigns to Secured Party any monies (but not in excess of the unpaid balance due hereunder) which may become payable under any insurance of the collateral, including return of unearned premiums, and directs any insurance company to make payments directly to the Secured Party to be applied to said unpaid balance and appoints Secured Party's, State Director for Farmers Home Administration as attorney-in-fact to endorse any draft. After default by Debtor or in accordance with written authorization of Debtor, Secured Party may, upon giving such notice as may be required by law, cancel said insurance and credit any premium refund within said unpaid balance.

L. Debtor will not increase the rent of any tenant without first giving public notice of the proposed increase, elicting tenant comment concerning the increase and submitting all comments together with a request for such increase to Secured Party in accordance with Secured Party's regulations.

IV. IT IS FURTHER AGREED THAT:

A. Until default Debtor may retain possession of the collateral.

B. Default shall exist hereunder if Debtor fails to perform or discharge any obligation or to pay promptly any indebtedness hereby secured or to observe or perform any covenants or agreements herein or in any supplementary agreement contained, or if any of Debtor's representations or warranties herein prove false or misleading, or upon the bankruptcy, insolvency or voluntary or involuntary dissolution or merger of Debtor. Upon any such default:

1. Secured Party, at its option, with or without notice as permitted by law, may (a) declare the unpaid balance on the note and any indebtedness secured hereby immediately due and payable, (b) enter upon the premises and take possession of, repair, improve, use and operate the collateral or make equipment unusable, for the purpose of protecting or preserving the collateral of this security interest, or preparing or processing the collateral for sale, (c) exercise any sale or other rights afforded by law; and (d) have the right at any time to notify the account debtors, or contract or other obligors of the security interest of Secured Party in, and of the assignment to Secured Party of the account, accounts receivable, contract rights, or general intangibles upon which the respective account debtors or contract or other obligors are liable to Debtor, and to notify such account debtors or contract or other obligors to make payment of such accounts receivable or contract or other obligations directly to Secured Party, and Secured Party shall also have the right to take control of the cash and other proceeds of any of Debtor's accounts receivable, contract rights, gross receipts, or general intangibles. The costs of collection and enforcement of the accounts receivable, contract rights or general intangibles shall be borne by the Debtor even though such expenses may have been incurred by Secured Party.

2. Debtor hereby (a) agrees to assemble the collateral and make it available to Secured Party at such time(s) and place(s) as designated by Secured Party, and (b) waives all notices, exemptions, compulsory disposition and redemption rights.

3. A default shall exist under any other security instrument held or insured by Secured Party and executed or assumed by Debtor on real or personal property. Likewise, default under any such other security instrument shall constitute default hereunder.

C. Proceeds from disposition of collateral shall be applied first on expenses of retaking, holding, preparing for sale, selling and the like, and for payment of reasonable attorneys' fees and legal expenses incurred by Secured Party; second to the satisfaction of prior security interests or liens to the extent required by law and in accordance with current regulations of the Farmers Home Administration; third to the satisfaction of indebtedness secured hereby; fourth to the satisfaction of subordinate security interests or liens to the extent required by law; fifth to any other obligations of Debtor owing to or insured by Secured Party; and sixth to Debtor. Any proceeds collected under insurance policies or condemnation awards shall be applied first on advances and expenditures made by Secured Party with interest, as hereinabove provided; second on the debt evidenced by the note, unless Secured Party consents in writing to their use by Debtor under Secured Party's direction for repair or replacement of the collateral; third on any other obligation of Debtor owing to or insured by Secured Party, and any balance shall be paid to Debtor unless otherwise provided in the insurance policies. Debtor will be liable for any deficiency owed to Secured Party after such disposition of proceeds of the collateral condemnation awards and insurance.

D. This Agreement is subject to the present regulations of the Secured Party and to its future regulations not inconsistent with the express provisions hereof.

E. If any provision of this Agreement is held invalid or unenforceable, it shall not affect any other provisions hereof, but this Agreement shall be construed as if it had never contained such invalid or enforceable provision.

F. The rights and privileges of Secured Party under this Agreement shall inure to the benefit of its successors and assigns. All covenants, warranties, representations, and agreements of Debtor contained in this Agreement shall bind Debtor's successors and assigns.

