No. 05-677C
(Judge Christine O.C. Miller)

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

TAMERLANE, LIMITED, et. al,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY**

---

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEANNE E. DAVIDSON
Director

**Filed electronically**

SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

January 16, 2008

# TABLE OF CONTENTS

DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY . . . . . . . . . . . . . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issue Presented . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

I. The Prepayment Restrictions Created By ELIHPA Did Not Constitute A Repudiation Of The Prepayment Right Contained In Plaintiffs' Loan Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

II. Tamerlane's Acceptance Of An Incentive To Avert Prepayment Involved A Bilateral Modification Of the Contract Or, Alternatively, An Accord And Satisfaction, Precluding Recovery For Breach Of Contract . . . . . . . . . . . . 14

III. Tamerlane's Receipt Of An Incentive To Avert Prepayment Precludes It From Recovering For Anticipatory Breach . . . . . . . . . . . . . . . . . . . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

### CASES


Abatement Contracting Corp. v. United States,
58 Fed. Cl. 594 (2003) . . . . . . . . . . 15

Adams v. United States,
65 Fed. Cl. 195 (2005) . . . . . . . . . . 10

Alaska American Lumber Co., Inc. v. United States, 25 Cl. Ct. 518 (1992) . . . . . . . . 11

Allegre Villa v. United States,
60 Fed. Cl. 11 (2004) . . . . . . . . . . passim

C & H Commercial Contractors, Inc. v. United States,
35 Fed. Cl. 246 (1996) . . . . . . . . . . 15

Central Trust Co. v. Chicago Auditorium Association,
240 U.S. 581 (1916) . . . . . . . . . . 19

Chesapeake & Potomac Telephone Co. v. United States,
228 Ct. Cl. 101, 654 F.2d 711 (1981) . . . . . . . . . . 15

Cienega Gardens v. United States,
503 F.3d 1266 (Fed. Cir. 2007) . . . . . . . . . . 12, 13

Cities Serv. Helex, Inc. v. United States,
211 Ct. Cl. 222, 543 F.2d 1306 (1976) . . . . . . . . . . 19

Exxon Corp. v. United States,
931 F.2d 874 (Fed. Cir. 1991) . . . . . . . . . . 10

First Fed. Sav. Bank of Hegewisch v. United States,
52 Fed. Cl. 774 (2002) . . . . . . . . . . 9

Franconia Associates v. United States,
536 U.S. 129 (2002) . . . . . . . . . . passim

Franconia Assocs. v. United States,
61 Fed. Cl. 718 (2004) . . . . . . . . . . passim

General Dynamics Corp. v. United States,
214 Ct. Cl. 607, 558 F.2d 985 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Indiana Michigan Power Co. v. United States,
60 Fed. Cl. 639 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Montana Power Co. v. United States, 8 Cl. Ct. 730 (1985) . . . . . . . . . . . . . . . . . . . . . . 11

N. Star Steel Co. v. United States,
477 F.3d 1324 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Rumsfeld v. Freedom NY, Inc.,
329 F.3d 1320 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Starflight Boats v. United States,
48 Fed. Cl. 592 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Tamerlane, Ltd. v. United States,
76 Fed. Cl. 512 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Tech. for Communications Int'l v. United States, 22 Cl. Ct. 711 (1991) . . . . . . . . . . . . 9

Thomas Creek Lumber v. United States,
36 Fed. Cl. 220 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Vessels v. Secretary of Dept. of Health & Human Services,
65 Fed. Cl. 563 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

## STATUTES

42 U.S.C. § 1472(c)(4)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 1472(c)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 1472(c)(5)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

42 U.S.C. § 1472(c)(5)(G)(ii)(I) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1472(c)(5)(G)(ii)(II) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

42 U.S.C. § 1472(c)(5)(H) . . . . . . . . . . 9

42 U.S.C. § 1485 . . . . . . . . . . 2

42 U.S.C. § 1490a . . . . . . . . . . 2

Emergency Low Income Housing Preservation Act,
Pub. L. No. 100-242, 101 Stat. 1877 (1988) . . . . . . . . . . 1

Housing Act of 1949, §§ 515, 521 . . . . . . . . . . 2

Housing and Community Development Act of 1992,
Pub. L. No. 102-550, 106 Stat. 3672 (1992) . . . . . . . . . . 1

**REGULATIONS**

7 C.F.R. Part 1965, Subpart E (1998) . . . . . . . . . . 5

7 C.F.R. § 1965.213-214 . . . . . . . . . . 5

7 C.F.R. Part 3560 (2004) . . . . . . . . . . 5

7 C.F.R. § 3560.656-657 (2004) . . . . . . . . . . 5

**MISCELLANEOUS**

6 Corbin on Contracts §1276 (1962) . . . . . . . . . . 15

Restatement (Second) of Contracts § 250 (1979) . . . . . . . . . . 7

RCFC 56 . . . . . . . . . . 1

## INDEX TO APPENDIX

Letter from Bart Axelrod to USDA, Rural Development (December 27, 2000) . . . . . . . . . . . . . 1