G. If at any time it shall appear to Secured Party that Debtor may be able to obtain a loan from a responsible cooperative or private credit source, at reasonable rates and terms for loans for similar purposes and periods of time, Debtor will, upon Secured Party's request, apply for and accept such loan in sufficient amount to pay the note and any indebtedness secured hereby.

H. Secured Party shall have the sole and exclusive rights as the secured party hereunder, including but not limited to the power to grant or issue any consent, release, subordination, continuation statement or termination statement, and no insured holder shall have any right, title, or interest in or to the security interest created by this Agreement or any benefits hereof.

I. Secured Party will make or insure future loans or advances to Debtor provided funds are available and the Debtor meets all then current requirements imposed by regulations of the Secured Party.

J. SECURED PARTY HAS INFORMED DEBTOR THAT DISPOSAL OF PROPERTY COVERED BY THIS SECURITY AGREEMENT WITHOUT THE CONSENT OF SECURED PARTY, OR MAKING ANY FALSE STATEMENT IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, MAY CONSTITUTE A VIOLATION OF FEDERAL CRIMINAL LAW.

IN WITNESS WHEREOF, the Borrower has caused this Security Agreement to be executed by its Partner(s) who hereunto set(s) his/their hand(s) and seal(s) as of the date first written above.

Park Terrace East Limited

By ______________________
Alvin Sigal General Partner

Signed, sealed and
delivered in the presence of:

______________________ (WITNESS)

**IN THE UNITED STATES
COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| TAMERLANE, LIMITED, PARK TERRACE LIMITED, PARK TERRACE EAST LIMITED, and MULLICA WEST, LIMITED,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | No. 05-677C<br>(Judge Christine O.C. Miller) |

**DECLARATION OF BART J. AXELROD, ON BEHALF OF TAMERLANE LIMITED, IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

Bart J. Axelrod deposes and states as follows:

1. I am President of Bala Realty Advisors, Inc. ("Bala"), the general partner of Tamerlane Investors, which is the general partner of Tamerlane Limited ("Tamerlane"), one of the plaintiffs in these proceedings. Bala has at all times relevant to the events in question been a general partner of Tamerlane. I am authorized to make this Declaration on behalf of Tamerlane in support of its motion for partial summary judgment as to liability.

2. In 1980 and 1982, Tamerlane made loans approved by the Farmer's Home Administration (the "FmHA" or the "Government") under the Section 515 housing program in connection with a 160 unit apartment building in Sicklerville, New Jersey. The loans had a twenty (20) year restriction on prepayment. The Tamerlane loans will not be fully liquidated until the end of their fifty (50) year term in 2032. Copies of the operative Tamerlane transaction documents are attached to this Declaration as Exhibits A-J respectively.

3. The Tamerlane project was acquired in or about 1982. At that time, it was generally known throughout the industry, and by myself, that prepayment of the loan and conversion to commercial multi-family housing at market rate rentals would be allowed upon the expiration of the restriction period. Prior to acquiring the project, I had specific discussions concerning the ability of Tamerlane to prepay the loan and convert the project to commercial multi-family residential use at market rate rentals upon the expiration of the restrictions. These discussions assured me that such prepayment and conversion would be permitted. These discussions took place with Alvin Segal (now deceased), a developer of two Section 515 properties (including Park Terrace East), Ralph Griffin, a developer of many Section 515 properties (including Tamerlane, the property owned by the other Moving Plaintiff), and Larry Isdaner, CPA (now deceased), a tax advisor. In addition, I had discussions to similar effect with representatives of the FmHA, although I do not recall the names of the persons with whom I spoke. In acquiring the property, Tamerlane relied upon knowledge that the loan could be repaid as soon as the restrictions expired, and that upon prepayment the project could be taken out of the Section 515 low income housing program operated by the Government and converted to commercial multi-family residential housing at market rate rent levels. In fact, I selected the project based on its location and with an eye toward a profitable conversion at the time it would be free of restrictions.