Letters from USDA, Rural Development to Bart Axelrod (August 30, 2001) . . . . . . . . . . . . . . . 3

Letter from Bala Realty to State Director, Rural Development (September 6, 2001) . . . . . . . . . 7

Letters from State Director, Rural Development to Bart Axelrod (January 31, 2002), with enclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Letter from D. Mark Griffin to State Director, Rural Development (March 14, 2002), with enclosures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Settlement Statement (May 10, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Plaintiffs' Responses to Defendant's First Set of Interrogatories (excerpts) . . . . . . . . . . . . . 22

Deposition of Bart J. Axelrod (excerpts) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TAMERLANE, LIMITED, et. al, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 05-677C |
| | ) | (Judge Christine O.C. Miller) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT
AND OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims, defendant respectfully requests the Court to grant summary judgment dismissing the claims of plaintiffs Tamerlane, Limited ("Tamerlane") and Park Terrace East, Limited ("Park Terrace East"), upon the grounds that there are no genuine issues of material fact and that defendant is entitled to judgment as a matter of law. In support of our motion, we rely upon the pleadings, the following brief, the appendix to this motion, the separately filed proposed findings of uncontroverted fact, and portions of the appendix to plaintiffs' motion for partial summary judgment.[1]

## DEFENDANT'S BRIEF

### Issue Presented

Whether the Government is liable for breach of its loan agreements with plaintiffs as a result of the enactment of the Emergency Low Income Housing Preservation Act, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA"), and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) ("the 1992 Act").

[1] "Def. App." refers to the appendix to this motion. "Pl. App." refers to the appendix to plaintiff's' motion for partial summary judgment. "Pl. Br." refers to the brief in support of plaintiff's motion.

Statement Of The Case

Plaintiffs allege that they are property owners who entered into loan agreements with the Farmers Home Administration, United States Department of Agriculture ("FmHA"),[2] pursuant to sections 515 and 521 of the Housing Act of 1949, 42 U.S.C. § 1485, 1490a, to provide rental housing for low- and moderate-income persons. Complaint ¶¶ 1, 19. Plaintiffs allege that the Government breached these agreements, or effected a taking of plaintiffs' property without just compensation, through the enactment ELIHPA and the 1992 Act.

Specifically, the loan agreements contained various provisions designed to ensure the low-income affordability of the projects. These provisions included restrictions as to the tenants to whom the plaintiffs could rent, the rents plaintiffs could charge, and the profits plaintiffs could receive, as well as requirements regarding the maintenance and financial operations of each project. Complaint ¶ 17. In connection with these loan agreements, each plaintiff executed a promissory note and real estate mortgage. Complaint ¶ 18. According to plaintiffs, these documents also provided plaintiffs with the option of prepaying their mortgages, and thereby discontinuing the low-income affordability restrictions, at any time, Complaint ¶¶ 21-22, except that, in the case of loans into which plaintiffs entered after December 21, 1979, plaintiffs were required by the terms of the loan documents to maintain the low-income affordability of the housing for a 20-year period following the date of the loan. Complaint ¶ 7.

Plaintiffs complain that ELIHPA amended the Housing Act of 1949 to place restrictions upon the prepayment options available to housing project owners who had entered into

[2] The Rural Housing Service is the successor agency to the Farmers Home Administration. For purposes of this brief, "FmHA" refers to the Farmers Home Administration or the Rural Housing Service, where appropriate.

mortgages prior to December 21, 1979, Complaint ¶ 26, and that the 1992 Act extended these prepayment restrictions to loans made after that date. Complaint ¶ 31. Plaintiffs allege that this legislation repudiated the purported right of these FmHA loan program participants to prepay their loans and "terminate" their loan agreements at any time. Complaint ¶¶ 24, 31, 39. In Count One of their complaint, plaintiffs assert a claim for breach of contract, upon the theory that this legislation "anticipatorily repudiated the contract between the defendant and each of the plaintiffs," and that this "anticipatory repudiation has deprived and will deprive each plaintiff of its contractual right to terminate its contract at any time at its option . . . ." Complaint ¶ 50. In Count Two, plaintiffs allege that "defendant's conduct constitutes a taking of plaintiffs' properties for public use and requires payment to plaintiffs of just compensation under the Fifth Amendment to the U.S. Constitution." Complaint ¶ 53.