4. Suit was brought by Tamerlane on June 22, 2005. At the time, Tamerlane could have prepaid the loan and converted the project to commercial multi-family housing at market rate rentals. The value of the project, in relation to the amount needed to prepay the Government's loan and to fund any expenses incurred in converting the property for commercial multi-family housing at market rate rentals, was more than adequate to support financing from an institutional real estate lender.

5. Prior to 2002, the New Jersey Regional Office of the FmHA informed the partnership that due to the passage of restrictive legislation the Government would not allow the partnership to prepay its loan to the FmHA and leave the Section 515 housing program, and that the only alternative available was to elect "incentives." To get "incentives," the partnership was required to follow the prescribed steps in the regulations. In the face of the Government informing the partnership that it had no other alternative, Tamerlane obtained an equity loan in 2002. Copies of the operative equity loan transaction documents are attached to this Declaration as Exhibits K-M respectively.

6. As part of the fulfillment of the requirements of the "incentive" process, Tamerlane obtained evidence to show the Government that it was able to pay off the loan. That evidence was reflected in the letter of Michael I. Blank, Executive Vice President of Pinnacle Capital Group, dated November 14, 2000. A copy of this letter is attached hereto as Exhibit N. The Government accepted this evidence and approved the equity loan.

7. At the time of the equity loan, the Government determined it would not allow the Tamerlane project to leave the program because there did not exist an adequate supply of low income housing in the area. In fact, the Government will not allow the Tamerlane project to leave the program until 2032, when the Tamerlane loan indebtedness has been fully liquidated. This is based on what Government officials, such as Howard Henderson, Ernest Grunow and Jack Kauffman, told us in connection with Tamerlane itself and other 515 properties in which I have been involved. It is also based on my knowledge of the Government's actions in refusing to allow other projects to leave the program, particularly projects located in areas near metropolitan centers, such as the one where the subject property is located, in which development over time has resulted in the escalation of rent levels and made it more difficult for low income tenants to secure rental housing.

8. The Government has raised the affirmative defense of accord and satisfaction by reason of Tamerlane's entry into the equity loan. The inability to prepay the loan and convert the project to commercial housing at market rate rentals, which was the consequence of the Government's wrongful act, worked an economic hardship on Tamerlane and its partners. It resulted in locking in Tamerlane and its partners in an illiquid investment, frustrating the anticipated exit strategy from that investment, while affording Tamerlane and its partners at best barely a minimal, and in any event a sub-market, return on their investment. The incentive process was not voluntary but coercive, since the Government left Tamerlane no other alternative for relief but to seek incentives.

9. At the same time, there was no provision in any document with respect to the equity loan transaction that provided that Tamerlane would relinquish any rights to assert claims by reason of the Government's wrongful act. There was no agreement or understanding, as part of the equity loan transaction or otherwise, that Tamerlane would relinquish any legal rights to assert claims by reason of the Government's wrongful act. Nor was it Tamerlane's intention to relinquish any such rights, which it would not have done.

10. The facts set forth herein are based upon my personal knowledge and are true and correct.

11. I understand that the statements made herein are made subject to the penalties of 28 U.S.C. § 1746 relating to unsworn falsification to authorities.

BART J. AXELROD

Dated: November 30, 2007

# Exhibit A

LOAN AGREEMENT
(RRH LOAN TO A LIMITED PARTNERSHIP
OPERATING ON A LIMITED PROFIT BASIS)

1. Parties and Terms Defined. This agreement dated January 11, 1980 of the Tamerlane Limited, a Partnership, duly organized and operating under The uniform Limited Partnership Law as enacted and amended in the State of New (Authorizing State statute) Jersey N.J.S.A.42:2-1 et herein called "Partnership," whose post office address is Box 69B, R.D. #1, Mt. Laurel, NJ08054with the United States of America acting through the Farmers Home Administration, United States Department of Agriculture, herein called "the Government," is made in consideration of a loan, herein called "the loan," to Partnership in the amount of $ 1,498,000. made or insured, or to be made or insured, by the Government pursuant to sections 515 (b) and 521 (a) of the Housing Act of 1949. The loan may be insured by the Government for the benefit of the lender. The loan shall be used solely for the specific eligible purposes for which it is approved by the Government in order to provide rental housing and related facilities for eligible occupants, as defined by the Government in rural areas. Such housing and facilities and the land constituting the site as herein called "the housing." The indebtedness and other obligations of the Partnership under the note evidencing the loan, the related security instrument and related agreement are herein called the "loan obligations."