A dispositive motion is presently pending, in which we have sought dismissal of the claims of two of the plaintiffs – Park Terrace Limited ("Park Terrace") and Mullica West Limited ("Mullica") – as time-barred, and dismissal of the takings claims of all of the plaintiffs for failure to state a claim upon which relief may be granted. Plaintiffs Tamerlane and Park Terrace East have moved for partial summary judgment with respect to their breach of contract claims.

Plaintiffs' summary judgment motion rests principally upon the notion that the principal premise of their claim – that the enactment of ELIHPA and the 1992 Act constituted a repudiation of plaintiffs' contractual right to prepay their section 515 loans – has been definitively resolved in their favor by the decisions of this Court in Franconia Associates v. United States, 61 Fed. C1. 718 (2004), and Allegre Villa v. United States, 60 Fed. Cl. 11 (2004).

This Court is not bound, however, by its previous decisions in other cases. In this case, moreover, plaintiffs rely upon a theory of what constitutes a breach of the contract's prepayment clause that is different from the theory advanced in Franconia and Allegre Villa. And, the theory advanced in this case is inconsistent with the basis upon which a repudiation was found in those cases.

Further, when plaintiff Tamerlane applied to prepay its loan, the Government responded by offering Tamerlane an incentive – in the form of a third-party equity loan – to forego prepayment and remain in the section 515 program. Tamerlane accepted this offer. Under the terms of agreements into which Tamerlane and the Government entered in conjunction with the equity loan, Tamerlane gave up the right to be released from the section 515 program through prepayment of its section 515 loan. Alternatively, these agreements constituted an accord and satisfaction concerning Tamerlane's claimed prepayment right. And, although plaintiffs assert that these transactions were the result of coercion, there is no basis for this assertion. Finally, even assuming that Tamerlane reserved a right to prepay its section 515 loan after the expiration of the restrictions assumed in these transactions, and to sue in the event of a breach of that right, Tamerlane nevertheless gave up any right to treat the prepayment right as abrogated and to sue prior to an actual breach, because Tamerlane continues to enjoy the benefit of the equity loan, which it obtained by virtue of the prepayment right.

## STATEMENT OF FACTS

In 1980, Tamerlane received two 50-year section 515 loans from the FmHA, in the amounts of $1,498,000 and $1,875,800. Pl. App. 35, 44, 48, 57. In 1982, Tamerlane received a third 50-year section 515 loan, in the amount of $1,493,000. Pl. App. 78, 85. The loan

agreements provided that the loan proceeds were to be used to provide rental housing to tenants eligible under section 515. Pl. App. 35, 48, 78. All of these loans were secured by mortgages containing a provision that restricted the use of the housing to housing people eligible for occupancy pursuant to section 515 for a period of 20 years from the closing of the loan. Pl. App. 66, 98 (¶ 32 of 1980 mortgage and 1982 mortgage).

In 1981, Park Terrace East received a 50-year section 515 loan to provide rental housing to eligible tenants, in the amount of $1,287,140. Pl. App. 5, 9. Neither the mortgage securing this loan (Pl. App. 13-21) nor any of the other loan documents contained a provision restricting the use of the Park Terrace East project for any specific period. Pl. App. 4-29.

By letter of December 27, 2000, Tamerlane submitted to the Government a request for approval to prepay its loan by July 1, 2001. Def. App. 1-2. The Government did not refuse to accept prepayment. Def. App. 23, 28-34. Rather, on August 30, 2001, the Government responded with a "General Incentive Offer" pursuant to RD Instruction 1965-E, paragraph 1965.213,[3] outlining the kinds of incentives that were available to avert prepayment. Def. App. 4-6. By letter of September 6, 2001, Tamerlane accepted this offer, and specified the kinds of incentives it was interested in obtaining. Def. App. 7-8. On January 31, 2002, the Government made a specific incentive offer, Def. App. 9-16, "to consent to a junior lien or subordination that

---

[3] Prior to 2004, RD Instruction 1965-E was codified at 7 C.F.R. Part 1965, Subpart E (1998) Part 1965 has since been revised and recodified, as part of a general recodification of the applicable prepayment regulations. These regulations now appear in 7 C.F.R. Part 3560 (2004). The provision concerning incentive offers, formerly codified at 7 C.F.R. § 1965.213-214, now appear at 7 C.F.R. § 3560.656-657 (2004).

will allow for an equity loan from a third party . . . ." Def. App. 9, 13.[4] This offer included various details and conditions, including reamortization of the existing loans, Def. App. 9, 13, and a requirement to "execute a 'Restrictive Use Agreement' that will obligate you and any successors in title to restricting the use of the project to very-low, low, and moderate income tenants for a period of 20 years from the date the incentives are closed." Def. App. 10, 14. Tamerlane transmitted its acceptance of this offer in March 2002. Def. App. 17-19.