2. Execution of Loan Instruments. To evidence the loan, the Partnership shall issue a promissory note signed by general partner(s) for the amount of the loan, payable in installments over a period of 40 years, bearing interest at a rate, and containing other terms and conditions, prescribed by the Government. To secure the note or any indemnity or other agreement by the Government, the general partner(s) are to execute a real estate security instrument giving a lien upon the housing and upon such other real property of the Partnership as the Government shall require, including an assignment of the rents and profits as collateral security to be enforced in the event of any default by the Partnership, and containing other terms and conditions prescribed by the Government. The general partner(s) are to execute any

other security instruments and other instruments and documents required by the Government in connection with the making or insuring of the loan.

3. Equal Opportunity and Nondiscrimination Provisions. The Partnership will execute (a) any undertakings and agreements required by the Government pursuant to Executive Order 11063 regarding non-discrimination in the use and occupancy of housing, (b) Farmers Home Administration Form FmHA 400-1 entitled "Equal Opportunity Agreement," including an "Equal Opportunity Clause" to be incorporated in or attached as a rider to each construction contract the amount of which exceeds $10,000 and any part of which is paid for with funds from the loan, and (c) Farmers Home Administration Form FmHA 400-4, entitled "Nondiscrimination Agreement (Under Title VI, Civil Rights Act of 1964)," a copy of which is attached hereto and made a part thereof and any other undertakings and agreements required by the Government pursuant to lawful authority.

4. Supervised Bank Account. The proceeds of the Government loan and the amount of $ 0 to be contributed by the Partnership from its own funds and used for eligible loan purposes shall be deposited in a supervised bank account as required by the Government. Amounts of the Government loan in the supervised bank account exceeding $40,000 shall be secured by the depository bank in advance in accordance with U.S. Treasury Department Circular No. 176. As provided by the terms of the agreement creating the supervised bank account, all funds therein shall, until duly expended, collaterally secure the loan obligations. Withdrawals (or advances) from the supervised bank account by (or for) the Partnership shall be made only on checks (or statements and partial payment estimates) signed by a general partner and countersigned by the County Supervisor of the Farmers Home Administration, and only for the specific loan purposes approved in writing by the Government. The Partnership's share of any liquidated damages or other monies paid by defaulting contractors or their sureties shall be deposited in the supervised bank account to assure completion of the project. When all approved items eligible for payment with the Government loan funds are paid in full, any balance remaining in the supervised bank account shall be applied on the note as an "extra payment" as defined in the regulations of the Farmers Home Administration, and the supervised bank account shall be closed.

5. Accounts for Housing Operations and Loan Servicing. The Partnership shall establish on its books the following accounts, which shall be maintained so long as the loan obligations remain unsatisified: A General Fund Account, an Operation and Maintenance Account, a Debt Service Account, and a Reserve Account. Funds in said accounts shall be deposited in a bank or banks insured by the Federal Deposit Insurance Corporation, except for any portion invested in readily marketable obligations of the United States as authorized by section 9. The general partner(s) shall execute a fidelity bond with a surety company approved by the Government, in an amount not less than the estimated maximum amount of such funds to be held in said accounts at any one time. The United States of America shall be named as co-obligee, and the amount of the bond shall not be reduced without the prior written consent of the government. The Partnership in its discretion may at any time establish and utilize additional accounts to handle any funds not covered by the provisions of this agreement.

6. General Fund Account. By the time the Government loan is closed or interim funds are obtained to preclude the necessity for multiple advances of loan funds. whichever occurs first, the Partnership shall from its own funds deposit in the General Fund Account the amount of $ 29,960. . All income and revenue from the housing shall, upon receipt, be immediately deposited in the General Fund Account. The Partnership may also in its discretion at any time deposit therein other funds, not otherwise provided for by this agreement, to be used for any of the purposes authorized in sections 7, 8, or 9. Funds in the General Fund Account shall be used only as authorized in said sections and until so used shall be held by the Partnership in trust for the Government as security for the loan obligations.