Pursuant to the terms of the incentive offer, Tamerlane obtained a third-party equity loan from Allegiance Bank of North America on May 10, 2002, in the principal amount of $1,849,725. Def. App. 20-21. On the same date, Tamerlane and the Government signed mortgage modification agreements reflecting the reamortization of the outstanding balances of Tamerlane's section 515 loans in accordance with the incentive package, Pl. App. 115-122, and, on June 1, 2002, Tamerlane and the Government entered into a new loan agreement concerning these loan balances, Pl. App. 110.

The mortgage modification agreements modified the mortgages on the section 515 loans to provide:

> The borrower and any successors in interest agree to use the housing for the purpose of housing people eligible for occupancy as provided in Section 514 or Section 515 of Title V of the Housing Act of 1949, as amended, and FmHA regulations then extant during this 20 year period beginning June 1, 2002 . Until June 1, 2022 [sic]. No eligible person occupying the housing shall be required to vacate, or any eligible person wishing to occupy shall be denied occupancy without cause. The borrower will be

[4] The offer was made in two separate letters dated January 31, 2002, one with respect to a 40-unit portion of the project, and one with respect to the remaining 120 units. The letters set the maximum amount of the third-party loans at $326,425 and $1,578,470, respectively. Def. App. 9, 13.

> released from these obligations before that date only when the Government determines that there is no longer a need for such housing, or that such other financial assistance provided to the residents of such housing will no longer be provided due to no fault, action or lack of action on the part of the borrower. A tenant or individual wishing to occupy the housing may seek enforcement of this provision, as well as the Government.

Pl. App. 115, 120. The June 1, 2002 loan agreement provided that the loan was to "be administered subject to the limitations of the authorizing act of Congress and related regulations," and that "[t]his loan agreement shall be subject to the present regulations of the Government and to its future regulations and provisions thereof." Pl. App. 112.

Park Terrace East did not apply to prepay its section 515 loan or communicate to the Government its desire to prepay the loan. Def. App. 35-36. Nor did Park Terrace East request or obtain an equity loan or other incentive to avert prepayment. Pl. App. 3.

## ARGUMENT

### I. The Prepayment Restrictions Created By ELIHPA Did Not Constitute A Repudiation Of The Prepayment Right Contained In Plaintiffs' Loan Documents

Repudiation "entails a statement or 'voluntary affirmative act' indicating that the promisor 'will commit a breach' when performance becomes due." Franconia Associates v. United States, 536 U.S. 129, 143 (2002), quoting Restatement (Second) of Contracts § 250 (1979). If a breach of plaintiffs' prepayment right would consist of a refusal to allow prepayment of section 515 loans at the request of the borrower, then ELIHPA cannot be characterized as a repudiation of that right. ELIHPA does not state that the Government must refuse to allow prepayment of such loans. Rather, it requires the Secretary of Agriculture to take certain steps before accepting an offer to prepay, in order to preserve the affordability of the housing for which the loan was given. And, far from expressing an intent to abrogate borrowers'

contract rights in order to achieve this goal, the statute provides that this goal is to be achieved principally through efforts to obtain the borrower's agreement.

Thus, the statute states:

> Before accepting any offer to prepay, or requesting refinancing in accordance with subsection (b)(3) of this section of, any loan made or insured under section 1484 or 1485 of this title pursuant to a contract entered into prior to December 15, 1989, the Secretary shall make <u>reasonable efforts to enter into an agreement with the borrower</u> under which the borrower will make a binding commitment to extend the low income use of the assisted housing and related facilities involved for not less than the 20-year period beginning on the date on which the agreement is executed.

42 U.S.C. § 1472(c)(4)(A) (emphasis added). In order to obtain such an agreement, the statute authorizes incentive offers to borrowers who offer to prepay and are able to do so, 42 U.S.C. § 1472(c)(4)(B). The statute also recognizes that agreement might not be achieved, and permits prepayment in certain circumstances, either subject to certain restrictions (if the borrower agrees to them), § 1472(c)(5)(G)(ii)(I), or without restrictions, § 1472(c)(5)(G)(ii)(II), depending upon the circumstances.

Finally, the statute states:

> (A) Offer to sell to nonprofit organizations and public agencies
>
> (i) In general
>
> If the Secretary determines after a reasonable period that an agreement will not be entered into with a borrower under paragraph (4), the Secretary shall require the borrower (except as provided in subparagraph (G)) to offer to sell the assisted housing and related facilities involved to any qualified nonprofit organization or public agency at <u>a fair market value</u> determined by 2 <u>independent appraisers</u>, one of whom shall be selected by the Secretary and one of whom shall be selected by the borrower. If the 2 appraisers fail to agree on the fair market value, the Secretary

> and the borrower shall jointly select a third appraiser, whose appraisal shall be binding on the Secretary and the borrower.
>
> (ii) Period for which requirement applicable
>
> If, upon the expiration of 180 days after an offer is made to sell housing and related facilities under clause (i), no qualified nonprofit organization or public agency has made a bona fide offer to purchase, the Secretary may accept the offer to prepay, or may request refinancing in accordance with subsection (b)(3) of this section of, the loan. This clause shall apply only when funds are available for purposes of carrying out a transfer under this paragraph.