7. Operation and Maintenance Account. Not later than the 15th of each month, out of the General Fund Account shall be transferred to the Operation and Maintenance Account sufficient amounts to enable the Partnership to pay from the Operation and Maintenance Account the actual, reasonable. and necessary current expenses, for the current month and the ensuing month, of operating and maintaining the housing not otherwise provided for. Current expenses may include, in addition to expenses occurring or becoming due monthly, monthly accumulations of proportionate amounts for the payments of items which may become due either annually or at irregular intervals, such as taxes, insurance

and normal repair and replacement of furnishings and equipment reasonably necessary for operation of the housing. Current expenses may also include initial purchase and installation of such furnishings and equipment with any funds deposited in the transferred from the General Fund account which are not proceeds of the loan or income or revenue from the housing.

8. Debt Service Account. Each month, immediately after the transfer to the Operation and Maintenance Account provided for in section 7, or after it is determined that no such transfer is called for, any balance remaining in the General Fund Account, or so much thereof as may be necessary, shall be transferred to the Debt Service Account until the amount in the Debt Service Account equals the amount of the next installment due on the loan: Funds in the Debt Service Account shall be used only for payments on the loan obligations and until so used, shall be held by the Partnership in trust for the Government as security therefor.

9. Reserve Account. (a) Immediately after each transfer to the Debt Service Account as provided in section 8, any balance in the General Fund Account shall be transferred to the Reserve Account. Funds in the Reserve Account may be used only as authorized in this agreement and until so used shall be held by the Partnership in trust as security for the loan obligations. Transfers at a rate not less than $ 10,640. annually shall be made to the Reserve Account until the amount in the Reserve Account reaches the sum of $ 106,640. and shall be resumed at any time when necessary, because of disbursements from the Reserve Account to restore it to said sum. Of such sum, at least 50 percent shall be maintained on a cash basis, referred to herein as the "cash reserve." After the cash reserve reaches the required 50 percent of said sum, all or any portion of the balance of said sum may, at the option of the Partnership, consist of an amount, referred to herein as the "prepayment reserve," by which the Partnership is "ahead of schedule" as defined in the regulations of the Farmers Home Administration. Funds in the cash reserve shall be deposited in a separate bank account or accounts insured by the Federal Deposition Insurance Corporation or invested in readily marketable obligations of the United States, the earnings on which shall accrue to the Reserve Account.

(b) With the prior consent of the Government, funds in the Reserve Account may be used by the Partnership--

(1) To meet payments due on the loan obligations in the event the amount in the Debt Service Account is not sufficient for the purpose.

(2) To pay costs of repairs or replacements to the housing caused by catastrophe or long-range depreciation which are not current expenses under section 7.

(3) To make improvements or extensions to the housing.

(4) For other purposes desired by the Partnership which in the judgment of the Government likely will promote the loan purposes without jeopardizing collectibility of the loan or impairing the adequacy of the security, or will strengthen the security, or will facilitate, improve, or maintain the orderly collectibility of the loan.

(5) To pay dividends to the partners of up to 8% per annum of the borrowers initial investment of $ 108,813.00 provided the Partnership determines that after such disbursement (a) the amount in the Reserve Account will be not less than that required by subsection 9 (a) to be accumulated by that time and (b) during the next 12 months the amount in the Reserve Account will be likely not fall below that required to be accumulated by the end of such period.

(c) Any amount in the Reserve Account which exceeds the aggregate sum specified in subsection 9 (a) and is not agreed between the Partnership and the Government to be used for purposes authorized in subsection 9 (b) shall be applied promptly on the loan obligations.

10. Regulatory Covenants. So long as the loan obligations remain unsatisfied, the Partnership shall--

(a) Impose and collect such fees, assessments, rents, and charges that the income of the housing will be sufficient at all times for operation and maintenance of the housing, payments on the loan obligations, and maintenance of the accounts herein provided for.

(b) If return on investment for any year exceeds 8 percent per annum of borrower's initial investment of $108,813.00 , the Government may require that the borrower reduce rents the following year and/or refund the excess return on investment to the tenants or use said excess in a manner that will best benefit the tenants.