42 U.S.C. § 1472(c)(5)(A) (emphasis added). The statute includes a funding authorization sufficient to finance the transfer of 5,000 units per fiscal year. 42 U.S.C. § 1472(c)(5)(H).

In sum, the prepayment provisions of ELIHPA do not preclude prepayment. They require Government efforts to avert prepayment by agreement, and, among the possible results that can flow from these efforts is acceptance of prepayment. Therefore, neither the enactment of ELIHPA nor the 1992 Act's extension of ELIHPA's prepayment restrictions to post-December 21, 1979 loans constituted an indication by Congress that the Government "will commit a breach" of the right to prepay.

In arguing that this legislation did constitute a repudiation of the prepayment right, plaintiffs rely entirely upon this Court's decisions in Franconia and Allegre Villa. These cases, however, are not dispositive here. As this Court has repeatedly observed, "the decisions of one judge of this Court have no binding effect on the other judges." Vessels v. Secretary of Dept. of Health & Human Services, 65 Fed. Cl. 563, 569 (2005), citing First Fed. Sav. Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 793 (2002); Tech. for Communications Int'l v. United States, 22 Cl. Ct. 711, 713 (1991). This is true even with respect to prior rulings of the same judge in the same case, absent subsequent appellate adoption of the rulings. Indeed, a

judge's ruling in one stage of a case is not binding upon the same judge or a successor judge at a later stage of the same case, absent incorporation of the ruling in an appellate decision in the interim. Exxon Corp. v. United States, 931 F.2d 874, 877-78 (Fed. Cir. 1991); Adams v. United States, 65 Fed. Cl. 195, 202 (2005).

Nor should Franconia and Allegre Villa be followed as persuasive. Both of these cases treated ELIHPA and the 1992 Act as an indication that the Government would breach plaintiffs' contracts, but both cases did so based upon a premise as to what constitutes a breach that is at odds with what plaintiffs contend would constitute a breach. According to these cases, the measures required by ELIHPA for averting prepayment by agreement, such as making incentive offers and following the procedures necessary for this purpose, are themselves a breach of borrowers' prepayment right, even if these measures result not in a refusal to allow prepayment but rather in acceptance of prepayment or in an agreement averting prepayment. [5] However, according to the theory that plaintiffs advance in opposition to the statute of limitation defense

---

[5] Both of these decisions rely, in part, upon dicta contained in the Supreme Court's opinion in Franconia concerning the nature of the prepayment right. These statements were made not in the context of deciding what plaintiffs' contractual rights actually were, but in the context of deciding whether the action was barred by the statute of limitations. The Court assumed the allegations of the complaint to be true for purposes of deciding this issue. Thus, the Court stated: "Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right petitioners allege, we reverse the Federal Circuit's judgment," 536 U.S. at 133 (emphasis added); "[f]or purposes of this case, the United States agrees, it may be assumed that petitioners obtained precisely the promise they allege – a promise that permits them an unfettered right to prepay their mortgages any time over the life of the loans, " id. at 141 (emphasis added); "[t]he Federal Circuit, we are persuaded, incorrectly characterized the performance allegedly due from the Government under the promissory notes." Id. at 142 (emphasis added). None of these observations constitute holdings concerning whether te plaintiffs possessed the contract right they alleged, whether the Government repudiated or breached that right, or any other issue on the merits. The merits were simply not before the Court.

against the claims of Mullica and Park Terrace, responding to a prepayment request with an incentive offer is not an actual breach, even though such a response differs from a simple acceptance of prepayment. An actual breach, according to this theory, occurs not when the Government takes the measures required by ELIHPA, but only when the Government finally refuses to accept prepayment. Plaintiffs cannot have it both ways; they cannot urge the Court to define a breach one way for statute of limitations purposes, and another way in deciding the merits.

Moreover, neither in Franconia nor Allegre Villa did the Court state that the plaintiffs' contracts precluded the Government from take steps to protect tenants from the harm that might result from prepayment, or that these steps could not properly include efforts to persuade the borrower voluntarily to keep the property in question in the section 515 program for a specified period of time, for example, by offering the borrower economic incentives to do so. Such efforts cannot in themselves be deemed a breach of contract. "Those who enter a contract may take steps at any time after its execution to modify it." General Dynamics Corp. v. United States, 214 Ct. Cl. 607, 617, 558 F.2d 985, 990 (1977); accord Alaska American Lumber Co., Inc. v. United States, 25 Cl. Ct. 518, 532 (1992); Montana Power Co. v. United States, 8 Cl. Ct. 730, 736 (1985). The Court's rulings in Franconia and Allegre Villa were based, rather, upon the implicit if not stated view that the measures required by ELIHPA were too onerous to characterize as simply a means to achieve an agreed modification of the parties' contractual relationship, and that these measures constituted a severe curtailment of the prepayment right. See, e.g., Franconia, 61 Fed. C1. at 725-28. However, in a recent discussion of takings claims based upon similar prepayment restrictions applicable to loans insured by the Department of Housing and

Urban Development ("HUD"), the United States Court of Appeals for the Federal Circuit has taken a different view of these restrictions. See Cienega Gardens v. United States, 503 F.3d 1266, 1282-87 (Fed. Cir. 2007). The court in Cienega Gardens observed:

> . . . As a practical matter LIHPRHA provided owners with two alternatives: (1) the right to sell the property at its fair market value or, if there was no offer or if HUD failed to provide financial assistance to the purchasers, the right to prepay the mortgage and eliminate the regulatory restrictions; or (2) entering into a use agreement with HUD under which HUD would provide financial incentives to the owner. See 12 U.S.C. §§ 4107, 4110 (2000).
>
> With respect to the first option, the owners here do not dispute that the opportunity for a fair market value sale would eliminate any takings claim. . . . Rather the owners complain that sale to qualified buyers was unlikely, that the sale process took time during which the rent and other restrictions remained in place, that appraisal value was not adjusted over the course of the two-year sale period, and that prepayment was not possible until the sale process was complete (and unsuccessful). However, any trouble finding a buyer only increased the probability that the owner would be able to prepay if a sale was not completed.
>
> Moreover, the sale process was not as time consuming as the plaintiffs assert. . . .
>
> * * *
>
> Alternatively, an owner could enter into a use agreement. The owner was required to file a "plan of action." 12 U.S.C. § 4107(a) (2000). This plan of action included the types of financial incentives requested. Id. § 4107(b)(1)(A)-(F). These incentives included the right to earn higher dividends, rent increases for current tenants, repair and capital improvement loans, and second mortgages. . . .
>
> The sale and use agreement options thus conferred considerable benefits on the owners. The major effect of the statute on an owner who did not elect to enter into a use agreement and wished to prepay was to keep the restrictions in place during the sale period which might expire near the prepayment date; to

> compel the owner to offer the property for sale at a fair market value; and, if there was no sale (and the owner prepaid the mortgage), to restrict rent increases for a three-year period. This sale option was plainly an available alternative because many owners in fact elected to sell their property. . . .

503 F.3d at 1284-286(footnotes omitted).

We recognize that the above-quoted discussion was in the context of a takings analysis rather than a breach of contract analysis, and that the prepayment provisions addressed there were not identical to those involved here. The Court's observations concerning the former, however, are also generally applicable to the latter, and support a far more benign characterization of the provisions involved here than that underlying this Court's rulings in Franconia and Allegre Villa. When viewed through the lense utilized by the Federal Circuit in Cienega Gardens, it is fair to characterize the measures required by ELIHPA as a genuine means of encouraging borrowers to keep their projects in the section 515 program voluntarily. And, viewed in this manner, the enactment of ELIHPA and the 1992 Act cannot be a repudiation of plaintiffs' prepayment right.

The absence of a repudiation does not mean that Tamerlane and Park Terrace East would be unable to sue for a breach of contract if and when they could establish an actual breach. But they do not claim that an actual breach has occurred yet. Plaintiffs have retreated from the allegation in their complaint that "[t]he Government has in every instance refused to accept prepayment from plaintiffs pursuant to the provisions of their contracts." Complaint ¶ 41. They do not contend that the Government refuse to accept prepayment when Tamerlane applied to prepay, and it is undisputed that Park Terrace East never attempted to prepay. Def. App. 23, 28-34; Pl. App. 3. Because there has been neither a repudiation nor an actual breach of their

asserted contract right, the Government is not liable to Tamerlane or Park Terrace East for breach of contract.

II. Tamerlane's Acceptance Of An Incentive To Avert Prepayment Involved A Bilateral Modification Of the Contract Or, Alternatively, An Accord And Satisfaction, Precluding Recovery For Breach Of Contract

When plaintiff Tamerlane applied to prepay its loan, the Government responded by offering Tamerlane an incentive – in the form of a third-party equity loan – to forego prepayment and remain in the section 515 program. Tamerlane accepted this offer, and received the equity loan. Def. App. 1-21. In conjunction with the equity loan transaction, Tamerlane and the Government entered into a new loan agreement concerning the outstanding balances of Tamerlane's section 515 loans. This loan agreement – dated June 1, 2002 – provided that the loan was to "be administered subject to the limitations of the authorizing act of Congress and related regulations," and that "[t]his loan agreement shall be subject to the present regulations of the Government and to its future regulations and provisions thereof." Pl. App. 112. The incentive package pursuant to which the equity loan and the June 1, 2002 loan agreement were transacted were authorized by ELIHPA. And, the "present regulations of the Government and . . . its future regulations" to which this loan agreement was subject included the regulations governing prepayment which were in effect in June 1, 2002 and at the time this suit was commenced.

Thus, by the time this suit was filed, the allegedly repudiated prepayment right had been modified by agreement of the parties. By that time, Tamerlane no longer possessed grounds to sue for repudiation, even if the contract had been repudiated. "[R]epudiation 'give[s] the promisee the right of electing either to . . . wait till the time for [the promisor's] performance has

arrived, or to act upon [the renunciation] and treat it as a final assertion by the promisor that he is no longer bound by the contract.'" Franconia, 536 U.S. at 143, quoting Roehm v. Horst, 178 U.S. 1, 13(1900). To treat a repudiation as "as a final assertion by the promisor that he is no longer bound by the contract" cannot be a basis for a claim when the promisor is truly no longer bound by the contract provision in question, as a result of a superseding agreement of the parties.

In the alternative, Tamerlane's claim is barred by the doctrine of accord and satisfaction. This doctrine is "'one of the recognized methods of discharging and terminating an existing right as set forth in a preexisting contract; it constitutes a perfect defense in an action for the enforcement of a previous claim, regardless of the merits of such a claim." Abatement Contracting Corp. v. United States, 58 Fed. Cl. 594, 607 (2003), quoting Thomas Creek Lumber v. United States, 36 Fed. Cl. 220, 237(1996), citing Chesapeake & Potomac Telephone Co. v. United States, 228 Ct. Cl. 101, 108, 654 F.2d 711, 716 (1981), quoting 6 Corbin on Contracts § 1276 (1962) (internal quotation marks omitted). Further, "'[i]t is also well established that ordinarily an executed bilateral contract modification that contains no reservations constitutes an accord and satisfaction of a claim.'" Starflight Boats v. United States, 48 Fed. Cl. 592, 598 (2001) quoting C & H Commercial Contractors, Inc. v. United States, 35 Fed. Cl. 246, 252 (1996). See also the cases cited in plaintiffs' moving brief concerning accord and satisfaction.

Plaintiffs assert that the equity loan transaction did not involve an accord and satisfaction, because it was coerced. We agree that a coerced agreement would not give rise to an accord and satisfaction. There is no basis, however, for plaintiffs' characterization of the equity loan transaction as coerced. As this Court observed in rejecting the claims of duress raised by Mullica and Park Terrace in connection with the equity loans that they received,

> [W]hile plaintiffs contend that they entered into the agreements under duress, they cannot meet the requirements of this legal theory. "To render a contract unenforceable for duress, a party must establish (1) that it involuntarily accepted the other party's terms, (2) that circumstances permitted no other alternative, and (3) that such circumstances were the result of the other party's coercive acts."

Tamerlane, Ltd. v. United States, 76 Fed. Cl. 512, 522 (2007), quoting N. Star Steel Co. v. United States, 477 F.3d 1324, 1334 (Fed. Cir. 2007) (citing Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320, 1329 (Fed. Cir. 2003)). Under these criteria, the Court found no evidence to support the claim of duress raised by Mullica and Park Terrace, and the same conclusion is warranted as to Tamerlane. The facts plaintiffs cite to establish coercion here demonstrate nothing more than the fact that Tamerlane considered obtaining the equity loan to be more economically advantageous than not obtaining it. But, it remained at all times free to forego this incentive. Indeed, it is undisputed that Park Terrace East did not request nor obtain an equity loan or other incentive. Pl. App. 3. Plaintiffs have offered no facts indicating that Tamerlane was any less free than Park Terrace East to forego this incentive. The only specific factual contention they offer in this regard is that is that Tamerlane's "inability to prepay the loan . . . resulted in locking in Tamerlane and its partners in an illiquid investment . . . ." Pl. Br. 10. But, to the extent that this is true, it is equally true of section 515 borrowers generally – including all of those who did not seek incentives. Tamerlane was no more coerced to accept incentives than any of the borrowers who chose not to do so.[6]

---

[6] It should be noted that Tamerlane's equity loan was not merely a lesser form of the benefit Tamerlane might have obtained through prepayment. Because debt service on loans secured by a section 515 project is a cost of operating the project, and because the section 515 program allows a fixed return to owners, an increase in debt service costs can be passed on to tenants in (continued...)

Plaintiffs quote out of context a passage from this Court's decision in Franconia, in which the Court discussed the potential disadvantages of accepting incentives. Pl. Br. 10-11, quoting Franconia, 61 Fed. Cl. at 746, n.7. This passage, however, appeared in the context of the Court's explanation of why the many plaintiffs who did not obtain incentives were not required to do so as a means of mitigating damages. In the same discussion, the Court also observed that "a plaintiff's acceptance of [incentives in lieu of prepayment] could well have been construed as abandoning its rights under the first contracts via some rescission, compromise, or accord and satisfaction." 61 Fed. Cl. at 745. This observation, if anything, supports the argument that Tamerlane, which did obtain incentives, thereby did " abandon[] its rights under the first contracts via [a] rescission, compromise, or accord and satisfaction."

Finally, plaintiffs argue that the incentive transaction was not an accord and satisfaction because

> [t]he government did not place language in the documents creating a waiver of any rights or a release of any claims. Nor was there any meeting of the minds to that effect. The fact that incentives partnerships could recover in Franconia proves that no document exists to relinquish rights. Absent an agreement on the relinquishment of rights, no rights were relinquished.

---

[6](...continued)
the form of rent increases, because rents are below market and the rent of lower income tenants is generally subsidized by the Government through rental assistance payments. But, if Tamerlane had prepaid its section 515 loan, begun charging market rents, and then obtained a conventional equity loan, it would have had to bear the expense of repaying the equity loan. The law of supply and demand would have prevented Tamerlane from recovering this cost through rent increases, since the rents would already have been at market levels. Therefore, Tamerlane's equity loan provided advantages that would not have been available if Tamerlane had prepaid its section 515 loan.

Pl. Br. 11 (emphasis in original). However, the incentive transaction simply makes no sense if is construed as leaving the borrower with a right to sue for breach of the prepayment right. Borrowers well understood that if the Government wished merely to keep them in the section 515 program while remaining subject to liability for breach of contract, it would have had no need to offer incentives; it could simply have refused to accept prepayment. The incentives offered were consideration for the borrower's foregoing prepayment without the Government's incurring liability for breach. Nor is there any significance to the fact that some of the plaintiffs in Franconia received incentives and yet were not precluded from recovery upon that basis. In Franconia, as the Court noted, the Government simply did not raise an argument that receipt of incentives precluded recovery, whether by "rescission, compromise, or accord and satisfaction." 61 Fed. Cl. at 745.

## III. Tamerlane's Receipt Of An Incentive To Avert Prepayment Precludes It From Recovering For Anticipatory Breach

Even assuming that Tamerlane reserved a right to prepay its section 515 loan after the expiration of the restrictions assumed in these transactions, and to sue in the event of a breach of that right, Tamerlane nevertheless gave up any right to treat the prepayment right as abrogated and to sue prior to an actual breach, because Tamerlane continues to enjoy the benefit of the equity loan, which it obtained by virtue of the prepayment right. By foregoing or postponing the exercise of its prepayment right in return for an incentive to avert prepayment, Tamerlane in effect invoked its prepayment right, by trading its exercise for an alternative benefit available only to borrowers who possessed such a right. To assert a claim for future damages based upon an anticipatory breach, however, a plaintiff must treat the repudiation as a total breach, i.e., the contract right must be treated as terminated and replaced with a claim for breach damages. See

Central Trust Co. v. Chicago Auditorium Association, 240 U.S. 581, 589 (1916) ("where a party bound by an executory contract repudiates his obligations . . . the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by such anticipatory breach"); Cities Serv. Helex, Inc. v. United States, 211 Ct. Cl. 222, 234, 543 F.2d 1306, 1313 (1976) ("If he decides to close the contract and so conducts himself, both parties are relieved of their further obligations and the injured party is entitled to damages to the end of the contract term . . . . If he elects instead to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach"); Indiana Michigan Power Co. v. United States, 60 Fed. Cl. 639, 641 (2004) ("Plaintiff cannot claim future damages in a partial breach case").

Despite the alleged repudiation of the contact right to prepay, Tamerlane did not treat that right as at an end, and as having been replaced with a claim for damages. Had it done so, it could not have obtained the incentive. Incentives under ELIHPA were authorized, after all, for borrowers seeking to exercise their prepayment right, not to those who already deemed their prepayment right abrogated and replaced with a claim for damages. Therefore, Tamerlane cannot maintain an action for anticipatory breach or repudiation.

## CONCLUSION

For the foregoing reasons, the motion of Tamerlane and Park Terrace East for summary judgment as to liability should be denied, and summary judgment should be entered in favor of the Government, dismissing the claims of these plaintiffs.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

**s/Jeanne E. Davidson**
JEANNE E. DAVIDSON
Director

**Filed electronically**

**s/Shalom Brilliant**
SHALOM BRILLIANT
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8275
Facsimile: (202) 305-7643

Attorneys for Defendant

January 16, 2008