(c) Maintain complete books and records relating to the housing's financial affairs, cause such books and records to be audited at the end of each fiscal year, promptly furnished the Government without request a copy of each audit report, and permit the Government to inspect such books and records at all reasonable times.

(d) If required or permitted by the Government, revise the accounts herein provided for, or established new accounts to cover the handling and disposition of income from and payment of expenses attributable to the housing or to any other property securing the loan obligations, and submit regular and special reports concerning the housing or financial affairs.

(e) Agreee that if any provisions of its organization documents or any verbal understandings in any conflict with the terms of this loan agreement, the terms of the loan agreeement shall prevail and govern.

(f) Unless the Government gives prior consent--

(1) Not use the housing for any purpose other than as rental housing and related facilities for eligible occupants.

(2) Not enter into any contract or agreement for improvements or extensnions to the housing or other property securing the loan obligations.

(3) Not change the membership by either the admission or withdrawal of the general partner(s) nor permit the general partner(s) to maintain less than a 5 percent financial interest in the organization nor cause or permit vountary dissolution of the Partnership nor cause or permit any transfer or encumbrance of title to the housing or any part thereof or interest therein, by sale, mortgage, lease, or otherwise.

(4) Not borrow any money, nor incur any liability aside from current expenses as defined in section 7 which would have a detrimental effect on the housing.

(g) Submit for the housing the following to the Government for prior review not less than 60 days before the effective dates, and for prior approval by the Government.

(1) Annual budgets and operating plans.

(2) Statements of management policy and practice, including eligibility criteria and implementing rules for occupancy of the housing.

(3) Proposed rents and charges and other terms of rental agreements with occupants and compensation to employees of the housing project.

(4) Rates of compensation to officers and employees of the Partnership payable from the chargeable to any account provided for in this agreement.

(h) If required by the Government, modify and adjust any matters covered by clause (g) of this section.

(i) Comply with all its agreements and obligaitons in or under the note, security instrument, and any related agreement executed by the Partnership in connection with the loan.

(j) Not alter, amend, or repeal without the Government's consent this agreement or the Parthersnip agreement, which shall constitute parts of the total contract between the Partnership and the Government relating to the loan obligation.

(k) Do other things as may be required by the Government in connection with the operation of the housing, or with any of the Partnership's operations or affairs which may affect the housing, the loan obligation, or the security.

(11) Refinancing the loan. If at any time it appears to the Government that the Partnership is able to obtain a loan upon reasonable terms and conditions to refinance the loan obligations then outstanding, upon request from the Government the Partnership will apply for, take all necessary actions to obtain, and accept such refinancing loan and will use the proceeds for said purpose.

(12) General Provisions. (a) It is understood and agreed by the Partnership that any loan made or insured will be administered subject to the limitations of the authorizing act of Congress and related regulations, and that any rights granted to the Government herein or elsewhere may be exercised by it in its sole discretion to carry out the purposes of the loan, enforce such limitations, and protect the Government's financial interest in the loan and the security.

(b) The provisions of this agreement are representations to the Government to induce the Government to make or insure a loan to the Partnership as aforesaid. If the Partnership should fail to comply with or perform any provision of the agreement or any requirement made by the Government pursuant to this agreement, such failure shall constitute default as fully as default in payment of amounts due on the loan obligations. In the event of such failure, the Government at its option may declare the entire amount of the loan obligations immediately due and payable and, if such entire amount is not paid forthwith, may take possession of and operate the housing and proceed to foreclose its security and enforce all other available remedies.

(c) Any provisions of this agreement may be waived by the Government in its sole discretion, or changed by agreement between the Government and the Partnership, after this agreement becomes contractually binding, to any extent such provisions could legally have been foregone or agreed to in amended form, by the Government initially.

(d) Any notice, consent, approval, waiver, or agreement must be in writing.

(e) This agreement may be cited in the security instrument and any other instruments as the "Loan Agreement of January 11, 1980 (date of this agreement), 19____."

Tamerlane Limited
PARTNERSHIP NAME

BY: